NELSON P. COHEN
United States Attorney

FRANK V. RUSSO
THOMAS C. BRADLEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
(907) 271-5071
(907) 271-1500 (fax)
frank.russo@usdoj.gov
thomas.bradley@usdoj.gov

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:06-cr-00041-RRB |
| | ) | |
| Plaintiff, | ) | |
| | ) | **OPPOSITION TO MOTION** |
| vs. | ) | **TO SUPPRESS** |
| | ) | **ELECTRONIC** |
| THOMAS P. RANES, | ) | **SURVEILLANCE EVIDENCE** |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW the United States of America, by and through undersigned

counsel, and hereby responds in opposition to defendant Ranes' motion, filed at

docket 419 under seal, to suppress evidence pertaining to electronic surveillance

evidence obtained by the United States[1].  The motion lacks merit, as the United

---

[1] Defendant Shine has joined the motion.

States fully satisfied the "exhaustion" requirement contained in 18 U.S.C.

§ 2518(3)(c).  No <u>Franks</u> hearing is necessary, as the defendant does not come

close to making a substantial preliminary showing that there were material

misstatements or omissions in the affidavit in support of the wiretap order.

## I.    <u>INTRODUCTION</u>

### A.    <u>The Indictment</u>

By indictment dated April 19, 2006, defendant Thomas Ranes was indicted

as part of a 142-count indictment charging Conspiracy to Import and Distribute

Marijuana, Money Laundering, and related crimes.  The indictment alleged that

this conspiracy spanned nearly six years.  <u>See</u> Indictment dated April 19, 2006, ¶ 1.

During this time, it alleged that Ranes was responsible for organizing and

coordinating shipments of marijuana from Canada.  <u>Id.</u>, ¶ 3.  The indictment

further alleged that Ranes "would organize and coordinate shipments by using

prepaid cellular telephones to speak with his sources of supply in Canada."  <u>Id.</u>

Further, it was alleged that Ranes used his welding and automotive repair business,

Ranes & Shine, LLC, to facilitate the importation and distribution of marijuana, as

well as to launder proceeds of the conspiracy.  <u>Id.</u>

The indictment was superseded on two occasions.  On June 20, 2006, the

United States filed a First Superseding Indictment, essentially adding nine

defendants, including the alleged Canadian sources of supply.  <u>See</u> First

Superseding Indictment, ¶ 3.  Next, on December 14, 2006, the United States filed

a Second Superseding Indictment, alleging the murder of co-conspirator Thomas

Cody by defendants Ranes and Shine as one of the overt acts in the indictment, as

well as adding two additional defendants.  Indeed, the Second Superseding

Indictment alleged that "[i]t was part of the conspiracy for the conspirators to use

violence and firearms to maintain control of and protect the conspiracy, to ensure

the repayment of debts, and to intimidate potential competitors or to remove

members of the conspiracy."  See Second Superseding Indictment, ¶ 7a.  To this

end, the Second Superseding Indictment alleged that Ranes used prepaid cellular

telephones to facilitate the removal of Cody from the conspiracy.  Id., ¶¶ 16b, 16c.

     B.    The Title III Orders

The United States obtained two orders authorizing the interception of wire

communications in this case.  The first order, dated April 4, 2007, was signed by

the Honorable James A. Von der Heydt, and authorized the United States to

intercept the wire communications of cellular telephone (907) 229-0056,

subscribed to by Thomas Ranes (hereinafter the "First Order").  The First Order

was supported by the Affidavit of Special Agent Zachary Jones, dated April 4,

2006, (hereinafter "Jones' First Affidavit").[2]  The second order, dated April 13,

---

[2]    A copy of the First Order is attached to defendants memorandum of law at Appendix C.  A copy of Jones' First Affidavit is attached to the defendant's memorandum in support of his motion to suppress at Appendix B.

2006, was signed by the Honorable John W. Sedwick, and authorized the United

States to intercept the wire communications of two prepaid cellular telephones

bearing numbers (907) 744-7617 and (907) 744-4246 (hereinafter the "Second

Order"). The Second Order was supported by the Affidavit of Special Agent

Zachary Jones, dated April 13, 2006, (hereinafter "Jones' Second Affidavit").[3]

Moreover, Jones' Second Affidavit included his First Affidavit that was attached

and incorporated by reference. See Jones' Second Affidavit, ¶ 4; see also Index of

Documents Submitted to the Court, dated April 13, 2006, attached hereto as

Exhibit 1.

In authorizing the intercepts, both Judge Von der Heydt and Judge Sedwick

found that, "[i]t has been established adequately that normal investigative

procedures have been tried and have failed, reasonably appear to be unlikely to

succeed if tried, or are too dangerous to employ." First Order, pp. 3-4, ¶ c; Second

Order, p. 4, ¶ c. Further, both judges found that there was probable cause to

believe that the communications to be intercepted would identify "(I) the nature,

extent, and methods of the drug importation business of the target subjects and

others; (ii) the nature, extent, and methods of operation of the drug trafficking

business of the target subjects and others; (iii) the identities, locations and the roles

---

[3]      A copy of the Second Order is attached to defendants memorandum of law at
Appendix F.  A copy of Jones' Second Affidavit is attached to the defendant's memorandum in
support of his motion to suppress at Appendix E.

of accomplices, aiders and abettors, co-conspirators, and participants in their illegal

activities, including sources of supply for the controlled substances; (iv) the

distribution and transfer of the contraband and money involved in those activities;

(v) the existence and location of records; (vi) the location and source of resources

used to finance their illegal activities; (vii) the location and disposition of proceeds

from those activities; (viii) the locations and items used in furtherance of those

activities."  First Order, p. 3, ¶ b; Second Order, p. 3, ¶ b.

    C.    <u>The Defendant's Motion</u>

On April 16, 2007 – some five months after the deadline for such motions

had passed – defendant Ranes filed a motion to suppress evidence obtained by the

United States pursuant to the First and Second Orders.  Essentially, Ranes argues

that, notwithstanding the findings of Judges Von der Heydt and Sedwick, neither

affidavit of Agent Jones satisfactorily established that traditional investigative

techniques were tried and failed, or would have been futile or too dangerous.

Ranes' primary reason for this conclusion is that investigators failed to rely upon

Canadian law enforcement to assist in a federal and state investigation of Canadian

citizens' commission of crimes within the United States.  Moreover, Ranes claims

that, despite the litany of investigative techniques outlined by Agent Jones that

were tried and failed or were impracticable, there were other things that

investigators could have done before resorting to wire interceptions.  Finally,

Ranes makes a half-hearted attempt to claim that Agent Jones made reckless omissions in his affidavits, thus entitling him to a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978).

D.    Summary of Response

Neither Judge Von der Heydt nor Judge Sedwick abused their discretion when they concluded that the affidavits in support of the wiretap applications met the required element of necessity.  The affidavits submitted to both judges meticulously describe the investigative methods that were attempted, or were considered but rejected, or could not be conducted.  They carefully explain why those techniques were not fully successful, and why they were unlikely to uncover needed information.  Further, the affidavit emphasizes the specific challenges faced by the investigators in this case, including the risk of detection, the inability to identify the conspiracy's members using traditional means, and the difficulty of identifying the Canadian sources of the marijuana.  Indeed, if the defendant's argument regarding the necessity of relying upon foreign law enforcement  to satisfy the necessity requirement were accepted, it would effectively cripple federal law enforcement's efforts to use electronic surveillance to investigate foreign citizens' violations of United States law.  Hence, the defendant's argument, taken to its logical conclusion, would require United States' law enforcement agents to enlist foreign law enforcement – no matter how corrupt or ineffectual – to

investigate violations of United States law committed by foreign citizens.

Regardless, the test is whether "<u>normal</u> investigative procedures have been tried

and failed or reasonably appear to be unlikely to succeed if tried or to be too

dangerous." 18 U.S.C. § 2518(3)©. Cooperation of foreign law enforcement is far

from a normal investigative procedure. In any event, the identification of foreign

sources of supply was not the only goal of either wiretap.

Moreover, the defendant's argument that the affidavit contains merely

boilerplate language is not correct. He cites introductory paragraphs of sections,

but fails to discuss the detailed, case-specific analysis that follows. All wiretap

affidavits address the same necessity issues; to a certain extent they may all sound

the same, but the test is whether unique details of the current investigation are

addressed, which they are in this case.

Finally, the defendant has failed to identify any materially misleading

statements or reckless omissions that justify an evidentiary hearing. In fact, the

evidence shows that Special Agent Jones wrote a truthful and complete description

of the investigation, the efforts made to identify drug suppliers and customers, and

the necessity for a wiretap.

## II.    SUMMARY OF FACTS SUPPORTING FINDING OF NECESSITY[4]

### A.    The First Order

The facts set forth in Special Agent Jones' First Affidavit, supporting Judge

Von der Heydt's "necessity" finding in the challenged Order, include the

following:

> 1.    Investigative Techniques Which Were Tried, but Failed to
>        Succeed
>
>        a.    *Physical Surveillance*

Investigators used two different pole cameras in an attempt to satisfy the

objectives of the investigation: one outside Ranes & Shine's business (which was

operating for nearly a near prior to the wiretap application) and one outside a

warehouse (which had been operating for nearly four months). Jones' First

Affidavit, ¶¶ 61, 62.  However, the illegal business of the Ranes DTO appeared to

be conducted indoors, frustrating investigators.  Id.  Moreover, the remote location

of Ranes' residences (one of which was partially underground) made surveillance

---

[4]        As a threshold matter, although each affidavit includes a specific necessity
section, these sections frequently refer to matters stated elsewhere in the affidavit.  For the
purpose of evaluating necessity, the Court must review the entire affidavit, and not just the
paragraphs falling under the necessity heading.  See, e.g., United States v. Gonzalez, Inc., 412
F.3d 1102, 1112 (9th Cir. 2005), amended on other grounds by, 437 F.3d 854 (9th Cir. 2006)
(evidence within"four corners of the wiretap application can be used to evaluate necessity");
United States v. Meling, 47 F.3d 1546, 1552 (9th Cir. 1995) ("Looking only to the four corners
of the wiretap application, we will uphold the wiretap if there is a 'substantial basis' for these
findings of probable cause.").

extremely difficult.  Id., ¶ 63.  Finally, Ranes was extremely surveillance-

conscious, as there were surveillance cameras at the Ranes & Shine business, and

Ranes had told the CS "that he was having sophisticated anti-bugging equipment

installed at his [Ranes'] house."  Id., ¶ 64.  Agent Jones candidly explained the

limitations of surveillance activities:

> The above physical surveillance has proven valuable in identifying
> some of the activities of the RANES DTO, but has failed to achieve
> the goals of the investigation.  Specifically, it has failed to identify
> members of the organization in other districts, jurisdictions, and
> countries; surveillance has failed to identify all stash houses for drugs
> and money, or the identities and roles of all the members of the
> organization, including the sources of supply.  Physical surveillance
> has also failed to establish conclusively the elements of the criminal
> violations by the RANES DTO.  Furthermore, any additional attempts
> at physical surveillance are unlikely to establish conclusively the roles
> of the targets, identify additional conspirators, or otherwise provide
> evidence sufficient to permit prosecution of all members of the
> organization.  Additionally, without positively knowing the reason for
> meetings between individuals or why they are entering or exiting
> locations under surveillance, physical surveillance is of limited use.
> Furthermore, additional or prolonged physical surveillance of the
> movements of the targets would most likely be noticed, causing them
> to become more cautious in their illegal activities, to flee to avoid
> further investigation and prosecution, to cause a real threat to the
> safety of the CS, or to otherwise compromise this investigation.

Id., ¶ 65.

### b.    *Use of Cooperating Sources*

Jones' First Affidavit details the attempted use of cooperating sources,

including one particular cooperating source (the "CS") who had some success

infiltrating the organization. However, Jones' First Affidavit discusses in detail why the use of this confidential source had not – and would not – satisfy the goals of the investigation, which included identifying the entirety of the "RANES DTO", as well as its source of supply. Id., ¶¶ 56, 57 (setting forth the broad goals of the investigation). Among these obstacles, Agent Jones stated:

> The CS exists only on the fringe of this organization and has no direct contact with the RANES DTO's sources of supply. Other than RANES, the CS does not know the roles of the other members of the RANES DTO. The CS has facilitated RANES's laundering of marijuana proceeds on one occasion, and has purchased marijuana on one occasion. RANES has never made any attempt to introduce the CS to his sources of supply, nor has RANES revealed the identity of his sources of supply to the CS, other than to state that his sources are from the Vancouver, Canada area and are affiliated with the "HA's". RANES has simply referred to them as the "big guys," the "head guys," or the "top dogs." While the CS can continue to make purchases of marijuana from RANES, it is not believed that further purchases would help reveal the identities of RANES's sources of supply, or their sources of supply, or help reveal the full extent of the organization's marijuana trafficking activities.

Id., ¶ 66. Moreover, Agent Jones properly considered and rejected continued use of the CS to discover the true identity of the RANES DTO's suppliers:

> If the CS were to ask RANES who his sources of supply are, RANES, who is already law enforcement conscious, would likely get suspicious, since the CS has no need to know such information. This would result in the exposure of the CS and the investigation. The only other conceivable way the CS could learn the identities of the sources of supply is for the CS to "front" hundreds of thousands of dollars to the RANES DTO, and, over time, effectively become a partner of RANES. Under this circumstance, it is possible that RANES would then feel comfortable enough to disclose the names and identities of

his suppliers. However, aside from this scenario being sheer speculation, law enforcement does not have the resources to fund this type of "buy in," since any money "fronted" to the RANES DTO would effectively be lost. In addition, it likely would take months to engender such trust, and, so as not to arouse RANES's suspicions, necessarily involve law enforcement allowing hundreds of pounds of marijuana to be imported into the Anchorage, Alaska area without seizing such shipments. This would result in the widespread distribution of marijuana in the Anchorage, Alaska area, endangering citizens.

Id., ¶ 67.

Agent Jones also explained the potential danger faced by risking exposure of

the CS, as retaliation and danger were a very real concern:

> Although the CS is willing to testify if necessary, the CS has expressed a fear for his safety and for that of his family should his cooperation with law enforcement in this case become known. This fear is occasioned by two concerns. First, that the sources of supply of the RANES DTO are members of the Hells Angels Motorcycle Club, which has been known to perpetrate violence against those that cooperate with law enforcement. Second, a member of the RANES DTO, Thomas Cody, was reported missing on June 1, 2005 – approximately five days after the May 27, 2005 seizure of approximately 225 pounds of marijuana by the RCMP in the area of Whitehorse, Canada. The vehicle that Cody was last seen driving, which was registered to RANES, was found "burned-out" in the Jim Creek area north of Anchorage. Cody, who left over $100,000 in his bank accounts and approximately $11,000 cash in his residence when he disappeared, is still missing and presumed dead.

Id., ¶ 68. This fear of exposure was exacerbated by the fact that Ranes was

extremely surveillance conscious:

> For example, on three occasions, RANES patted down the CS's person, which the CS perceived as an attempt to discover recording

> devices on the CS's person.  In addition, RANES told the CS that he
> was installing anti-bugging equipment in his house.

Id., ¶ 58. Finally, investigators unsuccessfully attempted to cultivate four other

confidential sources, as none could provide any specific information about the

RANES DTO.  Id., ¶ 69.

### c.    *Undercover Agents*

Agent Jones detailed the attempted introduction of two undercover agents,

neither of which succeeded in gaining information or even access to the RANES

DTO.  Id., ¶ 70.  Based on the CS's inability to learn the specifics about the

RANES DTO, it was highly unlikely that Ranes would divulge such information to

a complete stranger.  Id., ¶ 71.

### d.    *Interviews of Subjects and Associates*

Agent Jones explained that interviews of the subjects or their known

associates would produce insufficient information as to the identities of all of the

persons involved in the conspiracy; this technique would also have had the effect

of alerting the members of the conspiracy, thereby compromising the investigation

and resulting in the possible destruction or concealment of documents and other

evidence, as well as the possibility of harm to the CS, whose identity may have

become known through such efforts.  Id., ¶ 72.  Nevertheless, investigators

interviewed a number of individuals on the periphery of the RANES DTO,

including two employees of the Ranes & Shine business. No one was able to provide specific information about the members or suppliers of the RANES DTO. Id., ¶ 73.

### e.    *Trash Searches*

Agent Jones' First Affidavit explains how investigators searched the trash at the Ranes and Shine business in the hopes of achieving the goals of the investigation. While these searches were valuable, they failed to achieve the goals of the investigation. Id., ¶ 77. Moreover, Ranes told the CS that he knew that law enforcement had been "digging through his trash," and continuing to do so could have compromised the investigation. Id. Once again, this demonstrates how surveillance conscious Ranes was.

### f.    *Financial Investigation*

Investigators used grand jury subpoenas to conduct a financial investigation in this case. While such information was useful in identifying large sums of cash being deposited and wired, it "has not revealed the identities of all of the members of the RANES DTO, nor has it reflected any money transfers to suspected sources of supply." Id., ¶ 79.

### g.    *Telephone toll records / Pen registers / trap and traces*

While law enforcement had been analyzing telephone records and using pen registers in an effort to accomplish the investigative goals for nearly a year (see id.,

¶ 55), these tools had major shortcomings.  For example, they do not record the identity of the parties to the conversation nor can they identify the nature or substance of the conversation, or differentiate between legitimate calls and calls for criminal purposes.  As a result, these tools did not assist greatly in identifying other members of the organization, associates, customers, stash locations, or methods of operation used by the organization.  Id., ¶ 80.

    2.    Investigative Techniques Which Were Rejected

    a.    *Search Warrants*

Execution of search warrants was rejected because the agents did not have sufficient information about where drugs or proceeds were stored to obtain warrants.  Id. at ¶ 76. Furthermore, investigators knew that, although they had not been identified, the sources of supply were Canadian citizens, and as such were not subject to the service of United States' search warrants.  Id.  Moreover, execution of search warrants would have alerted the RANES DTO of the investigation, led to the destruction of evidence, flight to avoid prosecution, or endangered the CS.  Id., ¶ 76.

    b.    *Tracking Devices*

Investigators considered the possibility of obtaining court orders to place tracking devices on the vehicles utilized by the RANES DTO to import marijuana. Id., ¶ 82.  The problem with this was that investigators did not know what vehicle

would be dispatched to pick up the next load of marijuana from Canada. Id. Even if they did, a court order would not have allowed investigators to legally monitor such device when the vehicle entered Canada. Id. In addition, placement of a tracking device would have been risky and could have led to exposure of the investigation. Id.

c.    <em>Grand Jury Subpoenas</em>

Service of grand jury subpoenas for testimony of targets or associates was rejected, as it would have alerted the subjects to the investigation and would have been unlikely to generate additional evidence. Id., ¶ 78. Moreover, if targets or subjects were alerted, there was a strong possibility that they would have destroyed or concealed documents or other evidence, fled to avoid further investigation or prosecution, threatened the life of the CS, or to otherwise compromised the investigation. Id.

## B.    <u>The Second Order</u>

During the interception of wire communications pursuant to the First Order, investigators determined that Ranes was using two prepaid cellular telephones to communicate with sources of supply, as well as Kevin Browning, a member of the RANES DTO who was in Canada picking up the next load of marijuana. This was not surprising, given Ranes' prior use of prepaid cellular telephones and the fact that he was surveillance conscious. See Jones' Second Affidavit, ¶ 20, n. 2. While

the necessity set forth in the Jones' First Affidavit (which was incorporated by reference) also applied to his Second Affidavit, Agent Jones did not simply rely upon this necessity.  Instead, even once the First Order allowed interception, investigators continued to attempt to use normal investigative techniques to attempt to achieve the goals of the investigation.  Unfortunately, as set forth below, those techniques failed.

### 1.    Physical Surveillance

Investigator Jones cited to particular examples of the shortcomings of physical surveillance of the RANES DTO.  For example, on one occasion, surveillance units nearly got into an accident with Ranes' vehicle; another surveillance unit risked exposure as it followed Browning's vehicle toward Canada.[5]  Id., ¶¶ 46, 47.  Moreover, United States' investigators are not authorized to conduct law enforcement activity in Canada.  Id., ¶ 48.

### 2.    Confidential Sources

The CS continued to meet with and speak to RANES.  However, the CS did not obtain any more information as to RANES's sources of supply.  Id., ¶ 49.

### 3.    Execution of the First Order

Investigators began electronic surveillance of Ranes' regular cellular

---

[5]    The Court can take notice of the fact that the "highway" to Canada from Alaska is typically one lane in each direction.  As Agent Jones stated, as one travels further toward Canada, the road is "less traveled."  Id., ¶ 47.

telephone on April 4. This resulted in further identification of members of the

RANES DTO. See id., ¶¶ 12 - 14 (setting forth the identification of Joe Bryant as

a target). However, it also became clear that Ranes did not speak freely on his

regular cellular telephone about illegal business, especially with members of the

DTO in Canada, such as his sources of supply. Id., ¶ 43. Moreover, it appeared

that the RANES DTO sources of supply would not speak freely to Ranes unless it

was on a prepaid cellular telephone, such as the ones named in the Second Order.

Id. ¶ 56. Accordingly, wire intercepts pursuant to the First Order were unlikely to

ever accomplish the full goals of the investigation. Id.

> ### 4. Reliance on Canadian Law Enforcement

Investigators carefully considered whether information supplied by

Canadian law enforcement could help accomplish the goal of identification of the

RANES DTO's source of supply. However, such reliance was not likely to be

fruitful, as Agent Jones explained in detail:

> Investigators have attempted to gather information from RCMP
> officers during the course of the investigation. In particular,
> investigators asked an RCMP officer about Philip BERINGER. The
> RCMP officer consulted intelligence analysts, who consulted
> Canadian law enforcement databases. The RCMP was unable to find
> any information linking BERINGER with criminal activity. The only
> information the RCMP was able to provide was that they had a
> reliable informant who told them that an Australian was exporting
> large quantities of marijuana from Vancouver, British Columbia.
> BERINGER's name was not mentioned. In addition, the RCMP did
> not have any relevant information pertaining to the Whistler phone.

Cooperation from the RCMP has been sporadic, as this investigation spans two different Canadian provinces.

Id., ¶ 57.

5.    Exigent Circumstances

Investigators faced an additional challenge in investigating the RANES

DTO: the DTO was about to import a large shipment of marijuana, which, for

public safety reasons, needed to be intercepted before it was distributed in Alaska.

Agent Jones outlines this concern in his Second Affidavit:

> In addition, as set forth above, information obtained from surveillance, as well as interceptions occurring over TARGET TELEPHONE 1, indicates that the RANES DTO is currently in the process of importing a large shipment of marijuana into the United States. Investigators are planning to intercept this shipment, as they cannot let such a large shipment of marijuana be distributed in Alaska. Once the shipment is intercepted, the TARGETS/SUBJECTS may cease to associate, and the INTERCEPTEES may discontinue talking on their telephones. Thus, aside from the failure and/or futility of normal investigative procedures, as set forth below and in the original affidavit, there is insufficient time to attempt conventional methods of gathering evidence on the sources of supply and other conspirators. It is hoped that the interception of wire communications over TARGET TELEPHONES 2 and 3 will help reveal further information about this shipment, because, as more fully set forth above, RANES, BROWNING, and the Canadian sources of supply appear reluctant to speak freely over TARGET TELEPHONE 1.

Id., ¶ 43.  So, in addition to the inability to achieve the goals of the investigation

through normal investigative procedures, time pressure added to the necessity of

obtaining the Second Order.

## III. <u>ARGUMENT</u>

### A.    <u>The Standard of Review is Abuse of Discretion.</u>

The judge authorizing a wiretap has considerable discretion.  <u>See</u>  <u>United States v. McGuire</u>, 307 F.3d 1192, 1197 (9th Cir. 2002); <u>United States v. Martin</u>, 599 F.2d 880, 886-87 (9th Cir. 1979), <u>overruled on other grounds by</u> <u>United States v. De Bright</u>, 730 F.2d 1255 (9th Cir. 1984).  Although an appellate court reviews *de novo* whether a wiretap application was submitted in compliance with 18 U.S.C. § 2518(1)©, it "review[s] the *issuing judge's* decision that the wiretaps were necessary for an abuse of discretion." <u>Canales Gomez</u>, 358 F.3d at 1225 (emphasis added); <u>see also</u> <u>McGuire</u>, 307 F.3d at 1197;  <u>United States v. Bennett</u>, 219 F.3d 1117, 1121 (9th Cir. 2000); <u>United States v. Carneiro</u>, 861 F.2d 1171, 1176 (9th Cir. 1988);  <u>United States v. Brone</u>, 792 F.2d 1504, 1506 (9th Cir. 1986).  A district court evaluating a wiretap authorization in order to resolve a suppression motion applies the same standards of review.  <u>United States v. Ai Le</u>, 255 F. Supp.2d 1132, 1133-34 (E.D. Cal. 2003).  An abuse of discretion occurs only if a trial court acted in a manner that was "arbitrary, capricious, whimsical or manifestly unreasonable[.]"  <u>United States v. Gabaldon</u>, 389 F.3d 1090, 1098 (10th Cir. 2004).

Thus, properly framed, the only question before this Court is whether Judges

Von der Heydt and Sedwick abused their discretion when they determined that

necessity existed to issue the wiretaps.  The sufficiency of a wiretap application,

including the necessity determination, is determined *solely* from the information

within the "four corners" of the affidavit, unless there is a <u>Franks</u> violation.  <u>United</u>

<u>States v. Shryock</u>, 342 F.3d 948, 976 (9th Cir. 2003); <u>United States v. Meling</u>, 47

F.3d 1546, 1552 (9th Cir. 1995); <u>Bennett</u>, 219 F.3d at 1124; <u>United States v.</u>

<u>Ippolito</u>, 774 F.2d 1482, 1485 (9th Cir. 1985).  As outlined below, neither judge

abused his discretion in finding necessity for these wiretaps because the affidavits

fully complied with the law.

### B.   <u>The Affidavit Included Ample Facts to Support a Finding of Necessity</u>

#### 1.   <u>Legal standard</u>

Title 18, United States Code, Section 2518(1)© requires that a wiretap

application include "a full and complete statement as to whether or not other

investigative procedures have been tried and failed or why they reasonably appear

to be unlikely to succeed if tried or to be too dangerous."  Similarly, 18 U.S.C. §

2518(3)© requires that the judge determine that "normal investigative procedures

have been tried and have failed or reasonably appear to be unlikely to succeed if

tried or to be too dangerous."  The Ninth Circuit has clarified that "this necessity

requirement means that the affidavit must set out a factual background that shows

that <u>ordinary</u> investigative procedures, employed in good faith, would likely be ineffective in the particular case." <u>Brone</u>, 792 F.2d at 1506 (emphasis added). The requirement is simply designed to ensure that the government does not resort to wiretaps when traditional investigative techniques would suffice to expose the crime. <u>United States v. Kahn</u>, 415 U.S. 143, 153 n.12 (1974).

In this case, the affidavits of Special Agent Jones include an extensive, factually-detailed, and specific recitation of the investigators' attempts over the year-long investigation to achieve their goals through ordinary investigative means, including their attempted use of five confidential sources of information and two undercover officers, nearly a year of surveillance, including the use of two pole cameras, analysis of close to a year's worth of telephone data, witness interviews, a detailed financial investigation, criminal history and database checks, and trash pulls. <u>See</u> Summary of Facts Supporting Finding of Necessity, *supra*. Jones' First Affidavit contains a recitation of the few techniques that agents in this investigation did not attempt prior to seeking the wiretap. The use of tracking devices was rejected because, international issues aside, their use was risky and not likely to satisfy the goals of the investigation. Also specifically rejected were the use of grand jury subpoenas or search warrants, because they would have jeopardized the entire investigation, and all the work put into it up to then, by revealing its existence. <u>See id.</u> Similarly, Jones' Second Affidavit details the

continued efforts to satisfy the objectives of the investigation through ordinary means, including renewed attempts by the CS to gain information, the use of surveillance, both electronic and physical, as well as the extraordinary effort to consult with foreign law enforcement.  Unfortunately, these techniques were not entirely successful and were unlikely to achieve the ultimate goals of the investigation.  The wiretap applications were the last resort.

2.     Wiretaps are particularly appropriate in conspiracy investigations.

The Ninth Circuit has recognized that the objective of an investigation is a *successful* prosecution of everyone involved in the criminal conduct.  "We held in Brone that a wiretap can be necessary if it gives the government the ability to 'develop an effective case.'  By 'an effective case,' we meant evidence of guilt beyond a reasonable doubt, not merely evidence sufficient to secure an indictment."  McGuire, 307 F.3d at 1198 (internal citation omitted).  Moreover, "because the government has a duty to extirpate conspiracy beyond its duty to prevent the mere commission of specific substantive offenses, we conclude that the government is entitled to more leeway in its investigative methods when it pursues a conspiracy."  Id. (citation omitted).  Hence, the Ninth Circuit has "consistently upheld findings of necessity where traditional investigative techniques lead only to apprehension and prosecution of the main conspirators, but not to apprehension

and prosecution of . . . other satellite conspirators." Id.  Indeed, the inability to

determine the full extent of a conspiracy and to obtain evidence permitting

successful prosecution of all the conspirators has frequently been the basis on

which the Ninth Circuit has upheld the necessity of wiretaps.  See Shryock, 342

F.3d at 977; Bennett, 219 F.3d at 1121-22.  Courts have recognized that wiretaps

are particularly appropriate when investigating a conspiracy, especially a small or

closed group of co-conspirators.  See, e.g., United States v. Phillips, 959 F.2d

1187, 1190 (3d Cir. 1992) (sufficient showing by government that other techniques

would have been too dangerous due to close association of conspiracy members

and group was small, where outsiders would have been immediately suspected);

United States v. Vento, 533 F.2d 838, 850 (3d Cir. 1976) ("[u]ndercover agents are

not readily insinuated into a conspiracy, and may be exposed to unusual danger.").

The investigation of the RANES DTO appropriately targeted more than just

individual loads of marijuana seized at the border and the drivers of those loads.

The goal of the investigation, as stated clearly in the affidavits, was to understand,

dismantle, and prosecute those responsible for directing those loads and those who

were profiting from the transportation and distribution of the drugs:

> Traditional methods of investigation will not entirely accomplish the
> stated goals, which include (but are not limited to) discovering: (a) the
> identities of all of the individuals involved in the RANES DTO; (b)
> the exact roles of these various individuals; (c) the full identification
> and methods of operation of the persons providing controlled

substances to this organization; (d) the locations where members of
the organization store their controlled substances; (e) the methods by
which the members of the organization transport and distribute their
controlled substances, (f) the methods by which the organization's
members launder, distribute, or conceal the assets acquired as a result
of their drug trafficking activities; and (g) the identities of the
customers of the RANES DTO.

Jones' First Affidavit, ¶ 56.  Achieving these goals was challenging for many

reasons, not the least of which is that the members of the RANES DTO who

supplied the marijuana were foreign citizens:

> Additionally, RANES closely protects the identity and location of his
> Canadian drug source.  RANES will not mention the source by names,
> and instead refers to them as the "head guys," the "big guys," or the
> "top dogs."  On February 2, 2006, RANES told the CS that his
> sources of supply are "HA's", which the CS took to mean that they
> are members of the Hells Angels Motorcycle Club.  Your affiant
> knows that the Hells Angels Motorcycle Club has a strong presence in
> British Columbia, Canada, within the marijuana smuggling business.
> The Hells Angels Motorcycle Club has been known to protect its
> illegal dealings by engaging in violence against those that attempt to
> expose them.  Thus, it is highly unlikely that RANES will ever
> divulge the identities of his sources of supply.  Aside from the source
> of supply's possible affiliation, the mere location of the sources in
> Canada demonstrates the difficulty of identifying the source without
> interception. For example, Canadian citizens are not subject to
> ordinary United States legal process.

Jones' First Affidavit, ¶ 59.  This difficulty was compounded by the fact that the

suppliers were not only Canadian citizens, but they also avoided the use of regular

cellular telephones.  Jones' Second Affidavit, ¶ 43.  Agent Jones necessity analysis

in both affidavits properly reviewed the available investigative techniques using

these goals as the measure of success, tempered by the above challenges, and

reasonably concluded both that traditional means had failed or were too risky, and

that a wiretap was likely to succeed in disrupting or dismantling the entire

conspiracy, where the use of other tools – including cooperating sources, physical

surveillance, pole cameras, trash dumps, undercover officers, financial

investigations, and witness interviews – had failed.

### 3.     Exhaustion of every conceivable technique was not required.

Traditional investigative techniques include the following:  (1) standard

visual and aural surveillance; (2) questioning and interrogation of witnesses or

participants (including the use of grand juries and the grant of immunity if

necessary); (3) use of search warrants; (4) infiltration of conspiratorial groups by

undercover agents or informants; and (5) pen registers and trap and trace devices.

United States v. Castillo-Garcia, 117 F.3d 1179, 1187 (10th Cir. 1997), overruled

on other grounds by United States v. Ramirez-Encarnacion, 291 F.3d 1219 (10th

Cir. 2002); United States v. Anderson, 542 F.2d 428, 431 (7th Cir. 1976).  The

government need not show that law enforcement officials exhausted every

conceivable alternative before using electronic surveillance.  United States v.

Canales Gomez, 358 F.3d 1221, 1225-26 (9th Cir. 2004); McGuire, 307 F.3d at

1196-97; United States v. Butz, 982 F.2d 1378, 1383-84 (9th Cir. 1993); Brone,

792 F.2d at 1506.  Rather, the Ninth Circuit requires only that the affidavit as a

whole sets forth a "factual background that shows that ordinary investigative procedures, employed in good faith, would likely be ineffective in the particular case." Brone, 792 F.2d at 1506; see also United States v. McGlory, 968 F.2d 309, 345 (3d Cir. 1992) (holding that government need only lay factual predicate sufficient to inform court why other methods of investigation are not sufficient); Anderson, 542 F.2d at 431 (noting that government's burden of establishing compliance with necessity requirement is not great). Furthermore, attaining some success with traditional investigative methods does not alone extinguish the need for a wiretap. Canales Gomez, 358 F.3d at 1225.

Agent Jones' First Affidavit, comprising 42 total pages, establishes that investigators spent over a year attempting, in good faith, to infiltrate this conspiracy using all of the traditional means outlined in the affidavit. See Summary of Facts Supporting Finding of Necessity, *supra*. The agents had some success which allowed them to identify Ranes, Shine, and the other listed target suspects. See Jones' First Affidavit, ¶ 7. As detailed throughout the affidavit, however, after all their attempts with traditional means, the agents still lacked sufficient evidence to dismantle the organization or prosecute all the conspirators. At that point, the law did not require the agents to invent new and creative means of investigation, or to try any technique possibly conceivable. On the contrary, after their good faith attempts using the traditional means discussed above failed,

they were entitled under the law to seek a wiretap.

When interceptions occurring pursuant to the First Order demonstrated that it would be ineffectual in prosecuting all members of the conspiracy (especially the sources of supply), Agent Jones properly applied for the Second Order. However, he did not do so before considering and attempting other normal investigative procedures. In his 35-page Second Affidavit, which incorporated by reference his First Affidavit, he discussed in detail not only the probable cause for the Second Order, but other investigative procedures that were attempted, or could not be attempted, or were unlikely to succeed. Beyond that, Agent Jones went on to consider unusual and creative methods of accomplishing the goals of the investigation, such as consultation with Canadian law enforcement and use of the existing wiretap pursuant to the First Order. Again, of particular importance to the Second Affidavit was the extraterritorial nature of the conspiracy. Being that federal law enforcement was not permitted to operate in Canada (Jones' Second Affidavit, ¶ 48), and that United States investigators could not fully depend on Canadian law enforcement (Id., ¶ 57), Agent Jones had a choice: abandon attempts to identify and prosecute the Canadian sources of supply (who appeared unwilling to speak freely on telephones other than prepaid telephones), or make application for the Second Order. Investigators chose the latter course, and did in fact identify the suppliers based in large part on the intercepts occurring pursuant to the Second

Order.

### 4.  Common sense governs interpretation of the necessity requirement.

As the Ninth Circuit has explained, the necessity requirement is not intended to relegate the use of wiretaps to that of last resort; the restriction must be interpreted in a practical and common sense fashion.  See United States v. Smith, 893 F.2d 1573, 1583 (9th Cir. 1990); United States v. Brown, 761 F.2d 1272, 1275 (9th Cir. 1985).  The wiretap statute "does not mandate the indiscriminate pursuit to the bitter end of every non-electronic device as to every telephone and principal in question to a point where the investigation becomes redundant or impractical or the subjects may be alerted and the entire investigation aborted by unreasonable insistence upon forlorn hope."  Bennett, 219 F.3d at 1122 (citing United States v. Baker, 589 F.2d 1008, 1013 (9th Cir. 1979)).  A finding of necessity is not precluded just because conventional methods of investigation *might* have worked. United States v. Commito, 918 F.2d 95, 98-99 (9th Cir. 1990).  The necessity requirement may even be met when electronic surveillance is the initial step in the investigation where the affidavit sets forth reasons why other investigative procedures would have been unlikely to succeed.  United States v. Orozco, 630 F. Supp. 1418, 1511 & n.4 (S.D. Cal. 1986) (necessity requirement met, even though electronic surveillance was initial investigative tool against defendant, because

affidavit set forth numerous reasons why other investigative procedures appeared unlikely to succeed).

Reviewing Agent Jones' affidavits using common sense, it is evident that the investigators arrived at the request for a wiretap only after spending approximately a year trying everything else that was reasonably likely to succeed, rejecting only those few remaining techniques that they reasonably and practically concluded were too dangerous relative to the amount of evidence that would be gained, or because they would have exposed the investigation. Moreover, one must also consider that the RANES DTO was in the process of importing a large shipment of marijuana into the United States. Jones' First Affidavit, ¶ 57; Jones' Second Affidavit, ¶ 43. Unlike the February shipment received by the RANES DTO, investigators were certain that the next load would contain a large quantity of marijuana.[6] As such, investigators needed to seize the load of marijuana before it was distributed in Alaska. A seizure would necessarily alert the members of the conspiracy, who would likely cease to associate and speak freely on their telephones. Jones' Second Affidavit, ¶ 43. Thus, applying a common sense approach, there was insufficient time to attempt exhaustive other methods of

---

[6]    In February, investigators watched as Ranes, Shine, and others unloaded several boxes they believed to contain marijuana. However, what confirmed the fact that they were unloading marijuana was the sale of approximately 10 pounds of marijuana to the CS the next day after the shipment arrived.

investigation.  Given the fact that Ranes was extremely surveillance conscious and used phones that could not be linked to him to discuss illegal business with his suppliers, Agent Jones application for a Second Order was reasonable and necessary.

### C.    Ranes' Arguments Regarding Lack of Necessity are Unavailing.

Much of Ranes' arguments amount to second guessing the manner in which investigators conducted their investigation.  The Ninth Circuit has rejected this sort of methodology in wiretap cases.  See, e.g., Carneiro, 861 F.2d at 1178 ("Appellants' contentions are not persuasive.  They merely suggest, with the benefit of hindsight, alternative ways that the DEA could have pursued its investigation.  The investigative methods used by the DEA were potentially productive.  The fact that the DEA could have taken different or some additional steps in its investigation does not demonstrate that the district court abused its discretion in upholding the wiretap order."); United States v. Brown, 761 F.2d 1272, 1275 (9th Cir. 1985) (necessity requirement is not intended to limit the use of a wiretap to a tool of last resort); United States v. Orozco, 630 F. Supp. 1418, 1509 (S.D. Cal. 1986) (district court emphasized that "[p]ost factum suggestions as to how an investigation might have been handled are entitled to little weight in analysis of statutory compliance with § 2518(1)©.")  Id.

Specifically, with respect to Jones' First Affidavit, Ranes attacks Judge Von

der Heydt's finding of necessity primarily by claiming that the affidavit fails to consider assistance from Canadian law enforcement.[7]  He then claims, in retrospect and perhaps in recognition that cooperation with foreign authorities is not a "normal investigative technique", that conventional procedures could have accomplished the goals of the investigation.  Next, he attempts to assail Judge Sedwick's finding of necessity by speculating that, despite its specific reference on numerous occasions within the Second Affidavit, Jones' First Affidavit was not supplied to the Court.  Again, perhaps in recognition of the numerous specific references to the First Affidavit within the Second, he argues that normal investigative techniques should have been given more time.  In order to arrive at these conclusions, Ranes' parses out the goals of the investigation instead of considering them as a whole.  Moreover, the arguments defy the common sense approach to reviewing the exhaustion requirement of Title III as set forth by the relevant case law.

1.    <u>Cooperation with Foreign Authorities is not a "Normal Investigative Technique."</u>

Within his memorandum, Ranes at first acknowledges that investigators must exhaust "normal investigative procedures" to satisfy the goals of the

---

[7]    Ironically, Ranes later attacks Jones' Second Affidavit by claiming that investigators should not have relied upon information provided by Canadian authorities, but should have contacted Canadian telephone companies themselves.  <u>See</u> Defendant's Memorandum, p. 14.

investigation.  However, he then makes the unfounded leap that use of foreign law enforcement to investigate violations of United States law must necessarily constitute "normal investigative procedures."  Not so.  In fact, in enacting Title III, Congress specifically envisioned that "normal investigative procedures would include, for example, standard visual or aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants."  Senate Comm. On the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1968, S. Rep. No. 90-1097, at 79 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190.  Moreover, Congress noted that "[m]erely because a normal investigative technique is theoretically possible, it does not follow that it is likely."  Id.

The exclusion of assistance from foreign governments from "normal investigative techniques" is completely understandable.  After all, an imposition of such a requirement would require federal authorities to consult with foreign governments, no matter how hostile, corrupt, or ineffectual, to investigate its own citizens for violations of United States law.  This would make no sense, and case law has recognized such futility.  See United States v. Echavarria-Olarte, 904 F.2d 1391, 1396 (9th Cir. 1990) (accepting investigators "Need for Interception" based on the fact that "no normal investigative techniques were reasonably available or

likely to succeed in the identifying of the suppliers who were 'apparently located in Colombia and/or Venezuela.'").  The defendant's suggestion that the investigators should have used the MLAT process to enlist Canadian help is similarly far-fetched.  Such a formal request likely would have taken weeks – if not months – to be acted upon.  See, e.g., United States v. Hagege, 437 F.3d 943, 946-47 (9th Cir. 2006) (three months to obtain documents from Israel pursuant to MLAT).  Indeed, the delays occasioned by such formal requests are so great that the United States Code allows for the suspension of the statute of limitations while such requests are being processed.  See 18 U.S.C. § 3292.  While such a request may be a possible option in investigating an historical white collar fraud case, it would be wholly ineffectual in investigating a rapidly-moving, dynamic drug trafficking organization that was in the process of importing a large shipment of drugs.

Nevertheless, as is clear from Jones' First Affidavit, the United States' investigators attempted to seek assistance from Canadian law enforcement, but nonetheless were unable to achieve the goals of the investigation.  See Jones' First Affidavit, ¶¶ 6a, 14, 16, 18, 42, and 43; supra, n. 3.  Regardless, consultation with Canadian law enforcement was only marginally helpful with respect to one of the goals of the investigation: identification of sources of supply.  Obviously, the Royal Canadian Mounted Police could not supply information on the identity of the other members of the RANES DTO, their exact roles, their methods of

operation, the locations of "stash houses", the methods of money laundering, or the identities of customers of the RANES DTO. All of these were goals of the investigation. None would have been satisfied even if Canadian law enforcement was acting wholly as an extension of the United States investigators.

2.    <u>Normal Investigative Procedures Were Attempted with Limited Success.</u>

In his attacks on both orders, Ranes next attempts to claim that continued use of traditional investigative techniques would have resulted in satisfaction of the goals of the investigation. However, Agent Jones explains in detail why this is not so.

a.    *Surveillance*

As detailed in above, as well as within his affidavits, Agent Jones explained in detail why surveillance was of marginal value. <u>See</u> Summary of Facts Supporting Finding of Necessity, *supra*; Jones' First Affidavit, ¶ 65. Nevertheless, in attempting to claim that surveillance would have accomplished the goals of the investigation, the defendant relies upon the <u>United States v. Gonzalez, Inc.</u>, 412 F.3d 1102 (9th Cir. 2005), <u>amended on other grounds by</u>, 437 F.3d 854 (9th Cir. 2006). <u>Gonzalez, Inc.</u> is an unusual case involving the wiretap of a commercial office. In that case, the appellate court affirmed a district court's conclusion that "the evidence presented within the four corners of the affidavit failed to establish

the necessity for the . . . wiretap." <u>Gonzalez, Inc.</u>, 412 F.3d at 1110.  The Ninth

Circuit's holding was based on the fact that the United States Border Patrol

employed only a handful of investigative techniques during a short period of time

before it applied for a wiretap:

> This brief investigation included: five days of pen
> registers on the office's telephones; an equally brief use
> of trap-and-trace analysis of the telephones; limited
> physical surveillance; and a preliminary inquiry
> attempting to place an undercover agent at one of the
> company's "Los Angeles offices," which might have
> included the [office in which the wiretap was sought].

<u>Gonzalez, Inc.</u>, 412 F.3d at 1108.  Moreover, the Ninth Circuit found that there was

no information in the affidavit "supporting a finding that law enforcement had any

reason to fear danger from anyone associated with the office."

Unlike <u>Gonzalez</u>, the investigators here had pole cameras in use for nearly

one year before making the application.  Jones' First Affidavit, ¶¶ 61, 62.

Telephone records were also analyzed for nearly a year.  Investigators attempted to

develop five confidential sources (<u>Id.</u>, ¶¶ 66 - 69), and to introduce two undercover

officers (<u>Id.</u>, ¶ 70).  Moreover, there was specific information about the potential

danger in investigating the RANES DTO, including its suspected affiliation with

the Hell's Angels Motorcycle Club and the disappearance of a co-conspirator.  <u>Id.</u>,

¶ 68.  Finally, the investigators knew that Ranes was surveillance conscious from

cameras at Ranes' business and Ranes' interaction with the CS.  <u>See id.</u>, ¶ 58

(detailing Ranes interaction with the CS in which he appeared to "pat down" the CS for wires, as well as told the CS that he was having "anti-bugging equipment" installed at his house); ¶ 64 (surveillance cameras outside Ranes & Shine, LLC); ¶ 77 (Ranes told CS that he knew that investigators were going through his trash). In these paragraphs, Agent Jones demonstrated that Ranes was <u>always</u> surveillance conscious – not just when he was around his home and his business (where, it appears, most of the illegal dealings occurred in any event).

Despite its limited value, investigators continued to attempt surveillance during the pendency of the First Order.  However, surveillance risked exposure of the investigation.  Jones' Second Affidavit, ¶ 46 (detailing near accident between a surveillance unit and Ranes); ¶ 47 (inability to follow Browning on less traveled roads toward the Canadian border).  Further, from interceptions occurring pursuant to the First Order, it appeared that Ranes was also electronic surveillance conscious, given that he was using several prepaid cellular telephones to speak to his sources of supply and Browning.  <u>Id.</u>, ¶¶ 20 n. 2, 39.  Finally, Ranes' argument regarding surveillance ignores the goal of the investigation of identifying the sources of supply.  In essence, this could not be done through physical surveillance because United States investigators were not legally authorized to do so.  Jones' First Affidavit, ¶¶ 59, 75, 82; Jones' Second Affidavit, ¶¶ 48, 57.  Nor could they legally demand Canadian law enforcement in two different provinces to surveil

members the RANES DTO.  Instead, they had to ask for assistance and hope for

the best.  One cannot fault the United States investigators for Canadian law

enforcement's failure to provide extensive support to an investigation into

violations of United States' law.

        b.    *The Use of the CS*

Ranes also claims that was no reason to believe that the CS could not have

satisfied the goals of the investigation.  This possibility was discussed extensively

in Agent Jones' affidavits, which arrived at the conclusion that the use of the CS

alone could not satisfy the goals of the investigation, primarily the goal of

identifying the sources of supply.  Agent Jones prefaced his detailed discussion of

"Need for Interception" with the following: "RANES closely protects the identity

and location of his Canadian drug source.  RANES will not mention the source by

names, and instead refers to them as the 'head guys,' the 'big guys,' or the 'top

dogs.'"  Jones' First Affidavit, ¶ 59.  While Jones admits that Ranes mentioned to

the CS that the source of supply were possibly "Hells Angels", this was more an

indication that Ranes never would divulge them rather than an intent to bring the

CS into the know: "The Hells Angels Motorcycle Club has been known to protect

its illegal dealings by engaging in violence against those that attempt to expose

them.  Thus, it is highly unlikely that RANES will ever divulge the identities of his

sources of supply."  Id.

Agent Jones does not stop there, however.  He specifically considers the use of the CS to ascertain the sources of supply, using different scenarios.  First, Agent Jones explained why investigators would risk exposure if they directed the CS to ask Ranes who his sources of supply were.  Id., ¶ 67.  Next, he poses a scenario in which the CS would "front" hundreds of thousands of dollars to the RANES DTO in the hopes of becoming a partner and learning the sources of supply.  However, Agent Jones properly rejected this possibility, because, "aside from this scenario being sheer speculation, law enforcement does not have the resources to fund this type of "buy in," since any money "fronted" to the RANES DTO would effectively be lost."  Id.  Again taking a common sense approach, investigators were not required to "exhaust every conceivable investigative technique in order to show necessity."  United States v. Torres, 908 F.2d 1417, 1422 (9th Cir. 1990).

Simply because the CS had a relationship with Ranes and could buy drugs from him does not mean that investigators did not satisfy the need for wire interceptions.  Indeed, the Ninth Circuit has held that a CS's ability to buy drugs from a source does not preclude a finding of necessity.  Bennett, 219 F.3d at 1122-23 (necessity satisfied where the CS had ability to buy drugs, but was unable to discover information about the source of supply); see also Brone, 792 F.2d at 1505 (necessity satisfied where undercover officer had the ability to buy drugs, but was unable to identify source of supply).  Moreover, not only could the CS not identify

the source of supply, but "[o]ther than RANES, the CS does not know the roles of the other members of the RANES DTO." Jones' First Affidavit, ¶ 66. These facts, coupled with the danger faced by the CS due to exposure through Ranes' anti-surveillance techniques, support a finding of necessity of the First Order.

Finally, during the pendency of the First Order, Agent Jones candidly admits that the CS had some success identifying other local members of the RANES DTO. See Jones' Second Affidavit, ¶ 12 (identifying Bryant as member). However, despite telephone and personal contact with the CS, Ranes did not provide any more information about the RANES DTO's sources of supply. Id., ¶ 49. These facts, coupled with the other facts set forth in Jones' Second Affidavit, support a finding of necessity for the Second Order.

      c.     *Search Warrants, Trash Searches, Grand Jury*
                *Subpoenas*

Ranes attempts to discount Agent Jones' reliance on these means of investigation to establish necessity because they rely upon "boilerplate recitations of the difficulties of gathering usable evidence." Defendant's Memorandum, p. 10. Not true. Although portions of an affidavit may include general descriptions of the inherent limitations of particular investigative techniques, such "boilerplate" language does not preclude a finding of necessity. See United States v. Fernandez, 388 F.3d 1199, 1237 (9th Cir. 2004) (boilerplate assertions did not affect finding

that affidavits satisfied necessity requirement where affidavits were not plagued by material misrepresentations and omissions); <u>Torres</u>, 908 F.2d at 1423 (presence of conclusory language in affidavit does not negate finding of necessity if affidavit as a whole alleges sufficient facts demonstrating necessity); <u>United States v. Carneiro</u>, 861 F.2d 1171, 1177 (9th Cir. 1988) (concluding that necessity requirement met for first wiretap based on affidavit as whole, even though some statements in affidavit were mere conclusions).

Although Ranes accuses Special Agent Jones of including "boilerplate" language in his affidavit, he fails to identify any specific language he contends falls into this category. On the contrary, a review of the affidavit reveals that it is fact-specific and detailed. Conclusions about drug investigations in general, where they appear, are appropriate, accurate, and qualified by factual examples specific to the investigation of the RANES DTO.

Moreover, repetitive language is not inherently inaccurate. For example, there is nothing inappropriate about agents commonly concluding that issuing grand jury subpoenas to the suspects in their investigations will alert those suspects to the existence of the investigation, hence jeopardizing the secrecy of the investigation and risking flight and destruction of evidence. This is obviously true and, not surprisingly, probably holds true in nearly every investigation conducted in secret - regardless of the nature of the investigation. It would be neither

inaccurate nor inappropriate (although possibly superfluous, since it is so obvious) for similar language on this topic to be included in nearly every wiretap application.  The same is true of the execution of search warrants.

In this case, however, Special Agent Jones' affidavit goes much further than just relying upon truthful, but conclusory, statements.  Over and over, in fact in every single section describing the techniques used or rejected, Agent Jones' affidavits provide at least one specific factual example unique to this investigation. Jones' First Affidavit, ¶ 75 (discussing how U.S. search warrants cannot be executed on Canadian locations); ¶ 77 (discussing how Ranes has learned that investigators were searching his trash); ¶ 79  (discussing the use of grand jury subpoenas to conduct a financial investigation, and the shortcomings of the information provided as a result); Jones' Second Affidavit, ¶ 54 (citing the fact that the Grand Jury for the District of Alaska did not meet until April 18, 2006).  Any generalizations or conclusory language that may be found in Special Agent Jones' affidavits are true, and also are supported by fact-specific examples from this particular investigation.  This is precisely what the law requires, and Ranes' nonspecific contention that "boilerplate" in the affidavits requires suppression is without merit.

### C.    The Necessity of the Second Order was Demonstrated by the Shortcomings of the First Order.

Initially, in apparent recognition of the compelling statements of necessity contained in Jones' First Affidavit, Ranes speculates that "the second application fails to include the original affidavit," and thus necessity was not shown. Unfortunately for Ranes, this was not the case, as Exhibit 1 to this motion clearly demonstrates that the packet of documents given to the Court contained the "Original Affidavit." Ex. 1, p. 1. Indeed, this index bears a certification dated "4-13-06", the same day that the second application was submitted to the Court. Moreover, within his Second Affidavit, Agent Jones stated that his First Affidavit "is attached as Exhibit A and incorporated by reference herein." Jones' Second Affidavit, ¶ 4. Moreover, he references his First Affidavit repeatedly throughout his Second. Surely if Judge Sedwick was somehow lacking this document from the packet of application materials, he would have requested it. In any event, a simple review of the Court file in 3:06-MC-00010-JWS will reveal the presence of Jones' First Affidavit.

That being the case, there is no question that the Second Order was necessary to accomplish the goals of the investigation. As was evident from interceptions occurring pursuant to the First Order, the sources of supply, Ranes, and Browning were unwilling to speak on Ranes' regular cellular telephone. See id., ¶¶ 19, 28, 31, 33, 35. Consequently, as explained by Agent Jones, reliance on the First Order would not have achieved the goals of the investigation. Id., ¶ 56

("In particular, based on the number of calls between TARGET TELEPHONE 2 and the BERINGER phone, and TARGET TELEPHONE 3 and the Whistler phone, it appears that the Canadian sources of supply will only speak freely if RANES is using a telephone other than TARGET TELEPHONE 1.") .

Finally, Ranes' claim that the Second Order was obtained to simply expedite the investigation similarly fails.  Here, the Court must "determine that ordinary investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time."  United States v. Spagnuolo, 549 F.2d 705, 711 (9th Cir. 1979).  Due to the imminency of the large shipment of marijuana arriving in the United States, investigators waited a "reasonable period of time."  Within that time, it became clear that the Canadian sources of supply would not be identified through traditional means, as outlined in Jones' First Affidavit, or through intercepts occurring pursuant to the First Order.  Indeed, due to the sources' foreign location, no amount of normal investigative procedures for any length of time would have satisfied this goal of the investigation.  Accordingly, Agent Jones demonstrated necessity for the Second Order.

### D.    The Defendant is Not Entitled to Franks Hearing.

Ranes requests a Franks hearing, relying on two meager "misstatements" or "omissions."  Defendant's Memorandum, p. 16.  When scrutinized, neither comes close to satisfying the threshold showing required before the Court can order a

Franks hearing.  Consequently, the Court should reject this claim.

       1.    Legal Standard

"In order to receive a Franks hearing, the defendant must make a non-

conclusory and substantial preliminary showing that the affidavit contained actual

falsity [or an omission], and that the falsity either was deliberate or resulted from

reckless disregard for the truth."  United States v. Prime, 363 F.3d 1028, 1031 n.1

(9th Cir. 2004) (internal quotations omitted); Meling, 47 F.3d at 1553 (extending

analysis applied to false inclusions to omissions).  A defendant must also

demonstrate that the falsity or omission is material.  United States v. Chavez-

Miranda, 306 F.3d 973, 979 (9th Cir. 2002).  A false inclusion or an omission is

not material unless the affidavit, purged of its defects, would not be sufficient to

support a finding of probable cause or necessity.  Meling, 47 F.3d at 1553;

Bennett, 219 F.3d at 1124.

A defendant "bears the burden of proof and must make a substantial

showing to support both elements."  Chavez-Miranda, 306 F.3d at 979.  Therefore,

if the defendant fails to make a "substantial preliminary showing" of *either*

intentional or reckless inclusion or omission, *or* materiality, the district court

should not conduct a Franks hearing.  See Shryock, 342 F.3d at 976-77 (denial of

hearing would have been correct, even if affidavit contained the alleged misleading

statements and omissions, because they were not required for the finding of

necessity); <u>Bennett</u>, 219 F.3d at 1124-25 (proper to refuse <u>Franks</u> hearing where defendant satisfied recklessness requirement but did not show materiality).

In <u>Franks</u>, the Supreme Court "was careful . . . to avoid creating a rule which would make evidentiary hearings into an affiant's veracity commonplace, obtainable on a bare allegation of bad faith. It crafted, therefore, a rule of very limited scope." <u>United States v. Chesher</u>, 678 F.2d 1353, 1360 (9th Cir. 1982). "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." <u>Franks</u>, 438 U.S. at 171.

Mere assertions by counsel in a pleading, unsupported by an affidavit, are not acceptable evidence. <u>United States v. Michlin</u>, 34 F.3d 896, 899 and n.1 (9th Cir. 1994) (statement in brief was not evidence). This principle applies when a wiretap affidavit is challenged on the basis of <u>Franks</u>. "A bare assertion falls short of the preponderance of the evidence that <u>Franks</u> requires." <u>Chavez-Miranda</u>, 306 F.3d at 979. Thus, in order to obtain a <u>Franks</u> hearing, the defendant must offer real evidence, not just unsupported assertions.

> Allegations of deliberate falsehood or of reckless disregard for the truth . . . must be accompanied by an offer of proof. They should point out specifically the portion of the warrant affidavit that is claimed to be false; and they should be accompanied by a statement of supporting reasons. Affidavits, or sworn or otherwise reliable statements, of witnesses should be furnished, or

> their absence satisfactorily explained.  Allegations of
> negligence or innocent mistake are insufficient.

Id.  When a defendant's counsel represented that he would present evidence of

reckless disregard for the truth if given a <u>Franks</u> hearing, but provided no affidavit

or offer of proof to support his allegations, the district court "correctly held that the

failure to make a substantial showing precluded holding a <u>Franks</u> hearing."  <u>United</u>

<u>States v. Furrow</u>, 229 F.3d 805, 815 (9th Cir. 2000), <u>overruled on other grounds</u>,

<u>United States v. Johnson</u>, 256 F.3d 895, 913 (9th Cir. 2001); <u>see also</u> <u>Meling</u>, 47

F.3d at 1553-54 (where defendant offers "nothing more than his own speculation"

and expressions of disbelief about FBI statements in a wiretap application, "that

disbelief does not amount to the substantial showing required under <u>Franks</u>").

Initially, Ranes offers absolutely no showing of a deliberate falsehood or

reckless disregard for the truth and, hence, is not entitled to a hearing.

Nevertheless, accepting Ranes conclusory statements as an offer of proof, neither

amounts to the substantial preliminary showing of deliberate falsehood or of

reckless disregard for the truth.  First, Ranes alleges that Agent Jones made the

claim that "physical surveillance is impossible and unlikely to be of any use," but

investigators contradicted that claim by continuing to perform physical

surveillance, as detailed in Jones' Second Affidavit.  Defendant's Memorandum, p.

16.  Quite the contrary, what Agent Jones clearly states in his First Affidavit that

"[t]he above physical surveillance has <u>proven valuable</u> in identifying some of the

activities of the RANES DTO, but has failed to achieve the goals of the

investigation."  Jones' First Affidavit, ¶ 65 (emphasis added).  Agent Jones then

proceeds to explain why surveillance alone will not satisfy the goals of the

investigating.  <u>Id.</u>  Ironically, the only one culpable of a material misstatement

regarding this argument is the defendant himself.

Next, the defendant claims that within the First Affidavit, Agent Jones failed

to mention the interaction between Ranes and the CS on April 3, 2006.  <u>See</u> Jones'

Second Affidavit, ¶ 12 (detailing that this meeting occurred "later in the day" on

April 3, 2006).  However, one must be mindful that the First Order was signed on

April 4, 2006.  In order to present the application to the Court, it needed to be

authorized by the Attorney General of the United States or his authorized

representative.  <u>See</u> 18 U.S.C. § 2516(1).  Thus, the application was first submitted

to the Deputy Attorney General, who authorized submission to a federal judge.  In

this case, the Deputy Attorney General authorized the presentation on April 3,

2006.  <u>See</u> Authorization Letter signed by Deputy Attorney General Bruce Swarz,

dated April 3, 2006, attached hereto as Exhibit 2.  After that happened, the entire

application and 42-page affidavit was submitted to Judge Von der Heydt, who

signed the First Order on April 4, 2006.  Thus, Agent Jones' affidavit contained

full and accurate disclosure of the progress of the investigation through April 3,

2006.  <u>See also</u> Jones' First Affidavit, ¶ 55 (detailing call records through April 3, 2006).

As is evident, this was a fast paced and dynamic investigation, requiring the participation of the Drug Enforcement Administration, the Alaska State Troopers, the United States Immigration and Customs Enforcement, the Internal Revenue Service, and the Anchorage Police Department.  Jones' First Affidavit, ¶ 6a. Investigators worked daily to attempt to establish the goals of the investigation. Given the procedural and legal requirements necessary to make application to the Court, it would have been impossible to continue changing the affidavit to account for real-time information.  Then, the affidavit would have to be returned to the Deputy Attorney General to review and authorize, followed by the Court, during which time new developments would almost certainly occur.  The cycle would then repeat itself in a "Kafka-esque" fashion, and no interception orders would ever get authorized in an investigation such as the instant one.

Agent Jones expeditiously presented all of the relevant facts known to him at the time to Judge Von der Heydt in his First Affidavit.  As the paragraph pertaining to the April 3 contact demonstrates, it was only after putting together the CS's contact, conveyed by one group of investigators, with surveillance of the Ranes and Shine shop, conveyed by a different group of investigators, together with telephone records, that investigators made the connection to arrive at the belief that

Joe Bryant is the "old man" that Ranes mentioned to the CS.  Clearly this falls short of the "deliberate falsehood" or "reckless omission" required for a Franks hearing.  Moreover, such information is not even material, as even if this information was somehow put together on April 3 and quickly conveyed to Agent Jones for inclusion in his First Affidavit, it would not have undermined the necessity of the wiretap.  Indeed, the identification of Joe Bryant did nothing to identify the sources of supply, which was a main goal of the investigation.  Accordingly, none of Ranes' proffered facts are material, reckless, or even misleading.  A <u>Franks</u> hearing is unwarranted.

## <u>CONCLUSION</u>

Both of Agent Jones' Affidavits truthfully and completely described the broad goals of the investigation and the normal investigative procedures used to attempt to satisfy those goals.  When those normal (and some extraordinary) investigative procedures fell short, investigators resorted to making application for electronic surveillance.  Both Judges Von der Heydt and Sedwick properly considered and granted Agent Jones' applications, and it cannot be said that those judges abused their discretion.  Due to the meticulous and comprehensive nature of both affidavits, a <u>Franks</u> hearing is unnecessary, as the defendant falls far short of the substantial preliminary showing of material deliberate falsehood or reckless omission necessary to justify such a hearing.  The defendant's motion should be

denied, and the evidence derived from the wiretaps should be admitted at trial.

RESPECTFULLY SUBMITTED this 11th day of May, 2007, in Anchorage,

Alaska.

NELSON P. COHEN
United States Attorney

s/ Frank V. Russo
FRANK V. RUSSO
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
(907) 271-1500 (fax)
Frank.Russo@usdoj.gov

I declare under penalty of perjury that a true
and correct copy of the foregoing was sent to
the following counsel of record on May 11, 2007, via:

(X )Electronic Filing

Michael Filipovic and Michael Dieni

s/ Frank V. Russo
Office of the U.S. Attorney