MICHAEL FILIPOVIC
First Assistant Federal Public Defender
Attorney for Thomas P. Ranes
FEDERAL PUBLIC DEFENDER FOR THE
WESTERN DISTRICT OF WASHINGTON
1601 Fifth Avenue, Suite 700
Seattle, Washington 98101
Tel: (206) 553-1100
Fax: (206) 553-0120
E-mail:  Michael_Filipovic@fd.org

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | NO.  3:06-cr-00041-RRB-JDR |
| | ) | |
| Plaintiff, | ) | DEFENDANT RANES'S REPLY TO |
| | ) | OPPOSITION TO MOTION TO |
| v. | ) | SUPPRESS ELECTRONIC |
| | ) | SURVEILLANCE EVIDENCE [Docket |
| THOMAS P. RANES, et al., | ) | Nos. 419 and 459] |
| | ) | |
| Defendant. | ) | |
| | ) | |

COMES NOW Thomas P. Ranes by his attorney, Michael Filipovic, Assistant Federal

Public Defender for the Western District of Washington, and hereby submits the following reply

to the government's response to his motion to suppress electronic surveillance evidence.

**1.   Foreign Assistance in Criminal Investigations Is a Normal Investigative Procedure That must Be Pursued or Reasonably Considered to Be Ineffective Before Seeking Electronic Surveillance.**

Perhaps recognizing that the first affidavit sets forth no efforts to work with Canadian

law enforcement and that the second affidavit provides only minimal mention of any such effort,

the government asserts that cooperating with Canadian law enforcement falls outside of the realm of normal investigative procedures. This argument is unsupported by Title III, the legislative history, and the facts of this case.

### A. Use of Established Means of Cooperation With Foreign Governments Is a Normal Investigative Technique.

The government makes the unsupported claim that "cooperation with foreign authorities is not a 'normal investigative technique.'" Government's Response at 31. Contrary to this position, courts have found that cooperation with foreign governments is a normal investigative technique that must be considered in assessing the necessity of a wiretap. In *United States v. Ailemen*, 986 F. Supp. 1228 (N.D. Cal. 1997), the court granted defendant's motion to suppress evidence collected by electronic surveillance where the government did not pursue potential leads developed by Canadian assistance. *Id.* at 1240. In that case, Canadian authorities arrested a man named Sidney Gladney for smuggling narcotics through Canada. Federal investigators knew Gladney was involved in the drug distribution ring allegedly run by Ailemen. *Id.* at 1239. At the time the government filed its application for electronic surveillance, federal authorities were aware of Gladney's arrest in Canada and his connection to Ailemen. *Id.* The *Ailemen* court concluded that the government "should have learned more about the Canadian investigation before submitting an application for wiretap," and that a "wiretap was [un]necessary" where the government had made no effort to determine if Gladney would disclose information about Ailemen's drug organization. *Id.* at 1239, 40 (bracketing added).

The facts herein closely resemble those of *Ailemen,* as Special Agent (SA) Jones was aware of Kurtis Croy's arrest when applying for electronic surveillance of Target Telephone 1

(907/229-0056). Jones's First Aff. at ¶ 18. According to SA Jones's affidavit, the Royal Canadian Mounted Police (RCMP) seized 225 pounds of marijuana from Kurtis Croy during the time Mr. Ranes was being investigated for his involvement in an alleged drug trafficking operation. *Id.* SA Jones also learned from the RCMP that Mr. Croy was married to Virginia Croy, the registered owner of a cell phone that received 23 calls from Target Telephone 1, including a call four hours after Mr. Croy was arrested by the RCMP. *Id.* Despite the apparent and suspected connection between Mr. Ranes and Mr. Croy, SA Jones's affidavit is silent as to whether investigators made any efforts through the RCMP to inquire into Mr. Croy's willingness to reveal information about Mr. Ranes's suspected involvement in a drug trafficking organization. The government's failure to investigate potential leads arising from Mr. Croy's arrest by the RCMP, before applying for electronic surveillance, should be viewed as an inadequate exhaustion of normal investigative procedures. *See Ailemen*, 986 F. Supp. at 1240.

      The only support the government finds for its position is in an overly generous reading of the legislative history. Government's Response at 32. In enacting Title III, Congress provided *examples* of traditional investigative procedures. *See* Senate Comm. On the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1968, S. Rep. No. 90-1097, at 79 (1968), *reprinted in* 1968 U.S.C.C.A.N. 2112, 2190. This list should be taken for what it is: a list of examples of traditional investigative procedures. Had Congress intended it to be an exclusive list, it would have said so and not prefaced the list with "for example." The exclusion of foreign legal assistance from the list has no bearing on whether the government should have exhausted this means before applying for electronic surveillance. Rather, a judgement as to what constitutes a normal investigative procedure should "involve a consideration of all of the facts

and circumstances." *Id.* Nothing in either the text of § 2518 or its legislative history supports the government's proffered per se preclusion of foreign governmental assistance from the body of normal investigative procedures.

The government's argument that a ruling in favor of Mr. Ranes would require that federal authorities "consult with foreign governments, no matter how hostile, corrupt, or ineffectual" when investigating United States citizens is equally hollow. While working with corrupt or ineffectual foreign governments may not have a likelihood of success, and thus may not be required to prove necessity, Canada is not such a government. The only case the government cites, *United States v. Echavarria-Olarte*, 904 F.3d 1391, 1396 (9th Cir. 1990), involved Colombia and Venezuela in the 1980s where the government could cite to no instances in which cooperation with Colombian or Venezuelan law authorities had been fruitful. *Id.* In marked contrast, the investigation of Mr. Ranes had already involved Canadian authorities and Canada, one of our closest and most cooperative allies, regularly assists United States law enforcement with investigations. *See* Memorandum In Support of Motion to Suppress Electronic Surveillance Evidence at 6 and cases cited therein.

    **B.**    **United States and Canadian Law Enforcement Organizations Assist Each Other With Narcotics Investigations.**

There is no reason why working with Canadian authorities was likely to prove unfruitful. To the contrary, both Canadian and United States authorities pride themselves on the cooperation between the two governments with regard to law enforcement efforts. For example, the United States Department of State explains,

> The U.S. and Canada cooperate closely at the federal, state/provincial, and local levels. The annual U.S./Canada Cross-Border Crime Forum engages policy-makers and senior operational directors in a joint effort to guide the relationship strategically, to develop a common agenda, and to enhance operation coordination.

U.S. Department of State, International Narcotics Control Strategy Report (2006) (attached as Appendix A). The report further states, "In 2006, the United States and Canada will continue to pursue joint operations against drug trafficking organizations," and notes that Canada hosted the 2006 International Drug Enforcement Conference, a DEA-sponsored conference aimed at "develop[ing] a coordinated approach to combat criminal threats." *Id*. For its part, the Canadian Department of Justice's 2004-2005 report stated, "There has been a significant increase in cooperation with international partners, particularly the U.S., our largest partner." Department of Justice Canada, DPR 2004-2005 (attached as Appendix B). The report notes a conference between the U.S. Attorney's Office in Seattle, Washington and the Vancouver office of the Federal Prosecution Service. *Id*.

Additionally, the Treaty Between the United States and Canada on Mutual Legal Assistance in Criminal Maters (MLAT) was designed particularly for criminal cases to streamline and enhance "the effectiveness of the process for obtaining needed evidence." *In Re Comm'r's Subpoenas, United States of America*, 325 F.3d 1287, 1289 (11th Cir. 2003). The government complains that utilization of the MLAT would have taken too long, but this position is contradicted by the undisputed facts. Government's Response at 33. The amount of time it takes for the "contractually obligated" compulsion of evidence varies from around a week to months, but here the investigators had adequate time for the request to be authorized. *See, e.g.,*

*id.* at 1291 (authorizing subpoenas took nine days in Canadian smuggling case). According to SA Jones's affidavit, on December 27, 2005, investigators became aware of Mr. Croy's relation to the defendant's alleged drug trafficking organization. Jones's First Aff. at ¶ 18. The affidavit was not filed until April 4, 2006. Investigators therefore had a sufficient amount of time to make an MLAT request for "the taking of testimony or statements of witnesses" or for "documents, records and evidence" stemming from Mr. Croy's arrest. *In Re Comm'r's Subpoenas*, 325 F.3d at 1290. Although the government was aware that the RCMP had arrested Mr. Croy, the affidavit omits any explanation for why the government failed to make a MLAT request that would have been reasonably ineffective in producing evidence relating to their investigation.

Granting Mr. Ranes's motion to suppress, just as in *Ailemen*, would simply require the government to pursue foreign assistance where cooperation already exists and the investigators are informed that an individual of interest is being investigated by foreign authorities.

**2.    In the First Affidavit, the Only Mention of Canadian Assistance Shows That This Assistance Was Occurring and Was Fruitful, Not That Canadian Assistance Had Failed or Was Reasonably Unlikely to Succeed.**

Instances of Canadian assistance in the investigation of the alleged drug-trafficking organization make it all the more difficult for the government to show that using the RCMP was an investigative method that was reasonably unlikely to succeed.[1] In addition to the Croy arrest,

---

[1] Mr. Ranes assumes the government disclosed the full extent of the cooperation it received from Canadian law enforcement in its wiretap applications. To the extent the government had failed to fully disclose this information, the government's failure to do so provides further support for the need for a *Franks* hearing. Moreover, the agents and the Assistant United States Attorneys would now be under an obligation to be candid with this Court and disclose any cooperative Canadian investigative information that they failed to include in their previous wiretap applications.

the RCMP also informed investigators of Mitchell Leblanc's involvement in a large scale marijuana operation and that they had observed Nopenon Shine acting suspiciously after being stopped and questioned by Canadian authorities. Jones's First Aff. at ¶¶ 14, 42-43. This information demonstrates that there was an open channel of communication between the DEA and the RCMP involving the investigation of the alleged drug-trafficking organization. SA Jones's affidavit, however, provides no explanation for why Canadian assistance would have been ineffective. To the contrary, Mr. Croy may have been willing to provide information regarding the alleged conspiracy to the RCMP or United States authorities, if given the opportunity. In light of the facts and circumstances of this case, the use of Canadian authorities was a normal investigative procedure that the affidavit neglected to show was reasonably unlikely to succeed.

Moreover, there is no reason to assume that Canadian assistance, if sought to the extent argued for above, would only be effective in furthering one of the affidavit's stated goals of investigation. While the government contends that relying on the RCMP would only provide information regarding the identities of the Canadian sources of supply, the true extent of the potential information remains unknown. This lack of information is because the government made no attempt, formal or otherwise, to obtain evidence regarding the alleged drug-trafficking organization from the RCMP. Without inquiring into what information Mr. Croy and Mr. LeBlanc had already provided and what additional information they may have been willing to provide, the government could not reasonably declare that RCMP assistance would be ineffective in furthering any or all of the goals of the investigation.

SA Jones's first affidavit inadequately explains the failure to pursue normal investigative

procedures stemming from Canadian assistance and specifically relating to the investigations of Mr. Croy and Mr. LeBlanc.  Nor does the affidavit allude to reasons why cooperation with the Canadian authorities or making MLAT requests appeared as reasonably unlikely to succeed.  There is an insufficient showing within the four corners of SA Jones's first affidavit to overcome the necessity requirement for electronic surveillance and thus the defendant's motion to suppress should be granted.

**3.    The Second Affidavit Also Fails to Establish That Normal Investigative Procedures Failed or Were Reasonably Unlikely to Succeed.**

The second affidavit in support of application for wire intercepts of Target Telephones 2 (907/744-7617) and 3 (907/744-4246) does not establish that normal investigative procedures failed or were reasonably unlikely to succeed where Canadian assistance was available.  *See, e.g.*, *Gonzalez, Inc.*, 412 F.3d at 1110.  The government asserts that the immediacy of the investigation made it unlikely that Canadian assistance would be effective "within a reasonable period of time," but the affidavit itself does not support that contention.  *United States v. Spagnuolo*, 549 F.2d 705, 711 (9th Cir. 1977).

SA Jones's affidavit notes that Target Telephone 3 was activated on February 16, 2006, and that it received 45 phone calls from the Whistler number (604/966-6771) between April 4, 2006, and the last contact on April 10, 2006.  Jones's Second Aff. at ¶¶ 35-36, 41.  When investigators became aware of the potential connection between the Whistler number and a suspected Canadian marijuana supplier, they sought RCMP assistance to provide information about the number, but were unsuccessful.  *Id.* at ¶ 35.  That being the extent of the investigators' attempts to reveal information about the Whistler supplier number, the affidavit is silent as to

why no MLAT request was filed or why no appeal was made to the Canadian service provider in regard to the registered owner of the phone number. *Id.* at ¶ 36.

SA Jones's second affidavit also fails to show that normal investigative procedures did not produce, or were likely to be ineffective in leading to, information relating to Target Telephone 2. The affidavit explains that the investigation of Target Telephone 2 focused on contact with Philip Beringer, who the RCMP could not link to criminal activity, but who the federal authorities discovered was involved in the exportation of large quantities of marijuana. *Id.* at ¶ 16. However, the affidavit does not mention any attempts by the investigators to inform the RCMP of Mr. Beringer's suspected activities in order to elicit their help in exposing Mr. Beringer and his alleged ties to Mr. Ranes. The government claims that the investigators felt they had to act quickly in order to prevent an "imminent" drug transaction, but immediacy should not excuse investigative procedures that hold potential for being effective. It is possible that if the RCMP was provided with the information about Mr. Beringer they may have been able to assist in the investigation of Mr. Ranes within a "reasonable amount of time." *See Spagnulo*, 549 F.2d at 711.

The affidavit in support of electronic surveillance of Target Telephones 2 and 3 relies upon an immediacy justification that in this situation does not show that available normal investigative procedures failed or were likely to be ineffective. Evidence gathered from the wire

//

//

//

//

intercepts based upon SA Jones's second affidavit should be suppressed and the motion should be granted.

DATED this 25th day of May, 2007.

/s/ Michael Filipovic
MICHAEL FILIPOVIC
WSBA No. 12319
First Assistant Federal Public Defender
Attorney for Thomas P. Ranes
Federal Public Defender
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
Tel. (206) 553-1100
Fax (206) 553-0120
Michael_Filipovic@fd.org

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 25, 2007, I electronically filed the foregoing DEFENDANT RANES'S REPLY TO OPPOSITION TO MOTION TO SUPPRESS ELECTRONIC SURVEILLANCE EVIDENCE [Docket Nos. 419 and 459] with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: Assistant United States Attorneys Frank V. Russo and Thomas C. Bradley, Federal Building & U.S. Courthouse, 222 West 7th Avenue, #9, Room 253, Anchorage, Alaska 99513.

/s/ Michael Filipovic
MICHAEL FILIPOVIC
WSBA No. 12319
First Assistant Federal Public Defender
Attorney for Thomas P. Ranes
Federal Public Defender
1601 Fifth Avenue, Suite 700
Seattle, WA 98101
Tel. (206) 553-1100
Fax (206) 553-0120
Michael_Filipovic@fd.org