# APPENDIX B

| **I✦I** | **Treasury Board of Canada Secretariat** | **Secrétariat du Conseil du Trésor du Canada** | **Canada** |
|---|---|---|---|

| Français | Contact Us | Help | Search | Canada Site |
| What's New | About Us | Policies | Site Map | Home |

| **Estimates** |
|---|
| Results-based Management |
| Foreword |
| About |
| Catalogue No. : BT31-4/39-2005 |
| ISBN: 0-660-62919-4 |
| Alternate Format(s) |
| Instructions PDF (1.62 Mb) |
| Printable Version |

# DPR 2004-2005
# Department of Justice Canada

| Previous | Table of Contents | Next |
|---|---|---|

## B. A Safer, More Secure Society

**2004-2005 Actual vs. Spending:**

**Total Financial Resources for Strategic Outcome ($millions) [18]:**

| Planned Spending | Actual Spending |
|---|---|
| $108.2M | $115.7M |

**Part A: Strategic Overview**

Canadians rely on the justice system as part of the protection of a safe, secure society. The Department has three key priorities in this area. The Department strives to make Canada a safer and more secure place by developing and upholding the law. To develop the law, we track emerging crime issues, consult with provincial, territorial and international partners and with Canadians, and recommend criminal law reform where necessary.

To uphold the law, the Federal Prosecution Service (FPS) performs a number of roles that extend along a continuum from prevention, through diversion, to prosecution. Law enforcement and prosecutions under the Criminal Code are generally provincial responsibilities, but the Attorney General of Canada, through the FPS, has a significant role in relation to criminal prosecutions, including money laundering and drug prosecutions, and regulatory prosecutions related to income tax, the competition law provisions on telemarketing, customs, and immigration. The Attorney General also prosecutes Criminal Code offences in the North.

One growing area of activity is Canada's international obligations. Under the Extradition Act the Minister of Justice makes extradition requests to other countries; in addition, when Canada receives a request, the Minister must decide, after a judicial determination of the merits of the request, whether to surrender the fugitive. The Department takes part in negotiating extradition and mutual legal assistance treaties on behalf of the Minister and, under those treaties, provides counsel to assist foreign states appearing before Canadian courts. The International Assistance group and counsel in our regional offices continues to contribute in an ongoing and concrete fashion to the safety and security of Canadians by assisting in returning criminals to their jurisdictions where they committed their crimes and sending evidence to prove their guilt.

## Priority 4: Combating High-tech Crime, Organized Crime and Terrorism

## Total Financial Resources for the Priority ($millions) [19]:

| Planned Spending | Actual Spending |
|---|---|
| $32.5M | $35.2M |

App. B, p.2

A significant challenge is posed by the growing number of organized crime cases, many of which stretch across provincial and international boundaries. They range from drug trafficking that plagues local communities, to money laundering that crosses national boundaries. The prosecution of these cases is increasing in complexity and cost. Another challenge relates to the growth in marijuana grow operations and clandestine chemical laboratories and their impact on violent crime.

Globalization poses new challenges to prevent and respond to crime and threats to national security. Globalization of the communications industry, for instance, has raised new investigative hurdles. A lack of legal and technical solutions, or delays in the ability to use them, hampers investigations and efforts to prevent crime and reduce threats to national security.

At the same time, strengthening our capacity to prevent crime, combat terrorism and enhance public security may have implications for human rights and privacy. Proposals must, therefore, balance these objectives with concerns about human rights and privacy.

## Commitments

- More effective legal framework as it relates to lawful access, organized crime and terrorism while respecting the rights of Canadians
- More effective investigation, disruption, and prosecution of organized crime and terrorism offences;
- Deterrence and incapacitation of organized crime and terrorist entities

## Performance Results

More Effective Legal Framework as It Relates to Lawful Access, Organized Crime and Terrorism While Respecting the Rights of Canadians

In light of the challenges posed by new communications technologies, Justice Canada, along with Public Safety and Emergency Preparedness Canada, Industry Canada, the Competition Bureau and the Legislative Services Branch brought forward draft legislative proposals to obtain feedback from key stakeholders (provinces and territories, Canadian Association of Chiefs of Police, federal and provincial privacy commissioners, privacy and civil liberties groups, and telecommunications companies) regarding the modernization of Canada's legal framework as it relates to lawful access.

The Department worked with Citizenship and Immigration, the Courts Administration Service and other partners in the development of an objective judiciary workload measures model to ensure the Federal Courts continue to have sufficient resources to meet forecasted demand and ensure timely dispositions in sensitive national security/enforcement proceedings (including ministerial certificates, detention reviews, applications under the Canada Evidence Act and Security of Information Act, immigration and refugee claims, CSIS, Canada Revenue Agency and Canada Transportation Act applications) and to serve as a tool for improving the efficiency of case processing.

A formative (mid-term) evaluation of the Measures to Combat Organized Crime Initiative was conducted over the reporting period. It found that:

- the objectives of the Initiative continue to be relevant;
- some progress has been made towards meeting the objectives;
- Bill C-24 An Act to Amend the Criminal Code (organized crime and law enforcement)
  has increased knowledge and understanding of organized crime issues and tools;
- current resource levels and allocations may influence future effectiveness due to the complexity of cases.

Further details are provided in Section III of this Report.

English: www.justice.gc.ca/en/ps/eval/ reports/04/mcoc/mcoc.html

French: www.justice.gc.ca/fr/ps/eval/ reports/04/mcoc/mcoc.html

The National Security Group participated in the Bill C-36 (Anti-Terrorism Act) three-year
Parliamentary Review by providing ongoing legal advice to policy-makers, appearing
with other officials before the Parliamentary committees conducting the review, and
provided litigation support in the context of Charter challenges to the Anti-terrorism Act.

The Department prepared options for the Government to deal with new mechanisms
created in foreign jurisdictions that could lead to the collection of personal information
about Canadians (such as the U.S. Patriot Act) and to address the concerns expressed
by other foreign jurisdictions about the collection, by the Canadian Government, of
personal information about their citizens (such as information about air travelers coming
to Canada).

Specific measures to target the proceeds of crime of criminal organizations were
developed, resulting in proposed amendments to the Criminal Code and the Controlled
Drugs and Substances Act (Bill C-53). (English:
http://www.parl.gc.ca/38/1/parlbus/ house/bills/government/C-53/C-53_1/C-
53_cover-E.html , French:
http://www.parl.gc.ca/38/1/parlbus/house/bills/government/C-53/C-53_1/C-
53_cover-F.html )

## More Effective Investigations, Disruption, and Prosecutions of Organized Crime and Terrorism Offences

| Number of Active Files for FY 2004-2005 for Federal Prosecution Service only | | | | |
|---|---|---|---|---|
| Initiative | NHQ | Regions* | Total | % of Total |
| Drugs | 33 | 8549 | 8582 | 52 percent |
| Organized Crime (general) | 583 | 2833 | 3416 | 21 percent |
| Regulatory Offences | 1725 | 2594 | 4319 | 26 percent |
| Public Safety and Anti-Terrorism (PSAT) | 168 | 41 | 209 | 1.0 percent |
| **Note: Count based on the number of files where timekeeping was entered. * Does not include Atlantic Region** | | | | |

One of the major areas of activity for the Federal Prosecution Service (FPS) continues
to be related to prosecutions under the Controlled Drugs and Substances Act.
Approximately one half of the active inventory of files for in-house departmental lawyers
involved offences under the Act. Organized crime poses threats to the social and
economic security of Canadians. Over the past decade, increased emphasis by
investigating agencies has led to increased workload in the Department. In the fiscal
year 2004-2005, approximately one fifth of the active inventory of files was related to
organized crime investigations and/or prosecutions [20].

The FPS worked with its partners at Health, PSEPC and the RCMP, to develop a
coordinated response to the problems created by large scale commercial marihuana
grow operations. FPS Counsel participated in the first national Marijuana Grow
Operations conference. FPS counsel worked with the National Coordinating Committee
on Organized Crime, which developed a coordinated approach to illicit chemical
laboratories and marihuana grow operations. FPS counsel also developed the required
interest in the decision to move methamphetamine into Schedule 1 of the Controlled
Drugs and Substances Act."

The FPS assigns advisory counsel to investigative units involved in organized crime
investigations in a number of regions, as part of the Intensive Prosecution Strategy, to
ensure effective investigations, prosecutions, and management of disclosure. In some
cases these assignments may be onsite with the police agencies. Overall, substantial

App. B, p.4

DPR 2004-2005 Department of Justice Canada - Part 5 of 8                    Page 4 of 8

progress has been made on the implementation of the IPS, as recognized in the Mid-
Term Evaluation of the Measures to Combat Organized Crime (English:
www.justice.gc.ca/en/ps/eval/ reports/04/mcoc/mcoc.html French:
www.justice.gc.ca/fr/ps/eval/reports/ 04/mcoc/mcoc.html ))

More effective investigation, disruption and prosecution of terrorism offences require a
better understanding of the Anti-Terrorism Act (ATA), its requirements and impact on
the agencies. Regular meetings have taken place with dedicated regional prosecutors
as well as counsel from various departmental legal service units to discuss actual cases
involving the use and protection of intelligence in procedures and to identify best
practices for future cases [21].

The National Security Group (NSG) coordinated the Justice Emergency Team that was
part of the Triple Play counter-terrorism exercise involving the U.S., the UK and
Canada. Lastly, a number of meetings have been held with dedicated regional
prosecutors to provide a consistent approach on counter-terrorism issues, such as the
use of intelligence in affidavits and search warrants.

The NSG acts as the central point for regular legal and communications briefings for the
minister responsible on such files as the Commission of Inquiry into the Actions of
Canadian Officials in relation to Maher Arar and a number of related cases. NSG
provides national security-related expertise to the government's legal team before the
Inquiry, especially in relation to national security confidentiality and the section 38,
Canada Evidence Act process. NSG serves as a coordination resource to ensure a
consistent approach across government for the production of documents containing
sensitive national security information.

## Criminal Litigation Files

Standing agents are appointed to assist in the prosecution of files in areas where the
Department does not have a regional office. The agents are appointed for specific
statutes and receive most of their files directly from the police agencies or other
enforcement officers.

During the fiscal year the Federal Prosecutions Service (FPS) Agents Affairs Unit
(AAU) continued a pilot project to examine means of reducing the average cost per
case of "simple possession of drug" files.

The pilot, initiated in 2003-2004, consisted of two elements: a) a process of pre-charge
(or early post-charge) review of the files assigned to the various standing agents by
counsel in the regional office to ensure that only files which met the FPS Deskbook
Standards went forward; and b) a new process for reviewing the files for
reasonableness which used benchmarking, file profiling and other statistical tools. At
the outset, extensive training was provided to the standing agents to ensure consistent
understanding of the Deskbook Standards. Additionally, departmental practitioners
monitored, supervised and provided guidance/advice to the standing Agents.

The intent of the pilot was twofold: to ensure that only those cases that met minimum
prosecution standards proceeded to court; and to reduce the average cost per case.
The results of the pilot are encouraging. Between 2002-2003 and 2003-2004, the
number of simple possession files handled by standing agents was reduced by 30
percent (See Figure 6). The reduction in caseload made it possible to spend more time
assisting the various investigative agencies during their investigations in order to
ensure compliance with the rules of evidence and Charter protections. During the same
time period, the average cost per case was reduced by 7 percent (from $349 to $325)

## Overall Assessment: Priority 4: Combating High-tech Crime, Organized Crime and Terrorism

| Assessment of Performance | | Assessment of Data Quality | |
|---|---|---|---|
| Anticipated Result | Performance rating | Performance Indicator | Rating |
| | | | |

App. B, p.5

DPR 2004-2005 Department of Justice Canada - Part 5 of 8                    Page 5 of 8

| More effective legal framework as it relates to lawful access, organized crime and terrorism while respecting the rights of Canadians | Mostly met | Number and types of legislative enhancements made and the extent to which they are used | Reasonable<br><br>Performance data limited primarily to inputs, activities and outputs. Enhancements have not been systematically reported, but have been partially captured through special studies. |
|---|---|---|---|
| | Unable to assess | Number of Charter Challenges | Unable to assess<br><br>These performance measures were not systematically tracked. There may also be a need to test the validity of these performance measures |
| | Unable to assess | Outcomes of Charter challenges | |
| More effective investigations, disruption, and prosecutions of organized crime and terrorism offences | Mostly met | #, types and outcomes of interventions directed at combating organized crime and terrorism offences | Reasonable<br><br>Data limited primarily to inputs, activities and outputs. Beginning to explore broader areas with Agents Pilot Study. Need for more data on impacts and identification of targets. |
| Overall assessment of Priority 4 | Mostly met | | Reasonable<br><br>need to be modified to capture the required performance measures. Need for consistent performance measurement against standards and targets. |

## Priority 5: Modernizing the Criminal Law

## Total Financial Resources for the Priority ($millions) [22]:

| Planned Spending | Actual Spending |
|---|---|
| $3.0M | $2.5M |

The criminal law in Canada is constantly evolving. One of the Department's core responsibilities is to monitor and review trends in court decisions and the evolution of Charter jurisprudence, scientific developments related to detecting and prosecuting crimes (e.g. DNA identification and testing), and social attitudes about whether and how we should use the criminal law to influence individual and corporate behaviour. These trends inform the Department's efforts to modernize the criminal law.

## Commitments

- Criminal Code is amended to reflect the needs and values of Canadians
- Increased understanding among Canadians on broad directions for modernizing the criminal law
- More effective criminal law, responsive to the needs and values of Canadians and consistent with the Charter

App. B, p.6

## Performance Results

The Criminal Code is amended to reflect the needs and values of Canadians (see Priority #2 for initiatives to modernize the criminal law.)

During the reporting period, work to modernize the criminal law continued with efforts to reform the law in key targeted areas:

A number of changes were made to significantly expand the types of offences to which the National DNA Data Bank scheme can apply, in addition to reforming procedural matters for the making and execution of DNA Data Bank orders. As a result, the range of offenders eligible for inclusion in the National DNA Data Bank under the retroactive provisions has been broadened considerably and orders for inclusion in the Data Bank can also be made with respect to persons found not criminally responsible on account of a mental disorder.

Efforts were made to modernize the way Canada enforces its cannabis laws and Canada remained committed to strengthening drug-impaired driving investigations by proposing reforms to the Criminal Code that would authorize police to demand standardized field sobriety tests, evaluations by drug recognition experts, and bodily fluid samples.

## Criminal Conviction Review Process

The Criminal Conviction Review process is an ongoing procedure designed to investigate and remedy miscarriages of justice. It is a process that is consistent with the Charter and is responsive to the needs and reflects the values of Canadians [23]. For fiscal year 2004-2005 the Criminal Conviction Review Group completed 13 preliminary assessments and six investigations and six decisions were rendered by the Minister [24]. (English: http://canada.justice.gc.ca/en/ps/ccr/report_04/index.html L. French: http://canada.justice.gc.ca/fr/ps/ccr/report_04/index.html )

## Overall Assessment: Priority 5: Modernizing the Criminal Law

| Assessment of Performance | | Assessment of Data Quality | |
|---|---|---|---|
| Anticipated Result | Performance rating | Performance Indicator | Rating |
| Criminal Code is amended to reflect the needs and values of Canadians | Mostly met | # and nature of amendments to the Criminal Code and degree of acceptance by justice system partners | Reasonable<br><br>Performance information is limited to inputs, activities and outputs. Data regarding impacts need to be developed and implemented. |
| Increased understanding among Canadians on broad directions for modernizing the criminal law | Unable to assess | Progress toward completion of a statement of principles on the use of the criminal law and degree of acceptance | Unable to assess<br><br>Data was not available for rating performance. |
| More effective criminal law, responsive to the needs and values of Canadians and consistent with the | Unable to assess | Canadians perceptions of the extent to which the criminal law is responsive and reflects their values | Unable to assess<br><br>Data was not available for rating performance. |

App. B, p.7

| Charter | Unable to assess | Number and outcome of Charter challenges on criminal matters | Unable to assess<br><br>These performance measures were not systematically tracked. There may be a need to review the validity of these performance measures. |
|---|---|---|---|
| **Overall Assessment of Priority 5** | Mostly met | | Needs Improvement |

## Priority 6: Improving our Capacity to Respond to International Requests and Transnational Crime

## Total Financial Resources for the Priority ($millions) [25]:

| Planned Spending | Actual Spending |
|---|---|
| $7.5M | $7.7M |

Due to greater mobility of goods, people and information, Canada needs to focus more attention and resources on transnational crime in order to ensure domestic safety and security.

Enhancing our capacity to work with international partners in dealing with global crime and security threats promptly and effectively will help ensure that we can promote and protect Canadian values when international policies, standards and conventions on crime and international cooperation are being developed.

The challenges in this area relate mainly to meeting the increasing volume of international requests arising from the greater prevalence of transnational crime. Differences between the criminal law system in Canada and in the countries making the requests also pose challenges.

## Performance Results

Increased cooperation with international partners

There has been a significant increase in cooperation with international partners, part-icularly the U.S., our largest partner [26]. The Department's efforts in this area have been largely affected by external factors including the need for greater cooperation amongst nations in a post-September 11 world. During the reporting period, senior Federal Prosecution Service (FPS) counsel attended cross-border meetings and conferences with American district attorneys and investigators, including Project North Star, the annual U.S. - Canada Ship Source Oil Pollution Conference, the Cross-Border Crime Forum and the National District Attorneys Association.

A representative of the FPS, along with the U.S. Attorney for northern New York, sit as members of the International Joint Management Team of the Integrated Border Enforcement Team program, providing U.S. and Canadian law enforcement officials with legal advice and prosecution support in their cross-border enforcement activities. Regional counsel also take part in the International Assistance Group (IAG) of the Federal Prosecution Service (FPS) national telephone conferences and continue to provide training to U.S. law enforcement officers working the Washington State/BC border on Canadian legal issues.

An exchange between the U.S. Attorney's Office in Seattle and the Vancouver office of the FPS occurred in March 2004. It was regarded by the participants as highly successful. Objectives achieved included the following:

App. B, p.8

- Enhanced cross-border relationships through establishment of personal working relationships;
- Enhanced understanding of laws and legal procedures of the two countries;
- A training session was delivered to American federal prosecutors in the Seattle office on Canadian extradition and Mutual Legal Assistance Treaty (MLAT) procedures.

The IAG also participated in joint RCMP working groups police and agency training, and regular meetings and conference calls with U.S. and French counterparts, and it liaised directly with European and Asian counterparts in Paris and Brussels through two Department of Justice lawyers posted abroad specifically to assist other countries in the preparation of their extradition and mutual assistance requests to Canada. The B.C. Region is currently developing resource materials to assist in cross-border investigations to aid in gathering basic evidence (e.g. telephone toll records) under the Canada-U.S. Mutual Legal Assistance Treaty.

Additionally, the Public Law Sector has prepared options for the Government to deal with new mechanisms created in foreign jurisdictions that could lead to the collection of personal information about Canadians (such as the U.S. Patriot Act) and to address the concerns expressed by other foreign jurisdictions about the collection, by the Canadian Government, of personal information about their citizens (such as information about air travelers coming to Canada).

In addition to the existing inventory of requests, the IAG worked on approximately 214 new extradition and 395 new mutual assistance requests in 2004-2005. The number and complexity of the submissions to the Minister on extradition cases have grown steadily over the years. Similarly, the complexity and number of incoming and outgoing mutual legal assistance requests have increased year by year, as has in addition to the number of supplementary mutual legal assistance requests. The sheer scale of transnational crime means that, for example, telemarketing fraud or drug cases may involve multiple requests to multiple jurisdictions.

## Overall Assessment: Priority 6: Improving Our Capacity to Respond to International Requests and Transnational Crime

| Assessment of Performance | | Assessment of Data Quality | |
|---|---|---|---|
| Anticipated Result | Performance rating | Performance Indicator | Rating |
| Increased cooperation with international partners | Mostly met | # of MLAT requests and extraditions processed | Needs Improvement Performance data is limited to the total number of MLAT requests |
| Effective investigations and prosecutions of transnational criminal activities | Unable to assess | # and nature of investigations, extraditions, arrests, charges and convictions for transnational criminal offences | Unable to assess Performance measures and appropriate monitoring and tracking systems and standards need to be developed and implemented |
| Overall assessment of Priority 6 | Mostly met | | Needs Improvement |



App. B, p.9