NELSON P. COHEN
United States Attorney

FRANK V. RUSSO
THOMAS C. BRADLEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska 99513-7567
Tel: (907) 271-5071
Fax: (907) 271-1500
E-mail: frank.russo@usdoj.gov
        thomas.bradley@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case No. 3:06-cr-00041-01-RRB |
| | ) | |
| Plaintiff, | ) | |
| | ) | **PLEA AGREEMENT** |
| vs. | ) | |
| | ) | |
| THOMAS P. RANES, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**Unless the parties jointly inform the Court in writing
of any additional agreements, this document in its
entirety contains the terms of the plea agreement
between the defendant and the United States. This
agreement is limited to the District of Alaska; it does
not bind other federal, state, or local prosecuting
authorities.**

## I. TERMS OF AGREEMENT, FEDERAL RULE OF CRIMINAL PROCEDURE 11, WAIVER OF CLAIM FOR ATTORNEY'S FEES AND COSTS

### A. Terms of Agreement

The defendant agrees to plead guilty to Counts 1 (Marijuana Importation

Conspiracy), 119 (Money Laundering), and 137 (International Money

Laundering), of the Second Superseding Indictment (the "indictment") in this

case. The defendant admits to the forfeiture contained in Counts 141 (Drug

Forfeiture) and 142 (Money Laundering Forfeiture). The United States agrees to

dismiss the remaining charges in the indictment and not to prosecute the

defendant further for any other offense related to the events that resulted in the

charges contained in the indictment. The parties agree, pursuant to Fed. R. Crim.

P. 11(c)(1)(C), on a sentence of 30 years in prison, followed by five years of

supervised release. The defendant will waive all rights to appeal the conviction

and sentence imposed under this agreement, and will waive all rights to

collaterally attack the conviction and sentence, except on the grounds of

ineffective assistance of counsel or the voluntariness of the pleas.

### B. Federal Rule of Criminal Procedure 11

Unless the parties otherwise inform the Court in writing, Federal Rule of

Criminal Procedure 11(c)(1)(C) will control this plea agreement. Thus, the

defendant may withdraw from the agreement only if the Court rejects this plea
agreement.

### C.    Waiver of Claim for Attorney Fees and Costs

Because this is a negotiated resolution of the case, the parties waive any

claim for the award of attorney fees and costs from the other party.

## II.    CHARGES, ELEMENTS, FACTUAL BASIS, STATUTORY PENALTIES AND OTHER MATTERS AFFECTING SENTENCE, FORFEITURE

### A.    Charges

1.    The defendant agrees to plead guilty to the following counts of the

indictment:

Count 1:  Conspiracy to Import Marijuana, in violation of 21 U.S.C.

§§ 963, 952 & 960(a) & (b)(1), (b)(3);

Count 119: Aiding and Abetting Money Laundering, in violation of

18 U.S.C. §§ 1956(a)(1)(A)(i), (a)(1)(B)(i), & (a)(1)(B)(ii); and

Count 137: International Money Laundering, in violation of 18

U.S.C. §§ 1956(a)(2)(B)(I).

### B.    Elements

The elements of the charges to which the defendant is pleading guilty are

as follows:

1)   Count 1, Conspiracy to import 1000 kilograms or more of marijuana:

      1.   There was an agreement between two or more people to
import marijuana into the United States;

      2.   the defendant joined the conspiracy knowing of its object and
intending to help accomplish it; and

      3.   during the course of the defendant's involvement in the
conspiracy, 1000 kilograms or more of marijuana was
imported, which was reasonably foreseeable to the defendant.

2)   Count 119, Aiding and Abetting Money Laundering:

      1.   The defendant (or his accomplice) knowingly conducted or
attempted to conduct or aided and abetted the conducting of a
financial transaction affecting interstate commerce;

      2.   the financial transaction involved the proceeds of a specified
unlawful activity;

      3.   the defendant knew that the funds represented the proceeds of
some form of unlawful activity; and

      4.   the defendant knew that the transaction was designed in whole
or in part either to

      a) promote the carrying on of the specified unlawful activity, or

b) conceal and disguise the nature, location, source, ownership, or control of the proceeds of the specified unlawful activity, or

c) avoid a financial reporting requirement under state or federal law.

3) Count 137, International Money Laundering:

1.  The defendant knowingly conducted or attempted to conduct or aided and abetted the conducting of a monetary transaction involving the international movement of funds;

2.  the monetary transaction involved the proceeds of a specified unlawful activity;

3.  the defendant knew that the funds represented the proceeds of some form of unlawful activity; and

4.  The defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, and control of the proceeds of the specified unlawful activity.

## C.  Factual Basis

The defendant admits the truth of the following statement, and the parties stipulate that the Court may rely upon this statement to support the factual basis for the guilty pleas and for the imposition of the sentence:

Beginning in or about early 2003 and continuing through April 22, 2006, I,

THOMAS P. RANES, the defendant, agreed with Thomas Cody, Joseph Bryant,

Dennis Shine and other individuals, both named and unnamed in the indictment,

to facilitate the importation and distribution of Canadian marijuana. I joined this

agreement knowing that the group would be importing marijuana from Canada

for the purpose of distributing it in Alaska. During the course of my involvement,

this group imported over 1,000 kilograms of marijuana, and this was foreseeable

to me. I joined this group with the knowledge that the goal was to import and

distribute marijuana, and with the intent of helping achieve these goals by, among

other things:

(1) fabricating hidden compartments in commercial trucks and other vehicles to

facilitate the importation of the marijuana, (2) arranging for the structuring of

cash bank deposits involving the proceeds of the conspiracy so that the bank

would not file currency transaction reports, disclosing the deposit of large

quantities of currency, (3) arranging for the wire transfer to the Ukraine of funds

received in payment for marijuana, (4) assisting Thomas Cody by paying him as

an "employee" of my business, Ranes and Shine, despite the fact that he did no

work for the business, which enabled Cody to conceal his involvement in the

conspriacy, and (5) driving from Canada into the United States (*i.e.*, the State of Alaska) in vehicles in which marijuana was concealed.

My business associates and I borrowed approximately $540,000 from Thomas Cody, which I knew to be the proceeds of marijuana smuggling and which I used as operating capital for Ranes and Shine.

With respect to money laundering, on or about July 1, 2005, I arranged for another member of the conspiracy to conduct financial transactions on behalf of myself. I gave this other member of the conspiracy approximately $45,000 in cash, which he brought into Northrim Bank and used to purchase a cashier's check made out to Ranes and Shine for that amount, under the pretext that it was payment for a business debt. I knew this money constituted proceeds of marijuana trafficking activity. This financial transaction was conducted in order to conceal and disguise the nature, location, source, ownership and control of drug trafficking proceeds by making it appear that it was a legitimate Ranes & Shine business transaction.

With respect to international money laundering, on or about October 20, 2004, I received approximately $40,000 in cash from Joe Bryant, which represented proceeds from marijuana sales. I arranged to wire this money from Northrim Bank in Alaska to Marine Transport Bank in the Ukraine.

This transaction disguised the true source of the wire transfer as well as Bryant's and Cody's ownership of the funds.

During the time when I was involved in the conspiracy, I learned that in January 2003, Thomas Cody had arranged for an assault to be made upon another individual who was setting up a competing marijuana distribution network, which assault was committed by shooting the other individual five times with a firearm (Overt Act No. 3). I was personally threatened by Thomas Cody on more than one occasion during the existence of the conspiracy. On May 31, 2005, I became aware that co-defendant Dennis Shine manufactured and tested a silencer for a 9 millimeter Beretta firearm at the Ranes and Shine shop, for the purpose of using the Beretta firearm to kill a co-conspirator. Dennis Shine admitted to law enforcement in approximately June 2007, that on June 1, 2005, he murdered Thomas Cody by lying in wait in Cody's home and then shooting him in the head with the silencer-equipped Beretta pistol, thereby killing Cody. Shine admitted to law enforcement at that time that he committed this murder in furtherance of the conspiracy and during the time in which Shine and Cody were both members of the conspiracy. I was a member of the conspiracy at that time as well. The murder fell within the scope of the unlawful agreement and I could have

reasonably foreseen that it would be a necessary and natural consequence of the unlawful agreement, that is, it was foreseeable to me that a firearm would be used in the course of the conspiracy and that a death would result from such use.

At the time of Thomas Cody's death, I caused to be recovered approximately one million dollars in cash proceeds of marijuana trafficking belonging to Cody and Bryant that had been sent to Canada for eventual transfer to Ukraine for investment on Cody and Bryant's behalf. After Cody's death, I arranged for approximately one million dollars of that money to be returned to Alaska. After Cody's death, I assumed a greater role in the marijuana trafficking and smuggling conspiracy than I had held before, organizing shipments and arranging deliveries, and I maintained that role until arrested in April 2006, when the conspiracy effectively ended.

### D.  Evidence the United States Would Introduce at Trial Regarding Ranes' Involvement in the death of Cody.

The following statement represents a proffer by the United States and is not conceded or endorsed by the defendant. The parties agree that these facts are not necessary to establish the defendant's guilt on the conspiracy and money laundering charges to which he is pleading guilty or to establish his legal responsibility for Thomas Cody's death. If the case were to proceed to trial, the

United States would produce testimony and other corroborating evidence that between May 27, 2005, and June 1, 2005, Shine, together with Ranes, planned to murder Cody to remove him from the conspiracy as well as take control of approximately one million dollars in drug proceeds being driven to Canada. Ranes spoke to Shine on two prepaid cellular telephones during this time period in order to conceal his participation in the plan to kill Cody. After two previously unsuccessful attempts on Cody's life, on June 1, 2005, Ranes dropped Shine off at a location near Cody's house located at 6621 Our Own Lane, in Anchorage. Shine went inside Cody's house and waited for him. At approximately 2:30 pm, Cody arrived home and Shine shot and killed him with a 9 mm Beretta fitted with a homemade silencer that Shine manufactured at the Ranes & Shine shop. Shine called Ranes after the shooting, and Ranes called him back using one of his prepaid cellular telephones. Ranes and Shine spoke numerous times during which they attempted to coordinate the disposal of Cody's body. Ultimately, Shine transported Cody's body in the back of the 2004 Ford Explorer, belonging to Ranes' wife, to the Jim Creek area in the Mat-Su Valley. Ranes later met Shine in that area to burn the 2004 Ford Explorer and conceal evidence of Cody's murder. Shine then drove to Fairbanks while Ranes returned to Anchorage.

E.    **Statutory Penalties and Other Matters Affecting
      Sentence**

1.    **Statutory Penalties**

The statutory penalties applicable to the charges to which the defendant is

pleading guilty, based on the facts to which the defendant will admit in support of

the guilty pleas, are as follows:

> Count 1: Marijuana Importation Conspiracy
>
> 1) 10 years (**Mandatory Minimum**) to life imprisonment;
>
> 2) a maximum $4,000,000 fine;
>
> 3) a $100 mandatory special assessment; and
>
> 4) five years (**Mandatory Minimum**) to life of supervised release.
>
> Counts 119 & 137: Money Laundering and International Money
> Laundering
>
> 1) 20 years imprisonment;
>
> 2) a $500,000 fine (or twice the value of the property involved in the
>
> crime, whichever is greater;
>
> 3) a $100 mandatory special assessment; and
>
> 4) up to a five-year term of supervised release.

2. **Other Matters Affecting Sentence**

    a. **Conditions Affecting the Defendant's Sentence**

The following conditions may also apply and affect the defendant's sentence: 1) pursuant to Comment 7 of U.S.S.G. § 5E1.2, the Court may impose an additional fine to pay the costs to the government of any imprisonment and supervised release term; 2) pursuant to 18 U.S.C. § 3612(f), unless otherwise ordered, if the Court imposes a fine of more than $2,500, interest will be charged on the balance not paid within 15 days after the judgment date; 3) upon violating any condition of supervised release, a further term of imprisonment equal to the period of the supervised release may be imposed, with no credit for the time already spent on supervised release; 4) the Court may order the defendant to pay restitution pursuant to 18 U.S.C. § 3663 and U.S.S.G. § 5E1.1.

    b. **Payment of Special Assessment**

The defendant agrees to pay the entire special assessment in this case on the day the Court imposes the sentence. All payments will be by check or money order, and are to be delivered to the Clerk of Court, United States District Court, 222 W. 7th Ave. Box 4, Rm. 229, Anchorage, AK 99513-7564.

c.    **Consequences of Felony Conviction**

Any person convicted of a federal felony offense may lose or be denied

federal benefits including any grants, loans, licenses, food stamps, welfare or

other forms of public assistance, as well as the right to own or possess any

firearms, the right to vote, the right to hold public office, and the right to sit on a

jury. If applicable, any defendant who is not a United States citizen, may be

subject to deportation from the United States following conviction for a criminal

offense and will not be permitted to return unless the defendant specifically

receives the prior approval of the United States Attorney General.

**F.**    **Forfeiture**

Pursuant to this written agreement, the defendant agrees to admit to the

forfeiture contained in Counts 141 and 142 of the indictment. In full satisfaction

of these counts, the defendant agrees to forfeit and/or abandon, surrender, and

disclaim any and all right, title, and interest he may have in the following

property:

1.    2004 BLACK MERCEDES-BENZ MODEL E55, SEDAN 4-DOOR, VIN WDBUF76J54A421493, Alaska License Plate Number ERK649;

2.    2005 BEIGE FORD F250 SUPER DUTY, 4-DOOR EXTENDED CAB PICKUP TRUCK, VIN 1FTSX21P95ED33593, Alaska License Plate Number EVG533;

3. 2001 WHITE 5TH WHEEL GOOSENECK FLATBED TRAILER, VIN 5BYEG24201E000551, Alaska License Plate Number 1769SH;

4. 2005 SILVER TRITON ENCLOSED SNOWMACHINE TRAILER, VIN 4TCSU22045HP01335 Alaska License Plate Number 9091RN;

5. 2000 BLACK FORD F350 EXTENDED CAB DUALLY PICKUP TRUCK, VIN 1FTWX33F2YEC74029, Alaska License Plate Number ENF430;

6. 2006 FLATBED ALUMINUM TRAILER, Alaska License Plate Number 5115RN;

7. VOLVO L-110E FRONT END LOADER;

8. SMITH & WESSON .45 CALIBER 1911 PISTOL, Serial Number JRE9940;

9. GLOCK MODEL 36 .45 CALIBER ACP PISTOL (Single Stack), Serial Number FNW506;

10. 2001 BLUE FORD MUSTANG GT COUPE, VIN 1FAFP42X91F124652, Alaska License Plate Number EPH366;

11. 2004 BLACK FORD EXPEDITION EDDIE BAUER, 4-DOOR WAGON/SPORT UTILITY, VIN 1FMPU18L94LA04832, Alaska License Plate Number EMC331;

12. 2003 H2 HUMMER, VIN Unknown, Alabama License Plate Number Unknown;

13. 2002 BLACK SLND FLATBED, VIN 2S9EB331X21029929, Alaska License Plate Number 5271RL;

14. 2005 WHITE TRAILKING FLATBED TRAILER, VIN 1TKU016285M010123, Alaska License Plate Number 4191SK;

15. 1993 BLUE FORD F250 SUPER CAB PICKUP TRUCK With Diamond Plate Bed Side Protectors, VIN 1FTHX26H2PKA88541, Alaska License Plate Number 9267CX;

16.     2004 WHITE FORD F450 SUPER DUTY, 4-DOOR EXTENDED CAB CHASSIS, VIN 1FDXX47P84EC50305, Alaska License Plate Number ETD875;

17.     2006 TAN TRAILKING FLATBED TRAILER, VIN 1TKU016286M072915, Alaska License Plate Number 5702SK;

18.     2002 BLACK HAULMARK ENCLOSED FLATBED CAR TRAILER, VIN 4XSGB28232G037941, Alaska License Plate Number 8686RP;

19.     YELLOW FLATBED TOW TRUCK, Acquired From Green's Towing, VIN Unknown, Alaska License Plate Number Unknown;

20.     2004 YELLOW INTERNATIONAL FLATBED TOW TRUCK, VIN 1HTMMAAM44H654555, Alaska License Plate Number EMF695 ;

21.     2003 FORD MUSTANG COBRA, STREET LEGAL DRAGSTER, Manufactured By SKINNY KID RACING, Color: Yellow With Red Flames;

22.     1964 RED PONTIAC GTO, 2-Door, VIN 824F23210, Alaska License Plate Number EWK484;

23.     CUSTOMIZED GOLF CART;

24.     1971 GREEN CHEVROLET STANDARD CAB SHORTBED 4X4 PICKUP TRUCK, Serial Number KE141S669517, Alaska License Plate Number ENT716;

25.     1994 BLUE FORD F350 DUALLY CREW CAB 4X4 PICKUP TRUCK, VIN 1FTJW36H9REA36299, Alaska License Plate Number EHD375;

26.     2001 MALIBU WAKESETTER BOAT, MODEL 21VL, HULL NUMBER US-MB2K6978F303, Including Accessories;

27.     HAULMARK BOAT TRAILER MODEL Po110590, Manufactured by Extreme Engineering, VIN 5DBBB22253R000903, Alabama License Plate Number 5TR3916;

28. 1994 CHEVROLET KODIAK C6H042 TOW TRUCK, With Tow
Equipment, VIN 1GBE6H1J6RJ107351, Alaska License Plate Number
DYL348;

29. 1996 HAULMARK G824T3 ENCLOSED CAR TRAILER, VIN
16HGB2420TU004179;

30. 2004 SEA DOO BOMBARDIER RXP JET SKI, VIN ZZN42618C404;

31. 2004 SEA DOO BOMBARDIER RXP JET SKI, VIN ZZN57196F404;

32. 2004 SHORELANDER MIDWEST DUAL JET SKI 2200 TRAILER,
VIN 1MDKNKK124A281488;

33. 2005 POLARIS ATV SPORTSMAN 800 EFI, VIN
4XAMH76A65A611162;

34. 2005 POLARIS ATV SPORTSMAN 800 EFI, VIN
4XAMH76A05A381103;

35. 2005 POLARIS MODEL S05PL8DSC SNOWMACHINE, VIN
SN1PL8DS25C540503, Alaska License Plate Number SD0331;

36. 1998 SKI DOO SNOWMACHINE, VIN 140700798;

37. WEATHERBY MARK V .338 CALIBER RIFLE, Serial Number
SS008083;

38. SMITH & WESSON MODEL 329 .44 MAGNUM REVOLVER, Serial
Number CFZ3604;

39. 1990 FORD MUSTANG RACE CAR, BLUE, VIN
1FACP40E3LF200941, Alaska License Plate Number DXS406;

40. $10,930.00 IN UNITED STATES CURRENCY;

41. $46,911.64 HELD IN NORTHRIM BANK ACCOUNT NUMBER
7100390025;

42. $45,571.70 IN U.S. CURRENCY HELD IN FIRST NATIONAL BANK OF ALASKA ACCOUNT NUMBER 30425268;

43. $28,871.70 IN U.S. CURRENCY HELD IN FIRST NATIONAL BANK OF ALASKA ACCOUNT NUMBER 30481808;

44. $6,864.48 IN U.S. CURRENCY HELD IN ALASKA USA FEDERAL CREDIT UNION ACCOUNT NUMBER 204509;

45. REAL PROPERTY LOCATED AT 1301 MULDOON ROAD, ANCHORAGE, ALASKA 99504;

46. REAL PROPERTY LOCATED AT 1625 E. 64th AVENUE, ANCHORAGE, ALASKA 99507;

47. REAL PROPERTY DESCRIBED AS NHN HILLCREST S/D 8 LOTS, ANCHORAGE, ALASKA 99515;

48. 2004 FORD F350 PICKUP TRUCK, VIN 1FDWF37L14EC82504;

49. 2005 RENEGADE MOTORHOME MODEL 22/12 32', VIN 1FVHA6CK85LN39363;

50. 2005 KIBBI LLC RENEGADE CAR TRAILER, VIN 1K9500T3661160003;

51. 2004 FORD F150 PICKUP TRUCK, VIN 1FTWW33P64EB71492;

52. 2005 CHEVROLET K2500HD SILVERADO PICKUP TRUCK, EXTENDED CAB, VIN 1GCHK292X5E121481;

53. GLOCK MODEL 29 10MM HANDGUN, Serial Number CKS783;

54. OLYMPIC ARMS MODEL CAT-AR .223 CALIBER RIFLE, Serial Number 03383;

55. MOSSBERG MODEL 500A 12 GAUGE SHOTGUN, Serial Number R154267;

56. $90,700.00 IN UNITED STATES CURRENCY, Seized April 22, 2006, From Joe Bryant At 1301 Muldoon Road, Anchorage, Alaska;

57. 2005 FORD F350, FLATBED WELDING TRUCK, VIN 1FDWF37P95EC46760;

58. 2005 BOMBARDIER SKIDO 800H0 SUMMIT ADRENALIN 144", VIN 2BPSCK5A75V000305, Alaska License Plate Number SD2509;

59. 2006 CHEVROLET C2500 DIESEL TRUCK, GRAY IN COLOR, VIN 1GCHK232X6F133621, Alaska License Plate Number EWV384;

60. GLOCK MODEL 36, .45 ACP (SINGLE STACK), PISTOL, Serial Number FNW506;

61. SMITH & WESSON MODEL 329, .44 MAGNUM, REVOLVER, Serial Number CFZ3604;

62. SMITH & WESSON .45 CALIBER PISTOL WITH MALASER SIGHTS, Serial Number JRE9940;

63. GLOCK 9MM PISTOL, Serial Number HFR612;

64. MARIJUANA GROW EQUIPMENT, Consisting of Tanks, Lights, Water Pumps, Ballasts, Timers, Generator, Fans, Heaters, & Humidifier;

65. SMITH & WESSON .357 AIRLITE HANDGUN, Serial Number CFU4243;

66. REMINGTON MODEL 7, 7MM RIFLE, WITH LUEPOLD SCOPE, Serial Number S7643871;

67. 2001 THUNDER JET MAXIM/RB BOAT WITH TRAILER, Serial Number AHQ10070E101, Alaska License Plate Number 6678-AB;

68. 5 KRUGERRAND COINS, 1 OZ. EACH, & 4 NATURAL GOLD NUGGETS;

69. 1998 FORD EXPLORER, BLUE IN COLOR, VIN 1FMYU24E8WUA48979, Alaska License Plate Number ESY775;

70. BOBCAT LOADER, Serial Number 512221357;

71.  2006 HARLEY-DAVIDSON FATBOY MOTORCYCLE, VIN 1HD1BMY166Y028106, Alaska License Plate Number 8054RP;

72.  2003 HONDA CR125 MOTORCYCLE, SILVER IN COLOR, VIN JH2JE01363M503762;

73.  2004 FORD F350 WITH BOSS ATTACHMENTS, WHITE IN COLOR, VIN 1FDWF37L14EC82504, Alaska License Plate Number ESS312;

74.  2004 INGERSOLL RAND LIGHTSOURCE, Serial Number 340570UJN789;

75.  1993 FORD MUSTANG LX SPORT, BLACK IN COLOR, VIN 1FACP41E4PF165721, Washington License Plate Number 636UAJ;

76.  1971 CHEVROLET EL CAMINO, RED IN COLOR, VIN 136801L106392;

77.  GENIE MODEL S-80 4WD MANLIFT, Serial Number 305;

78.  2004 YAMAHA 4-WHEELER RAPTOR ATV, BLACK IN COLOR, VIN UNKNOWN;

79.  $25,000.00 IN UNITED STATES CURRENCY, Seized June 26, 2006, From Justin Killian at 7001 Kathleen Circle, Anchorage, Alaska;

80.  2004 F250 HARLEY DAVIDSON SUPER DUTY CREW PICKUP TRUCK, BLACK IN COLOR, VIN 1FTNW21P44EC05499, Alaska License Plate Number ESX174;

81.  2005 HONDA RUBICON ATV, YELLOW IN COLOR, VIN 1HFTE260X54401644;

82.  2004 TRITON ELITE 16-101 FLATBED ALUMINUM TRAILER, VIN 4TCSS21494H102505, Alaska License Plate Number 5609RN; and

83.  $13,250.43 IN THE FORM OF A CASHIER'S CHECK, Seized June 28, 2006, From First National Bank Alaska Account Held In The Name Of Thomas Michael Cody, IV.

Further pursuant to this agreement, the defendant agrees not to contest

administrative forfeiture of the above-described property, and the defendant

agrees to assist the United States in defending against or otherwise resolving any

third party claims filed against said property, in order that appropriate disposition

may be made thereof by the United States.

### G.    Restitution

None.

## III.    SENTENCING AGREEMENT

The parties agree pursuant to Fed. R. Crim. P. 11(c)(1)(C) on a 360 month

sentence, followed by five years of supervised release, and $300 in special

assessments. Either party may withdraw from the agreement should the Court not

impose this sentence. In arriving at this agreement, the parties have considered

the applicable facts that can be established at trial, the nature and circumstances

of the offense, and the history and characteristics of the defendant, and the

advisory sentencing guidelines. In deciding whether to accept this agreement, the

parties acknowledge that the Court must consult the advisory United States

Sentencing Commission Guidelines [U.S.S.G.] as well as the factors set forth in

18 U.S.C. § 3553(a). The U.S.S.G. do not establish the statutory maximum or

minimum sentence applicable to the offenses to which the defendant is pleading

guilty. The U.S.S.G. are not mandatory and the Court is not bound to impose a

sentence recommended by the U.S.S.G

## IV. WAIVER OF TRIAL, APPELLATE RIGHTS, AND COLLATERAL ATTACK RIGHTS

### A. Trial Rights

Being aware of the following, the defendant waives these trial rights:

-- If pleading to an information, the right to have the charges presented to the grand jury prior to entering the guilty plea;

-- The right to a speedy and public trial by jury on the factual issues establishing guilt or any fact affecting the mandatory minimum and statutory penalties, and any issue affecting any interest in any assets subject to forfeiture;

-- The right to object to the composition of the grand or trial jury;

-- The right to plead not guilty or to persist in that plea if it has already been made;

-- The right to be presumed innocent and not to suffer any criminal penalty unless and until the defendant's guilt is established beyond a reasonable doubt;

-- The right to be represented by counsel at trial and if necessary to have a counsel appointed at public expense to represent the defendant at trial -- the defendant is not waiving the right to have counsel continue to represent the defendant during the sentencing phase of this case;

-- The right to confront and cross examine witnesses against the defendant, and the right to subpoena witnesses to appear in the defendant's behalf;

-- The right to remain silent at trial, with such silence not to be used against the defendant, and the right to testify in the defendant's own behalf; and

-- The right to contest the validity of any searches conducted on the defendant's property or person.

## B.    Appellate Rights

The defendant waives the right to appeal the convictions resulting from the entry of guilty pleas to the charges set forth in this agreement.  The defendant further agrees that if the Court accepts this agreement, the defendant waives without exception the right to appeal on all grounds contained in 18 U.S.C. §

3742 the sentence the Court imposes – including forfeiture or terms or conditions of probation (if applicable) or supervised release, and any fines or restitution.

### C. Collateral Attack Rights

The defendant agrees to waive all rights to collaterally attack the resulting convictions and/or sentence – including forfeiture or terms or conditions of probation (if applicable) or supervised release, and any fines or restitution – the Court imposes. The only exceptions to this collateral attack waiver are as follows: 1) any challenge to the conviction or sentence alleging ineffective assistance of counsel - based on information not now known to the defendant and which, in the exercise of reasonable diligence, could not be known by the defendant at the time the Court imposes sentence; and 2) a challenge to the voluntariness of the defendant's guilty pleas.

## V. ADDITIONAL AGREEMENTS BY UNITED STATES

In exchange for the defendant's guilty pleas and the Court's acceptance of the defendant's pleas and the terms of this agreement, the United States agrees to dismiss the remaining counts in the indictment at sentencing, and that it will not prosecute the defendant further for any other offense - now known - arising out of the subject of the investigation related to the charges brought in the indictment in

this case and the defendant's admissions set forth in Section II C. Provided,
however, that if this agreement is not accepted by the Court, or if the defendant's
guilty plea(s) is/are rejected, withdrawn, vacated, reversed, or set aside, or if the
defendant's sentence is vacated, reversed, set aside, or modified, at any time, in
any proceeding, for any reason, the United States will be free to prosecute the
defendant on all charges arising out of the investigation of this case including any
charges dismissed pursuant to the terms of this agreement, which charges will be
automatically reinstated as well as for perjury and false statements.

## VII.   ADEQUACY OF THE AGREEMENT

Pursuant to Local Criminal Rule 11.2 (d)(9), this plea agreement is
appropriate in that it conforms with the sentencing goals that would otherwise be
applicable to the defendant's case if the defendant had gone to trial and had been
convicted on all counts in the charging instrument.

## VIII.   THE DEFENDANT'S ACCEPTANCE OF THE TERMS OF
THIS PLEA AGREEMENT

I, THOMAS P. RANES, the defendant, affirm this document contains all of
the agreements made between me– with the assistance of my attorney– and the
United States regarding my pleas.  There are no other promises, assurances, or
agreements the United States has made or entered into with me that have affected

USA v. Thomas P. Ranes
3:06-cr-00041-01-RRB                    Page 24 of 27

my decision to enter any plea of guilty or to enter into this agreement. If there are any additional promises, assurances, or agreements, I and the United States will jointly inform the Court in writing before I enter my guilty pleas.

If anyone, including my attorney, has done or said anything other than what is contained in this agreement, I will inform the Court when I stand before it to enter my plea. If there were, I would so inform the Court.

I understand the Court will ask me under an oath to answer questions about the offenses to which I am pleading guilty and my understanding of this plea agreement. I understand that I may be prosecuted if I make false statements or give false answers and may suffer other consequences set forth in this agreement.

I have read this plea agreement carefully and understand it thoroughly. I know of no reason why the Court should find me incompetent to enter into this agreement or to enter my pleas. I enter into this agreement knowingly and voluntarily. I understand that anything that I discuss with my attorney is privileged and confidential, and cannot be revealed without my permission. Knowing this, I agree that this document will be filed with the Court.

I am fully satisfied with the representation given me by my attorney and am prepared to repeat this statement at the time I stand before the Court and enter my guilty pleas. My attorney and I have discussed all possible defenses to the

charges to which I am pleading guilty. My attorney has investigated my case and

followed up on any information and issues I have raised to my satisfaction.

My attorney has taken the time to fully explain the legal and factual issues

involved in my case to my satisfaction. We have discussed the statutes applicable

to my offense and sentence as well as the possible effect the U.S.S.G. may have

on my sentence.

Based on my complete understanding of this plea agreement, I therefore

wish to enter a plea of guilty to Counts 1, 119, and 137 of the indictment, as well

as admissions to Forfeiture Counts 141 and 142.

DATED: Feb 7, 2008

THOMAS P. RANES
Defendant


As counsel for the defendant, I have discussed the terms of this plea
agreement with the defendant, have fully explained the charges to which the
defendant is pleading guilty and the necessary elements, all possible defenses,
and the consequences of a guilty plea to a felony. Based on these discussions, I
have no reason to doubt that the defendant is knowingly and voluntarily entering
into this agreement and entering a plea of guilty. I know of no reason to question
the defendant's competency to make these decisions. If, prior to the imposition of
sentence, I become aware of any reason to question the defendant's competency
to enter into this plea agreement or to enter a plea of guilty, I will immediately
inform the court.

DATED: February 7, 2008

ALLEN BENTLEY
Attorney for Thomas P. Ranes

On behalf of the United States, the following accept the defendant's offer to plead guilty under the terms of this plea agreement.

DATED: 2/7/08

FRANK V. RUSSO
Assistant U.S. Attorney

DATED: 2/7/08

THOMAS C. BRADLEY
Assistant U.S. Attorney

DATED: 2/7/08

NELSON P. COHEN
United States Attorney