RECEIVED

ORIGINAL

MAY 1 4 2008

CLERK, U.S. DISTRICT COURT
ANCHORAGE, AK

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Case 3:06-cr-00041-01-RRB |
| | ) | |
| Plaintiff, | ) | Anchorage, Alaska |
| | ) | Friday, February 8, 2008 |
| vs. | ) | 8:34 o'clock a.m. |
| | ) | |
| THOMAS P. RANES, | ) | |
| | ) | CHANGE OF PLEA |
| Defendant. | ) | |

_____

### TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE RALPH R. BEISTLINE
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:      THOMAS C. BRADLEY
                        KATHERINE VOKE
                        Assistant U.S. Attorney
                        222 West 7th Avenue, Box 9, Room 253
                        Anchorage, Alaska  99513-7567
                        907-271-5071

For the Defendant:      ALLEN R. BENTLEY
                        Attorney at Law
                        1111 Third Avenue, Suite 2220
                        Seattle Washington  98101
                        206-343-9391

Probation Officer:      PAMELA SHAW
                        U.S. Pretrial/Probation Service
                        222 West 7th Avenue, Box 48, Room 168
                        Anchorage, Alaska  99513
                        907-271-5494

Court Recorder:         CAROLINE EDMISTON
                        ALEXIS GUTIERREZ
                        U.S. District Court
                        222 West 7th Avenue, Box 4
                        Anchorage, Alaska  99513-7564
                        907-677-6103
                        907-677-6154

*Gaylene's Word Services*
*907-338-3936*

773

1  APPEARANCES (CONTINUED):

2  Transcription Service:     GAYLENE'S WORD SERVICES
                              M. Gaylene Larrecou
3                             7330 Madelynne Dr.
                              Anchorage, Alaska   99504-4659
4                             907-338-3936

5  Proceedings recorded by electronic sound recording; transcript
   produced by transcription service.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        <u>**ANCHORAGE, ALASKA – FRIDAY, FEBRUARY 8, 2008**</u>

2    (Courtroom 3)

3        (On record at 8:34:42 a.m.)

4        THE CLERK:  All rise.  His Honor the Court, the

5    United States District Court for the District of Alaska is now

6    in session, the Honorable Ralph R. Beistline presiding.

7    Please be seated.

8        THE COURT:  Good morning.

9        MR. BRADLEY:  'Morning, Your Honor.

10        THE COURT:  Are we all ready to go?

11        MR. BRADLEY:  Yes, Judge.

12        THE COURT:  So it's *United States of America versus*

13    *Thomas Ranes*.  It's Case 3-06-41.  This must be Mr. Ranes, is

14    that right?

15        MR. RANES:  Yes, sir.

16        THE COURT:  And I don't know if we've met.  You're

17    his counsel, right?

18        MR. BENTLEY:  No.  I haven't appeared before Your

19    Honor before.  My name is Allen Bentley, a member of the CJA

20    panel in the Western District of Washington, and I'm appearing

21    specially in this district for this case.

22        THE COURT:  Okay, very good.  My understanding, sir,

23    is that you've reached an agreement with the government and

24    you wish to enter some guilty pleas this morning.  Is that

25    right?

1           MR. BENTLEY:  Yes, Your Honor.

2           THE COURT:  Is that right, Mr. Ranes?

3           MR. RANES:  Yes, sir.

4           THE COURT:  And that's the government's

5  understanding as well?  Government is --

6           MR. BRADLEY:  Yes, Judge.

7           THE COURT:  Okay.  All right.  I've -- I just had

8  this plea awaiting me.  I had a chance to review it just this

9  morning.  I need to ask you some questions make sure you're

10 aware of what's going on, you understand, and that you're

11 doing this freely and voluntarily.  That has to be done under

12 oath.  You understand that, sir?

13          MR. RANES:  Yes, sir.

14          THE COURT:  So you need to stand, and my clerk will

15 swear you in.

16          THE CLERK:  Raise your right hand, sir.

17          **THOMAS PAYTON RANES, DEFENDANT, SWORN**

18          THE CLERK:  Okay.  Sir, please be seated, and for

19 the record, please state your full name and spell your last.

20          THE WITNESS:  Thomas Payton Ranes, R-a-n-e-s.

21                   **VOIR DIRE EXAMINATION**

22 BY THE COURT:

23 Q    Okay.  Sir, you know you're under oath, you understand

24 that?

25 A    Yes, sir.

1  Q    And you're required therefore to respond truthfully to

2  the questions posed.  If you don't do that, you could be

3  charged with other felonies such as perjury and making a false

4  statement.  Do you understand all that?

5  A    Yes, sir.

6  Q    It's important that you understand my questions, that you

7  response truthfully.  If you don't understand them, just let

8  me know, okay?

9  A    Yes, sir.

10  Q    It's important that we all understand what's going on

11  here this morning.  First I need to make sure I understand a

12  little bit about you.  Can you tell me your date of birth?

13  A    10/9/74.

14  Q    And where were you born?

15  A    Baymonette, Alabama.

16  Q    And how long have you resided in Alaska, roughly?

17  A    Since '90 -- late '95.

18  Q    Okay.  Where did you -- what's the extent of your

19  education?

20  A    High school.

21  Q    And where did you go?

22  A    Blount (ph) County High School in Baymonette, Alabama.

23  Q    Did you get a degree?

24  A    Yes, sir.

25  Q    Okay.  Since coming to Alaska, what have you done?

1  A    Starting in '95, I started out as a roustabout for Pool

2  Arctic Alaska --

3  Q    Okay.

4  A    -- which is now Nabors Drilling, and got promoted to

5  welder in '96.  '97, '98, and '99 I worked for Pool Arctic,

6  which is Nabors Drilling, as a rig welder on the North Slope.

7  Q    Okay.

8  A    Then started my own company in '99 --

9  Q    All right.

10  A    -- Ranes & Shine, started out as a welding truck and then

11  got into a shop on King Street, and then built a new shop on

12  Quinhagak.

13  Q    Okay.  So it's obvious, then, that you've been involved

14  in the business community; I can presume from that that you

15  can read, you can write, you understand English, et cetera; is

16  that true?

17  A    Yes, sir.

18  Q    So have you been able to comprehend everything you've

19  heard me say so far?

20  A    Yes, sir.

21  Q    So you're mentally, emotionally, intellectually capable

22  of proceeding here today and entering guilty pleas, is that

23  right?

24  A    Yes, sir.

25  Q    You also in this matter signed a plea agreement, a

1  document entitled "plea agreement," is that right?

2  A    Yes, sir.

3  Q    Did you have a chance to review that?

4  A    Yes, I did.

5  Q    Did you read it?

6  A    Yes, sir.

7  Q    Did you discuss it with your attorney?

8  A    Yes, sir.

9  Q    Do you understand the terms of it?

10 A    Yes, sir.

11 Q    And you actually signed the plea agreement, is that

12 right?

13 A    Yes, sir.

14 Q    So you expect to be bound by the terms of this plea

15 agreement, is that right?

16 A    Yes, sir.

17 Q    And you're -- expect the government to be bound as well,

18 presuming I accept the plea agreement, is that true?

19 A    Yes, sir.

20 Q    Okay.  Okay.  So when you signed it, did you do that

21 freely and voluntarily?

22 A    Yes, sir.

23 Q    No one threatened you or anything, did they?

24 A    No, sir.

25 Q    Okay.  As we meet here this morning, are you under the

1   influence of anything that might impact your ability to

2   comprehend what you're doing such as drugs, alcohol,

3   medication?

4   A    No, sir.

5   Q    Okay.  Have you had a drug problem that might impact your

6   ability to comprehend in the past?

7   A    No, sir.

8   Q    Okay.  So I don't need to be concerned at all about

9   your --

10  A    Mental capacity, no, sir.

11  Q    Okay, mental capacity.

12          THE COURT:  And, counsel, do you agree with that?

13          MR. BENTLEY:  Yes, Your Honor.

14          THE COURT:  Okay.  All right.

15  BY THE COURT:

16  Q    Okay.  All right.  Let's talk a little bit about the

17  charges against you that were included in this plea agreement.

18  Actually, if -- just so everybody's on the same wavelength, if

19  you want to turn to page three of the plea agreement, it

20  actually sets for the charges that I understand you're going

21  to plead guilty to this morning.

22      The first charge is Count 1 of the indictment or the

23  second superseding indictment, is conspiracy to important

24  marijuana in violation of 21 USC 963, 952, and 960.  The

25  second charge that you're going to plead guilty to

1   is Count 119, aiding and abetting money laundering, and the

2   third charge you're going to plead guilty to is Count 137,

3   international money laundering.  Is that your understanding of

4   what you're going to do this morning?

5   A    Yes, sir.

6   Q    So we need -- you need to understand what the government

7   would have to prove in order to obtain a conviction with

8   regard to each of these counts, and that's set forth at the

9   bottom of page 3 in which it sets forth the elements.  So with

10  regard to Count 1, conspiracy to import 1,000 kilograms or

11  more of marijuana, this is what the government would have to

12  prove if the matter were to go to trial, and they'd have to

13  prove it beyond a reasonable doubt, each of these elements.

14       First, they'd have to prove that there was an agreement

15  between two or more people to import marijuana into the United

16  States.  Got that?

17  A    Yes, sir.

18  Q    Then they'd have to prove that you joined the conspiracy

19  or the agreement knowing of its object and intending to help

20  accomplish it.  They'd have to prove that was well.  Do you

21  understand that?

22  A    Yes, sir.

23  Q    Then they'd have to prove that during the course of your

24  involvement in this conspiracy, 1,000 kilograms or more of

25  marijuana was imported which was -- which you reasonably could

1   foresee.  You understand that?

2   A    Yes, sir.

3   Q    If they could prove all of those elements beyond a

4   reasonable doubt, then the jury would be instructed to find a

5   guilt -- find you guilty.  Do you understand that?

6   A    Yes, sir.

7   Q    On the other hand, if they were unable to prove any one

8   of those elements beyond a reasonable doubt, the jury would be

9   instructed to find you not guilty.  Do you understand that?

10  A    Yes, sir.

11  Q    Okay.  Then we turn to Count 119, aiding and abetting

12  money laundering.  Here's what they'd have to prove, and

13  there's a number of elements to that.  First they'd have to

14  prove that you or one of your accomplices knowingly conducted

15  or attempted to conduct or aided and abetted the conducting of

16  a financial transaction affecting interstate commerce.  You

17  follow that one?

18  A    Yes, sir.

19  Q    Then they'd have to prove that the financial transaction

20  involved the proceeds of a specified unlawful activity.  You

21  follow that?

22  A    Yes, sir.

23  Q    Then they'd have to prove that you knew that the funds

24  represented the proceeds of some form of unlawful activity.

25  You got that?

1   A    Yes, sir.

2   Q    Then they'd have to prove that you knew that the

3   transaction was designed in whole or in part to either promote

4   the carrying on of the specified unlawful activity or conceal

5   and disguise the nature, location, source, ownership, or

6   control of the proceeds of the specified unlawful activity.

7   It's kind of long, but you know what it means?

8   A    Yes, sir.

9   Q    And you talked to your attorney about that.  You

10  understand that element?

11  A    Yes, sir.

12  Q    Okay.  And then the last thing they'd have to prove --

13  oh, I guess, let's see here.  Now I got -- another -- C, I

14  guess, another option, to avoid a financial reporting

15  requirement under state or federal law.  Do you understand

16  that?

17  A    Yes, sir.

18  Q    So, boy, that's a lot of words, but I think everyone

19  understands what we're talking about.  The main charge is

20  aiding and abetting money laundering, and this just sets forth

21  all the elements that the government would have to prove in

22  order to obtain a conviction.  And you understand those

23  elements, true?

24  A    Yes, sir.

25  Q    Okay.  It's just like the other one.  The government

1 would have to prove all those elements beyond a reasonable

2 doubt.  If they were able to do that, the jury would be

3 instructed to return a guilty verdict.  If they were unable

4 to -- if the government were unable to prove any one of those

5 elements, then the jury would be instructed to return a

6 not-guilty verdict.  Got that?

7 A    Yes, sir.

8 Q    Okay.  Then we turn to Count 137, which is international

9 money laundering, and this -- there's four elements to that.

10 The government would have to prove that you knowingly

11 conducted or attempted to conduct or aided and abetted the

12 conducting of a monetary transaction involving the

13 international movement of funds, and that's first.  Then

14 they'd have to prove that the money transaction involved the

15 proceeds of a specified unlawful activity.  Understand that?

16 A    Yes, sir.

17 Q    Then they'd have to prove that you knew that the funds

18 represented the proceeds of some form of unlawful activity.

19 Got that?

20 A    Yes, sir.

21 Q    And then they'd have to prove that you knew that the

22 transaction was designed in whole or in part to conceal or

23 disguise the nature, location, source, ownership, and control

24 of the proceeds of the specified unlawful activity.  You

25 understand that?

1 | A     Yes, sir.

2 | Q     And again this all relates back to the marijuana drugs.

3 | A     Yes, sir.

4 | Q     You understand what we're -- it's all connected.

5 | A     Yes, sir.

6 | Q     Do you have any questions about any of this?

7 | A     No, sir.

8 | Q     Okay.  So those are the elements of the three charges to

9 | which you're going to plead guilty today.  And you've

10 | discussed this thoroughly with your attorney, is that right?

11 | A     Yes, sir.

12 | Q     Are you satisfied with the legal representation that

13 | you've received in this matter?

14 | A     Yes.

15 | Q     Okay.  All right.  Do you feel that you and your attorney

16 | have sufficient information about the case to proceed with

17 | guilty verdict -- guilty pleas here this morning?

18 | A     Yes, sir.

19 | Q     Okay, very well.  You know that -- and this apparently

20 | was the subject of some discussion because there is a plea

21 | agreement.  As you prepared to sign that plea agreement, I

22 | presume you had discussions and considered what the

23 | consequences of such a guilty plea would be in terms of a

24 | sentence, is that right?

25 | A     Yes, sir.

1  Q    And you understand that the way we sentence people in the

2  federal system is we begin by looking at the United States

3  Sentencing Commission Guidelines.  It's a manual.  And we look

4  at the nature of the crime, we look at your criminal history,

5  and that gives us a range.  You understand that?

6  A    Yes, sir.

7  Q    And then that's a beginning point, and then we look at

8  any number of other statutory factors--they call them 3553

9  factors--and we determine then what a fair sentence is, and

10  that's the process.  Do you understand that?

11  A    Yes, sir.

12  Q    And the amount of drugs involved is one of the factors

13  that's considered, your criminal history is one of the factors

14  that's considered, and there's any number of other factors

15  that can be considered.  You understand all that?

16  A    Yes, sir.

17  Q    Okay.  Do you have any questions about how a sentencing

18  is conducted in the federal system?

19  A    No, sir.

20  Q    Okay.  Okay.  And this decision to plead guilty to these

21  three charges, that's something that you're doing freely and

22  voluntarily as well, right?

23  A    Yes, sir.

24  Q    No threats there, either, was there?

25  A    No, sir.

1  Q    Okay.  You know, this plea agreement has a -- is fairly
2  detailed.  I'm not going to read it all to you unless you want
3  me to.  Do you?

4  A    I don't need to, sir.

5  Q    No?  Okay.  You've read it, you've talked about it to
6  your attorney.

7  A    Yes, sir.

8  Q    But I see that on page 22 and 23, it does talk about some
9  of the rights you're waiving, including your appellate rights
10 and your right to collaterally attack the sentence.  Do you
11 understand that, that once this is done, if I accept your
12 guilty pleas today, there's not going to be a trial.  You know
13 that, right?

14 A    Yes, sir.

15 Q    And we'll come back in two and a half months and we'll do
16 the sentencing.  You understand that?

17 A    Yes, sir.

18 Q    And if I accept the plea agreement, I'll have to sentence
19 you consistent with the agreement.  Do you understand that?

20 A    Yes, sir.

21 Q    But then you're stuck with it, you know that, right?

22 A    Yes, sir.

23 Q    You can't appeal.

24 A    Yes, sir.

25 Q    I mean, that's -- and you can't file another lawsuit and

1  attack the sentence.  You understand that?

2  A    Yes, sir.

3  Q    Basically, it's set forth right here in the plea

4  agreement.  It says that you waive your right to appeal the

5  convictions resulting from the entry of guilty pleas; you

6  further agree that if the Court accepts the agreement, you

7  waive without exception the right to appeal, on all grounds

8  contained in 18 USC 3742, the sentence that the Court imposes,

9  including the forfeiture and terms relevant to that.  You

10  understand that?

11  A    Yes, sir.

12  Q    And you can't collaterally attack the sentence, either.

13  You can't file another lawsuit.  I guess the only exceptions

14  to that would be any challenge to the conviction or sentencing

15  alleging ineffective assistance of counsel, but you've already

16  indicated you're satisfied with your counsel, right?

17  A    Yes, sir.

18  Q    And I suppose you could try to attack the plea if you

19  were able to prove that your plea today was not voluntary,

20  right?

21  A    Yes, sir.

22  Q    But it's voluntary, isn't it?

23  A    Yes, sir.

24  Q    I mean, you want to do this this morning.

25  A    Yes, sir.

1  Q    Okay.  All right.  All right.  You know, you don't have

2  to plead guilty, right?

3  A    Yes, sir.

4  Q    You're entitled to plead not guilty and go to trial, and

5  I think we have a trial date set here in April.  Do you

6  understand all that?

7  A    Yes, sir.

8  Q    The government would then have to prove all of the

9  charges against you beyond a reasonable doubt, and you

10  understand that, right?

11  A    Yes, sir.

12  Q    Here's some of the rights that you would have if you went

13  to trial, and I think you know them because you've obviously

14  read the plea agreement.  Let me just go over them briefly.

15  You would entitled to an attorney throughout the whole

16  process.  Do you understand that?

17  A    Yes, sir.

18  Q    And if you couldn't afford counsel, counsel would be

19  appointed to represent you.  You understand that?

20  A    Yes, sir.

21  Q    When I say throughout the whole process, I mean before

22  the trial, during the trial, and after the trial.  You

23  understand that?

24  A    Yes, sir.

25  Q    Trial would proceed in here in the federal court, in

1  either this courtroom or the courtroom next door.  I would be

2  the judge.  You understand all that?

3  A     Yes, sir.

4  Q     You could appear, obviously, with your attorney, dressed

5  in civilian attire.  You understand that?

6  A     Yes, sir.

7  Q     The government would then have to prove each of the

8  elements of all the charges against you.  Do you understand

9  that?

10  A     Yes, sir.

11  Q     The way they would try to do that is they'd call

12  witnesses in, witnesses who would come in and testify from the

13  witness stand to my left.  They'd be sworn in, and the

14  government would elicit testimony from them.  You through your

15  attorney could cross-examine any witness called.  You

16  understand that?

17  A     Yes, sir.

18  Q     When that was done, then you could bring in your own

19  witnesses, who would testify under oath as well.  Do you

20  understand that?

21  A     Yes, sir.

22  Q     And then you could testify if you wanted to at the trial.

23  Do you understand that?

24  A     Yes, sir.

25  Q     You wouldn't have to, and if you chose not to testify, we

1    tell the jury they couldn't hold that factor against you.  You

2    understand all that?

3    A    Yes, sir.

4    Q    So you have a pretty good sense of what a trial would be

5    if you went to trial, right?

6    A    Yes, sir.

7    Q    In order to obtain a conviction, the government would

8    have to prove, as I said before, each of the elements of all

9    the counts, but all of the jurors would have to find that you

10   were guilty.  It would -- the jurors would be -- there would

11   be 12 jurors, and they would have to unanimously all agree

12   that the government had proven the charges against you.  Do

13   you understand that?

14   A    Yes, sir.

15   Q    So that's what would happen if there were a trial.  But

16   if I accept your guilty pleas this morning, there's not going

17   to be a trial.  You know that, right?

18   A    Yes, sir.

19   Q    And as I said before, we'll just come back and do the

20   sentencing sometime in April, probably, okay?

21   A    Yes, sir.

22   Q    And you know that these are felony charges we're talking

23   about, right?

24   A    Yes, sir.

25   Q    There are certain consequences to pleading guilty to a

1  felony in and of itself.  For instance, you'd be forever a
2  felon, you know that, right?

3  A    Yes, sir.

4  Q    That means you could never possess a firearm ever for the
5  rest of your life.  Do you understand that?

6  A    Yes, sir.

7  Q    You would also, at least for the term of your sentence
8  and supervised release, not be able to serve on a jury, not be
9  able to run for public office, not be able to vote, and there
10 might be certain federal grants that you might be ineligible
11 for.  Do you understand all that?

12 A    Yes, sir.

13 Q    That's just as a consequence of being a felon.  In this
14 particular case, there are three charges that you're
15 contemplating guilty pleas on, so that would require a special
16 assessment of $100 with regard to each of the three charges,
17 so that would be $300 right off the top.  Do you understand
18 that?

19 A    Yes, sir.

20 Q    You've talked about -- and in fact this is a pretty
21 specific plea agreement in terms of what sentence you're
22 looking at, and it's set forth, it looks like, on page 11 of
23 the plea agreement.  So let's turn to page 11.  Well, this
24 sets forth -- we'll start off with the -- page 11 actually
25 sets forth the mandatory potential sentence that you're

RANES - VOIR DIRE

1   looking at.  For instance, Count 1, the marijuana conspiracy
2   charge, you see that?

3   A    Yes, sir.

4   Q    That carries a sentence range of 10 years mandatory
5   minimum, up to life imprisonment.  Do you understand that?

6   A    Yes, sir.

7   Q    It also carries a maximum fine of $4 million, a $100
8   mandatory special assessment, and five years mandatory minimum
9   supervised release, up to life.  Do you understand that?

10  A    Yes, sir.

11  Q    I don't know if you know what supervised release is, but
12  I'll just tell you real briefly.  That means after you've
13  served your sentence and you're out of jail, you are on
14  supervised release, which is kind of like probation in the
15  state system.  You have to follow certain conditions, report
16  to a probation officer, undergo drug assess -- drug testing,
17  any number of conditions.  If you do it, fine.  If you don't,
18  you could go back to jail for an additional period of time.
19  That's what supervised release is.  Understand it?

20  A    Yes, sir.

21  Q    Okay.  So we know what the maximum is for Count 1.
22  Count 119 and Count 137, they -- their sentence range is up to
23  20 years in prison; a fine of $500,000, or twice the value of
24  the property involved in the crime, whichever is greater;
25  again a $100 mandatory special assessment; and up to a

1    five-year term of supervised release.  So that's the maximum

2    sentence for Counts 119 and 137.  Do you understand that?

3    A    Yes, sir.

4    Q    You've had that explained before, right?

5    A    Yes, sir.

6    Q    Okay.  In this particular case, if I read the plea

7    agreement accurately, everyone has agreed to a sentence of 30

8    years in prison.  Is that true?

9    A    Yes, sir.

10   Q    And you understand that?

11   A    Yes, sir.

12   Q    Okay.  Well, just so you know, that would all be served

13   in a federal penitentiary somewhere in the United States.  You

14   understand that?

15   A    Yes, sir.

16   Q    And in the state -- in the federal system, not like the

17   state system, in the federal system there's no parole, so when

18   they say 30 years, that means 30 years.  You understand that?

19   A    Yes, sir.

20   Q    You can earn good time, but that's up to you and the

21   Bureau of Prisons.  The sentence is 30 years, and that's what

22   you serve other than good time.  Do you understand that?

23   A    Yes, sir.

24   Q    Okay.  And as I said before, once you get out, then

25   you're on supervised release.  Do you understand that?

1  A    Yes, sir.

2  Q    Okay.  Well, this is a pretty big sentence you're looking

3  at.  You still want to plead guilty?

4  A    Yes, sir.

5  Q    Do you have any questions about any of this?

6  A    No, sir.

7  Q    You've talked to your attorney.  You know if I accept

8  this sentence, then I'm going to take some time and determine

9  whether or not to accept the plea agreement.  I presume that

10 parties have negotiated in good faith.  It looks like it's

11 pretty thorough.  Chances are I'll accept the plea agreement,

12 then we'll just come back here, I'll impose a sentence, and

13 you'll go off and serve the sentence.  Do you understand that?

14 A    Yes, sir.

15 Q    Before I decide whether or not to accept the plea

16 agreement, I hear from the probation officer, who does a

17 report; you would be able to meet with the probation officer,

18 and your attorney could be there, and there would be an

19 interview, so we'd have a presentence report.  Then the

20 government would set forth its recommendations, which I

21 presume would be consistent with the plea agreement; I hear

22 from your attorney, and then I hear from you, and then I just

23 impose a sentence.

24 A    Yes, sir.

25 Q    Pretty straightforward, right?

1  A     Yes, sir.

2  Q     It looks like there's not any real surprises from what I

3  can tell.  Do you have any questions at all?

4  A     No, sir.

5  Q     So what I'll do is I'll ask the government to set forth

6  the facts it would prove at trial if this matter were to go to

7  trial, and I'll ask you to listen to this, sir, and tell me if

8  these facts are true.

9          MR. BRADLEY:  Thank you, Judge.  The United States

10  would prove that beginning in about 2003, early 2003, and

11  continuing April 22nd, 2006, the date the defendant and a

12  number of other people were arrested, that Tom Ranes, Tom

13  Cody, Joel Bryant, Dennis Shine, the other individuals named

14  in the indictment, and other individuals who are known to the

15  United States conspired, agreed, and joined together in order

16  to import marijuana from Canada into the United States and

17  then distribute it here in the United States.  We would prove

18  that through surveillance that took place at various

19  locations, video surveillance from cameras, border crossing

20  records, and testimony of other individuals both indicted and

21  unindicted.

22          We'd prove that Mr. Ranes knew that during the time

23  of the conspiracy and during his involvement at least 1,000

24  kilograms of marijuana was imported into the United States by

25  the members of the conspiracy and on their behalf.  We'd prove

1  that Mr. Ranes joined the conspiracy knowing that that was

2  what was going on and intending to help achieve that.  He

3  started by driving across the border and by fabricating tanks

4  using his welding skills to put concealed compartments in

5  tanks and in vehicles so that marijuana could be

6  surreptitiously smuggled across the border between Canada and

7  the United States.

8        Mr. Ranes also arranged for the structuring of cash

9  bank deposits so that currency would be deposited into bank

10  accounts, either in large amounts in order to make it appear

11  to be legitimate, and then when questioned by bank

12  authorities, reducing the amount to beneath the $10,000

13  reporting requirement to avoid the currency transaction

14  reporting requirements of the bank secrecy act.  He also

15  arranged for the wire transfer of funds from the United States

16  to Ukraine on behalf of other defendants in order to launder

17  the proceeds of drug trafficking.

18        He assisted Tom Cody by paying Mr. Cody as an

19  employee of the Ranes & Shine business, even though Mr. Cody

20  did no work for Ranes & Shine and Tom Ranes knew that would

21  allow Mr. Cody to receive money in payments that appeared to

22  be salary.  During the conspiracy, Mr. Ranes and his business

23  associates borrowed over half a million dollars from Tom Cody,

24  which Mr. Ranes knew was the proceeds of Tom Cody's drug

25  smuggling business and which was used to run the Ranes & Shine

1  business which was not functioning very well on its own and

2  needed an influx of capital from the drug business because the

3  welding and vehicle repair business was not keeping the

4  business afloat.  We would establish that through records from

5  the business and employees from the business and bank records.

6         Mr. Ranes, in July of 2005, arranged for another one

7  of his associates who was a member of the conspiracy to

8  deposit $45,000 in cash into the North Rim Bank, purchasing a

9  cashier's check made out to Ranes & Shine.  That enabled the

10  currency to be able to be transferred into a check form made

11  out to the business and made it appear to be legitimate;

12  however, Mr. Ranes knew that that was the proceeds of drug

13  trafficking, marijuana trafficking activity, and it was

14  designed to conceal the nature of the funds, making it look

15  legitimate, money laundering, taking dirty money and making it

16  look clean.

17         With respect to the international money laundering,

18  on or about October 20th, 2004, Tom Ranes received about

19  $40,000 in cash from Joel Bryant, another co-conspirator who

20  is now deceased.  That money was wired from North Rim Bank to

21  Marine Transport Bank of the Ukraine.  The purpose of that was

22  to take what Mr. Ranes knew was the proceeds of marijuana

23  trafficking and send it to the Ukraine where it could be

24  invested on behalf of Tom Cody and Joel Bryant, who were

25  members of the conspiracy involved in the marijuana

1  trafficking.

2         During the conspiracy, Tom Cody became unhappy about

3  another member of the conspiracy who was going out on his own

4  and arranged for another member of the conspiracy to shoot the

5  other individual over in Bootlegger Cove, approximately five

6  times.  Tom Ranes was aware of that.  The United States would

7  establish that by calling at trial the individual who was shot

8  and the individual who did the shooting.

9         Tom Cody -- because of the debt that Tom Ranes owed

10  Tom Cody, Tom Cody did threaten Tom Ranes on numerous

11  occasions, did take property from him, demand money from him,

12  and essentially assert that he was controlling Tom Ranes's

13  life during 2004 and 2005 when Tom Ranes owed a significant

14  debt to Mr. Cody.

15         In late May of 2005, Tom Ranes became aware that

16  Dennis Shine, who was a co-defendant, had manufactured and

17  tested a silence for a 9-millimeter Beretta semiautomatic

18  pistol at the Ranes & Shine shop.  Dennis Shine has admitted

19  to law enforcement that on June 1st, 2005, Dennis Shine

20  murdered Thomas Cody.  He let himself into Thomas Cody's house

21  here in Anchorage.  When Thomas Cody arrived, Dennis Shine

22  shot him in the face, shot him once in the head with the

23  silenced Beretta, and then that he did that in furtherance of

24  the conspiracy and during the time in which Dennis Shine, Tom

25  Cody, and Tom Ranes were members of the conspiracy.  Defendant

1    Tom Ranes was a member of the conspiracy at that time, and the

2    fact that someone would be shot and killed in furtherance of

3    the conspiracy was foreseeable to him under the concepts

4    spread out in *Pinkerton versus The United States*, that if

5    someone is involved in a conspiracy and a crime is committed

6    in furtherance of that conspiracy and that crime was

7    foreseeable to that defendant, a defendant who was a member of

8    the conspiracy, is responsible for the crime as if he had

9    committed that crime himself.  That murder was in the scope of

10   the unlawful agreement; it was reasonably foreseeable as a

11   necessary and natural consequence of the agreement.

12          After Tom Cody died, Tom Ranes caused about a

13   million dollars that belonged to Tom Cody and had been sent to

14   Canada with the eventual destination being Ukraine for money

15   laundering and -- international money laundering and

16   investment in business opportunities in the Ukraine for

17   Mr. Cody and Mr. Bryant, Mr. Ranes caused that money to be

18   brought back to Alaska.  After Tom Cody died, essentially Tom

19   Ranes filled his role in the conspiracy, which he maintained

20   until the arrests in April of 2006.

21          The United States would also prove certain things

22   that I don't -- it's reflected in the agreement Mr. Ranes

23   doesn't necessarily concede or deny those things, but we

24   would --

25          THE COURT:  Can I go ahead and then stop at this

1    point and ask Mr. Ranes --

2    BY THE COURT:

3    Q    Have you heard everything he said so far?

4    A    Yes, sir.

5    Q    Is what he just said so far true?

6    A    Can I ask my attorney something?

7    Q    Sure.

8         (Whispered conversation)

9    A    I'd have to agree with that, I guess.

10   Q    Well, you don't have to guess.  I mean, it's in the plea

11   agreement and you signed the plea agreement.  Is it true or

12   not?

13   A    Yeah.

14   Q    Yes or no?

15   A    Yes.

16   Q    Okay.

17          THE COURT:  Go ahead.

18          MR. BRADLEY:  The United States would proffer that

19   at trial we would offer testimony establishing that in late

20   May of 2005, Mr. Ranes and Mr. Shine planned to kill Tom Cody

21   to eliminate him from the conspiracy, thereby also eliminating

22   the debt that Tom Ranes owed to Tom Cody.  There were several

23   attempts that did not result in the death of Mr. Cody.

24   Finally, on about June 1st, Mr. Ranes dropped Mr. Shine off

25   near Tom Cody's house on Our Own Lane in Anchorage.  Mr. Shine

1   went into Mr. Cody's house and waited for him, shot him to

2   death, took the body first south of Anchorage and then north

3   of Anchorage to the Jim Creek area.  During that time he was

4   frequently in contact with Mr. Ranes on the telephone.  The --

5   that would be established through cell phone records and cell

6   tower records which showed where those cell phones were being

7   used during the calls, although we do not have the contents of

8   the calls.

9           The body was transported to the Jim Creek area in

10  the back of a 2004 Ford Explorer that belonged to Tom Ranes's

11  wife.  Dennis Shine buried the body in a shallow grave in Jim

12  Creek.  After the body was buried, Mr. Ranes arrived and

13  helped burn what was essentially his own Ford Explorer in

14  order to destroy evidence, and that was dumped about 300 yards

15  away from the site of the body.  The body was located by law

16  enforcement on July 5th of 2007.  After the body was disposed

17  of and the vehicle was burned, Mr. Shine went to Fairbanks,

18  and Mr. Ranes came back to Anchorage.

19          THE COURT:  Okay.  So -- and that last segment that

20  you just outlined is what you would prove through other

21  witnesses at trial --

22          MR. BRADLEY:  Yes, Judge.

23          THE COURT:  -- and that Mr. Ranes is not taking a

24  position on one way or the other for purposes of this hearing

25  this morning, is that right?

1           MR. BRADLEY:  That's my understanding.

2           THE COURT:  Is that right?

3           MR. BENTLEY:  Well, I would say it's not admitted by

4    Mr. Ranes.

5           THE COURT:  Right.

6           MR. BENTLEY:  He's denying that, but --

7           THE COURT:  Okay.

8           MR. BENTLEY:  -- I'm looking at the facts of this

9    case.  What the Court reviewed in part C is ample to support a

10   guilty plea, and for that reason, we're here to plead.

11          THE COURT:  Very well.

12   BY THE COURT:

13   Q    Okay.  Mr. Ranes, as you -- as we've gone through

14   earlier, you're charged with a number of matters in this

15   matter, but you want to plead guilty to several things, and so

16   I'm just going to ask you how you plead.  You've been charged

17   with -- in Count 1 with marijuana importation and conspiracy.

18   Now, this is Count 1 of the second superseding indictment.

19   We've had quite a discussion about that particular count.  How

20   do you plead to that?  Do you plead guilty or not guilty?

21   A    Guilty.

22   Q    Then you've been charged in Count 119 of money

23   laundering, and, again, this is in Count 119 of the second

24   superseding indictment.  How do you plead to Count 119?  Do

25   you plead guilty or not guilty?

1  A    Guilty.

2  Q    And you've been charged in Count 137 of the second

3  superseding indictment of international money laundering.  How

4  do you plead to that, guilty or not guilty?

5  A    Guilty.

6  Q    Okay.  Well, here's what it looks like to me, and you're

7  free to interrupt me or tell me if you disagree.  It appears

8  to me that you're fully competent and capable of entering

9  informed pleas this morning.  Would you agree with that?

10  A    Yes, sir.

11  Q    It also appears to me that you're aware of all your

12  rights.  Would you agree with that?

13  A    Yes, sir.

14  Q    It also appears to me that your guilty pleas that you've

15  just made are made -- being made freely and voluntarily and

16  knowingly.  Would you agree with that?

17  A    Yes, sir.

18  Q    No one's threatened you or anything of that nature?

19  A    No, sir.

20  Q    And it also appears to me that your guilty pleas are

21  being made at a time where you're in control of all your

22  faculties.

23  A    Yes, sir.

24  Q    Okay.  And it also appears to me that you've had the

25  advice of legal counsel and you're satisfied with the legal

RANES - VOIR DIRE

1   advice and counsel that you've received, is that right?

2   A    Yes, sir.

3   Q    Okay.  Additionally, it appears to me that the guilty

4   plea is supported by facts that the prosecutor has just set

5   forth and that you've acknowledged to be true which support a

6   finding of guilt with regard to each of the elements of each

7   of the offenses to which guilty pleas have been entered.

8   A    Ye --

9           THE COURT:  Based thereon, I'm going to accept your

10  guilty pleas, okay?

11          MR. RANES:  Yes, sir.

12          THE COURT:  That means I'm going to vacate the trial

13  in this matter.  You have a hearing set today at 10 o'clock

14  and another one at two o'clock apparently before the

15  magistrate judge that's no longer necessary, so I'll vacate

16  that.  And there was a final pretrial conference set for

17  April 10th, '08; I'll vacate that.  Trial was set for, I

18  think, April 14th; that's vacated.  Okay?

19          MR. RANES:  Yes, sir.

20          THE COURT:  Anything else?  Would --

21          MR. BRADLEY:  Judge, I would like to address the

22  forfeiture issues.  There are a couple of forfeiture counts

23  that I'm sure --

24          THE COURT:  There's -- and that's addressed

25  extensively in the plea agreement.

*Gaylene's Word Services*
*907-338-3936*

1          MR. BRADLEY:  It is.

2          THE COURT:  Go ahead.

3          MR. BRADLEY:  We'd ask that the defendant be asked

4   to admit the allegations in Count 141 and 142 alleging drug

5   and money laundering, forfeiture.  There are approximately 83

6   specific items--vehicles, trailers, snowmachines, money,

7   weapons, other things that the defendant -- real

8   property--that he will forfeit any interest that he may have

9   in those and that ask the Court to issue a preliminary order

10  of forfeiture in this case.

11          THE COURT:  You understand, sir, that you also are

12  going to forfeit any interest you have in all these items that

13  are identified in the plea agreement?

14          MR. RANES:  Yes, sir.

15          THE COURT:  And that it's subject to Counts,

16  apparently, 141 and 142 of the second superseding indictment.

17  Do you understand that?

18          MR. RANES:  Yes, sir.

19          MR. BENTLEY:  Your Honor, if there is a preliminary

20  order of forfeiture prepared, we'd be happy to sign off on it.

21          THE COURT:  And I will sign it as soon as I see it.

22  So there's -- I don't think there's any question about that.

23  All these items are very specifically set forth in the plea

24  agreement, and I will certainly accept the fact that the money

25  and the property, vehicles, et cetera, are subject to

1  forfeiture, and that the defendant has recognized and

2  acknowledged that as well.  Anything else we need to do in

3  that regard?

4            MR. BRADLEY:  No, thank you, Your Honor.

5            THE COURT:  Okay.  So what we're going to do is I'll

6  set sentencing.  We've vacated the trial.  I'll order a

7  presentence report, and you'll be able to meet with the

8  probation officer.  Your attorney can be there for that

9  meeting.  The report will be prepared, and that's one of the

10 things I'll look at in determining whether or not to accept

11 the plea agreement.  And then I have tentatively set

12 sentencing to proceed April 24th, 2008, here in Anchorage at

13 9:00 in the morning.  I think that covers everything that we

14 have to do today.

15           Does the probation officer have anything else?

16           MS. SHAW:  No, sir, Your Honor.

17           THE COURT:  The government have anything else?

18           MR. BRADLEY:  No, Your Honor.  Thank you.

19           THE COURT:  Counsel, anything?

20           MR. BENTLEY:  No, Your Honor.  I think it's

21 understood that the other counts in the second superseding

22 indictment will be dismissed at the time of sentencing.

23           THE COURT:  They typically are dismissed at the time

24 of sentencing.

25           MR. BENTLEY:  Very well.

*Gaylene's Word Services*

*907-338-3936*

1          THE COURT:  And I presume that's the plan.  Is that
2     right?

3          MR. BRADLEY:  Our intention will be to move to
4     dismiss those counts at that time, yes, Judge.

5          THE COURT:  Okay.  So, Mr. Ranes, any questions
6     whatsoever about any of this?

7          MR. RANES:  No, sir.

8          THE COURT:  Okay.  Thank you very much.

9          THE CLERK:  All rise.  This matter is now adjourned.
10    This court now stands in recess until the 9:00 a.m. matter.
11    Off record.

12        (Off record)

13         THE CLERK:  I am recording.  All rise.  His Honor
14    the Court, this United States District Court is again in
15    session.  Please be seated.

16         THE COURT:  All right.  Is there a detail we
17    overlooked?

18         MR. BRADLEY:  Yes.  I did mention, I think, that the
19    defendant needed to admit the allegations in the forfeiture
20    counts on the record.  Normally, they -- when they come in --

21         THE COURT:  141 and 142?

22         MR. BRADLEY:  Yes.  And then I forgot to make sure
23    that that happened.

24         THE COURT:  Do you admit that, sir?

25         MR. RANES:  Yes, sir.

1          THE COURT:  With regard to 141 --

2          MR. RANES:  With --

3          THE COURT:  -- and 142, both of the -- is that the

4     counts in the indictment?

5          MR. BRADLEY:  Yes, Judge.

6          THE COURT:  Count 141 seeks forfeiture of certain

7     items.  Do you admit that?

8          MR. RANES:  Yes, sir.

9          THE COURT:  Count 142 seeks forfeiture of certain

10    items.  Do you admit that as well?

11         MR. RANES:  Yes, sir.

12         THE COURT:  What else do you want me to do?

13         MR. BRADLEY:  That's what my forfeiture attorney

14    advised me that I needed to do, so I wanted to clear that up

15    on the record.  I think it'll save time later on.

16         THE COURT:  I mean, we've covered this backwards,

17    forwards, and upside down.

18         MR. BRADLEY:  Yes, sir, we have.

19         THE COURT:  But, I mean, he knows when he gets out

20    of jail, he's not going to pick up any of that money, any of

21    those drugs, or any of those vehicles, right?

22         MR. RANES:  Yes, sir.

23         THE COURT:  Or anything else associated with this.

24    They're all forfeited; you understand that?

25         MR. RANES:  Yeah.  It'll be airplanes when I get

1 out.

2          THE COURT:  They'll be gone.

3          MR. RANES:  So --

4          THE COURT:  All right.

5          MR. BRADLEY:  Thank you very much.

6          MR. BENTLEY:  Could we have -- could I have a

7 moment, Your Honor?

8          THE COURT:  Yeah.

9          MR. BENTLEY:  I don't want to be a fly in the

10 ointment here, but I just need to look at the --

11          THE COURT:  Sure, go ahead.

12          MR. BENTLEY:  -- plea agreement, if I may.

13     (Pause)

14          MR. BENTLEY:  I'm satisfied.  I --

15          THE COURT:  And I have the plea agreement.  I'm

16 satisfied.  Does anyone else want to do anything else?

17          MR. BRADLEY:  We're satisfied.

18          THE COURT:  Is it Mr. Barkeley that's giving you all

19 the trouble?

20          MR. BRADLEY:  No, it's Ms. Voke.

21          THE COURT:  Oh, she's the lady that cause -- are you

22 satisfied, ma'am?

23          MS. VOKE:  Yes.

24          THE COURT:  Okay.  All right.  Thank you.

25          MR. BRADLEY:  Thanks, Judge.

1          THE CLERK:  All rise.  This matter is adjourned.

2    This court stands in brief recess.

3          (Proceedings concluded at 9:21:18 a.m.)

4

5                        **CERTIFICATE**

6    I certify that the foregoing is a correct transcript from the
     electronic sound recording of the proceedings in the above-
7    entitled matter.

8

9                                          May 12, 2008
     M. Gaylene Larrecou, Transcriber     Date
10   United States Court Approved
     AAERT Certified #00285
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Gaylene's Word Services*

*907-338-3936*

1

## TABLE OF CONTENTS

2    PROPOSED CHANGE OF PLEA HEARING (2/8/08) . . . . . . . . . 3

| WITNESSES FOR THE DEFENDANT: | VOIR DIRE | DIRECT | CROSS | REDIRECT |
| --- | --- | --- | --- | --- |
| Thomas Payton Ranes | 4 | – | – | – |

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25