ALLEN R. BENTLEY
LAW OFFICES OF ALLEN R. BENTLEY
1111 Third Avenue
Suite 2220
Seattle, WA 98101
Tel.: (206) 343-9391
Fax: (206) 682-3746
Email: abentley@concentric.net
Attorney for Thomas P. Ranes

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | DEFENDANT THOMAS P. RANES'S |
| v. ) | SENTENCING MEMORANDUM |
| ) | |
| THOMAS P. RANES, ) | No. 3:06-cr-00041-RRB-JDR |
| ) | |
| Defendant. ) | |
| ) | |

**I.**

**INTRODUCTION**

On February 8, 2008, Thomas P. Ranes entered pleas of guilty to Counts 1 (conspiracy to import marijuana), 119 (money-laundering) and 137 (international money-laundering) in the Second Superseding Indictment [CR 721]. Sentencing is now set for June 4, 2008, at 9:00 a.m. In this memorandum, we discuss certain matters pertinent to the sentencing and the recently resolved motions concerning Mr. Ranes's guilty plea.

II.

SUMMARY

The plea agreement calls for a 360-month sentence. Mr. Ranes sought leave to withdraw the plea and proceed to trial [CR 754]. Earlier today, the court, in Docket Entry 817, denied Mr. Ranes's motion for leave to withdraw his plea, as well as his motion for appointment of special counsel to assist in the continued litigation of the plea withdrawal matter [CR 794] and his motion for a continuance of the sentencing [CR 792]. The remaining issue is whether or not the court should accept the plea agreement and impose a 360-month sentence.

The court's denial of Mr. Ranes's motion probably foretells its acceptance of the plea agreement.[1] However, we request that the court consider rejecting the plea agreement so that the factual issues in this case can be fully aired. In support of this request, we rely, first, on the fact that the Rule 11(c)(1)(C) sentence is significantly higher than the sentencing range that results when the Sentencing Guidelines are properly calculated. In addition, Mr. Ranes denies any involvement in the death of Thomas Cody, a denial that is tacitly embedded in the plea agreement. Yet Mr. Ranes is being punished for having *Pinkerton* responsibility for Mr. Cody's death. The Rule 11(c)(1)(C) sentence that Mr. Ranes is facing is exponentially higher than the sentences to be imposed on others who could similarly have been charged with legal responsibility for the death of Thomas Cody under a *Pinkerton* theory. This disparity is the second basis for our suggestion that the court should consider rejecting the plea agreement.

---

[1] "Under the circumstances, and given the overwhelming evidence of guilt, Defendant's course of action [accepting the plea agreement] appeared to be reasonable and calculated to avoid a more severe sentence." Order Denying Pending Motions [CR 817], p. 2.

## III.

## THE DISPARITY BETWEEN THE AGREED SENTENCE AND
## THE SENTENCING GUIDELINES

The Probation Office concludes that the advisory Sentencing Guidelines call for a sentencing range of 324 to 405 months [Presentence Report, ¶101]. Therefore, according to the Probation Office, the Rule 11(c)(1)(C) plea agreement is consistent with the guidelines.

The Probation Office finds that Mr. Ranes's Total Offense Level is 41 and his Criminal History Category is I. It is as a result of these findings that the presentence report places Mr. Ranes in the 324-to-405 month range [Presentence Report, ¶102]. We do not disagree with the conclusion that Mr. Ranes's Criminal History Category is I, but we *do* disagree with the conclusion that his Offense Severity Level is Level 41.

The Probation Office incorrectly applied the guidelines. The appropriate Offense Severity Level is not more than 37, possibly less. The reason is that the Probation Office has improperly included a Chapter Three enhancement (namely, leadership role) in determining the offense level for the marijuana charges as part of the process of applying Guidelines §2S1.1 to determine the offense level for the money-laundering counts.

Understanding our argument requires that one understand the process that the guidelines use for calculating the Offense Level for money-laundering. The process has at least three steps.

*Step One*. One determines the Base Offense Level. Guidelines §2S1.1(a)(1) is pertinent here. This section states that the Base Offense Level for money-laundering is determined by "[t]he offense level for the underlying offense from which the laundered funds were derived, if

(A) the defendant committed the underlying offense ....; and (B) the offense level for that offense can be determined ..."

*Step Two*.  One determines if any specific offense characteristics are present; *see* Guidelines §2S1.1(b).

*Step Three*.  One considers whether any Chapter Three adjustments would be applicable. *See generally, United States v. Anderson*, __ F.3d __, 2008 W.L. 2167229 (6th Cir. May 27, 2008) (holding that in calculating the offense level for money-laundering, the sentencing court is not limited to the Chapter Two-derived offense level for the underlying drug offense).

The presentence report made an error in Step One.  The report correctly sought to "borrow" or incorporate the offense level for Count 1, the marijuana smuggling charge.  In doing so, however, the report mistakenly included the four-level upward role-in-the-offense adjustment under Chapter Three of the guidelines that had been factored in, in scoring Count 1.  No role adjustment of any kind should have been included in the "borrowed" offense level used to calculate the Base Offense Level under §2S1.1.

Our conclusion that a Chapter Three role enhancement should not be included in the "borrowed" offense level utilized under §2S1.1(a)(1) is based on instructions from the Sentencing Commission itself.  The Commission adopted Amendment 634, which contained the current money-laundering, in 2001.  In a "Reason for Amendment" statement that accompanied Amendment 634, the Commission stated (emphasis and underlining added):

> This amendment is designed to promote proportionality by providing increased penalties for defendants who launder funds derived from more serious underlying criminal conduct, such as drug trafficking, crimes of violence, and fraud offenses that generate relatively high loss amounts, and decreased penalties for defendants who launder funds derived

from less serious underlying criminal conduct, such as basic fraud offenses that generate relatively low loss amounts.

First, this amendment ties offense levels for money laundering more closely to the underlying conduct that was the source of the criminally derived funds by separating money laundering offenders into two categories for purposes of determining the base offense level. For direct money launderers (offenders who commit or would be accountable ... for the underlying offense which generated the criminal proceeds), *subsection (a)(1) sets the base offense level at the offense level in Chapter Two (Offense Conduct) for the underlying offense* (i.e., the base offense level, specific offense characteristics, cross references, and special instructions for the underlying offense).

The "Reason for Amendment" offers no authority for including a Chapter Three adjustment in determining the "borrowed" offense severity level to be used in Step One.

The offense level for Count 1, as calculated under Chapter Two, is Level 34 [*see* Presentence Report, ¶¶22 and 23]. The report should have used Level 34 as the Base Offense Level for Counts 119 and 137, but instead, the report used the Chapter Three-adjusted level of 38 [*see*, Report, ¶29].

A correct application of the guidelines for Counts 119 and 137 would be as follows:

| | |
|---|---|
| Step One [Base Offense Level] | 34 |
| Step Two [Specific Offense Characteristic, conviction under §1956, Guidelines §2S1.1(b)(2)(B)] | + 2 |
| Step Three [Chapter Three Role in the Offense] | +2, 3 or 4[2] |
| Less Credit for Acceptance of Responsibility | - 3 |
| Total Offense Level | 35, 36, or 37 |

---

[2] For reasons set forth above, it may be appropriate to add some leadership points under Step Three, once the mistake in Step One has been corrected for. See the discussion contained in our letter of objections to the presentence report, dated May 14, 2008, at pp. 2-5. We do not feel that it is necessary to add anything to the argument presented in our letter.

We have found no case approving of the use of a "borrowed" Chapter Three role enhancement in calculating the Base Offense Level for scoring a related money-laundering conviction.[3]  Doing this results in impermissibly double-counting the leadership factor.

In short, the Total Offense Level here should be at least four levels less – and possibly six levels less – than the Level 41 contained in the presentence report.  Assuming for purposes of argument that presentence report has overstated the money-laundering offense level by *only* four levels (and thus, that the correct level is Level 37), the guidelines recommend a range of 210 to 262 months.  Even at the high end, this range is more than eight years less than the stipulated 360-month sentence found in the plea agreement.

The disparity between the correctly-calculated guidelines range and the Rule 11(c)(1)(C) plea-agreed sentence is a matter that the court should consider in deciding whether or not to accept the plea agreement.

---

[3]  In our letter of objections, at the top of page 2, we cited *United States v. Syrax*, 235 F.3d 422 (9th Cir. 2000).  The case held that money-laundering and the fraudulent conduct from which the laundered funds were derived did not "group" together under the guidelines, and thus, separate role adjustments for the fraud and money-laundering counts were appropriate.  235 F.3d at 428.  *Syrax* was in effect overruled by Amendment 634, and as a result the case is not particularly germane to our argument.  Moreover, we agree that a separate role enhancement may be imposed in calculating the guidelines sentence for money-laundering (Step Three).  Our objection is to the inclusion of the Chapter Three role enhancement in Step One.

## IV.

## THE DISPARITY BETWEEN THE AGREED SENTENCE AND
## THE SENTENCES OF CO-DEFENDANTS

The plea-agreed sentence is premised on affixing, on Mr. Ranes, *Pinkerton* liability for the death of Thomas Cody. However, assuming that Cody was intentionally murdered – as Dennis Shine has evidently alleged – and did not die accidentally in a struggle with Shine, most of the other members of the conspiracy could have been saddled with the same *Pinkerton*-based responsibility. Each of those listed in the following table had knowledge of the violent propensity of the ringleader of the conspiracy and could have foreseen that someone might die in drug-related violence, but as the table shows, no one else who for that reason could have faced *Pinkerton* liability will receive anything close to 30 years.

| DEFENDANT | COUNT OR COUNTS INVOLVED IN PLEA AGREEMENT | SENTENCE IMPOSED, OR OFFENSE SEVERITY LEVEL AND SENTENCING RANGE PROJECTED IN PLEA AGREEMENT |
|---|---|---|
| Dylan Bales | Count 2 – Drug Conspiracy | Level 27 – 70 to 87 months |
| Curtis H. McDonald | Count 1 – Marijuana Conspiracy | Level 25 – 57 to 71 months |
| Kevin Browning | Count 1 – Drug Conspiracy | Level 25 – 57 to 71 months |
| Robert H. McDonald | Count 2 – Marijuana Distribution Conspiracy | Level 25 – 63 to 78 months |
| Joshua S. Murphy | Count 2 – Marijuana Distribution Conspiracy | Level 31 – 135 to 168 months |
| Justin Killian | Count 2 – Marijuana Conspiracy | Level 27 – 87 to 108 months |
| Rodney Rhoden | Count 1 – Marijuana Importation Conspiracy | Level 25 – 57 to 71 months |
| William T. Yancey | Count 2 – Marijuana Distribution Conspiracy | Level 21 – 46 to 57 months |
| Yin Tak Miu | Count 2 – Marijuana Distribution Conspiracy | Level 25 – 63 to 78 months |

Moreover, at least three more individuals, identified in the presentence report as "CS"s, could have faced the same exposure.

The disparity between the anticipated sentences of the other conspirators and the Rule 11(c)(1)(C) plea-agreed sentence is a matter that the court should consider in deciding whether or not to accept the plea agreement.

This disparity is particularly troublesome in light of the fact that Mr. Ranes has no history of violence, indeed, no history of significant criminal behavior. Earl Lackey, vice-president of Yukon Equipment, expresses the view that it is hard to believe that Tom Ranes became involved in a major marijuana conspiracy [Exhibit A]:

> Tom has a great love for his family, especially his son, and his live revolved around his children and his work. Tom was always at work at 7AM and knew all the major oil field companies. His shop was always backlogged with work to be done, plus he had a crew of welders working in the oilfield in Prudhoe Bay, Alaska. Tom was always polite, "yes sir," and "yes mam" and "can I help you." He was never, no matter how high the stress, an in your face kind of person.

*   *   *

Mr. Lackey concludes, "Tom Ranes is not a violent man."

Similarly, Ann Miller Robinson, who has known Mr. Ranes all his life, states [Exhibit B]:

> "I've never known Tom to be anything but hardworking and honest. I can't tell you how shocked I (and my entire family) was to hear of Tom's involvement with all this illegal activity. My sons were so surprised and still do not believe that Tom has been or ever will be violent. I feel the same way."

## V.

## CONCLUSION

Thomas P. Ranes is a hard-working, personable young man. In an ideal world, he would not be scheduled to come before the court to be sentenced to a term of incarceration that will deprive him of most of his remaining adult life.

Mr. Ranes used poor judgment in doing welding work – making compartments in which drugs or money could be concealed – for the leaders of an Anchorage-based marijuana importation conspiracy. This misstep led to increasing involvement as he found it necessary to turn to the drug dealers for financing that he unexpectedly needed to complete the construction of a new shop, and they sought to enmesh him further and further. He sought to borrow money, and they in turn required him, and his father, to act as mules before they would make the loan.

After nearly two years of pretrial litigation, Mr. Ranes made a decision – with which he is quite openly dissatisfied – to accept the government's offer, made pursuant to Fed. R. Crim. P, Rule 11(c)(1)(C), of a 30-year prison sentence. For the reasons set forth above, the plea agreement is flawed. It calls for an unreasonably severe sentence.

The court should therefore exercise its authority under Rule 11(c)(1)(C) to reject the agreement and set the case for trial.

DATED this 28th day of May, 2008.

> Respectfully submitted,
>
> LAW OFFICES OF
> ALLEN R. BENTLEY
>
> By: /s/ Allen R. Bentley
>     ALLEN R. BENTLEY
>     WSBA No. 12275
>     Law Offices of Allen R. Bentley
>     1111 Third Avenue
>     Seattle, WA  98101
>     Telephone: (206) 343-9391
>     Fax: (206) 682-3746
>     Email: abentley@concentric.net

CERTIFICATE OF SERVICE

I hereby certify that on May 28, 2008, I electronically filed the foregoing Defendant Ranes's Sentencing Memorandum with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the attorneys for the United States of America, Assistant United States Attorneys Frank Russo and Thomas Bradley.

By: /s/ Allen R. Bentley
ALLEN R. BENTLEY
WSBA No. 12275
Law Offices of Allen R. Bentley
1111 Third Avenue
Seattle, WA  98101
Telephone: (206) 343-9391
Fax: (206) 682-3746
Email:  abentley@concentric.net