NELSON P. COHEN
United States Attorney

FRANK V. RUSSO
THOMAS C. BRADLEY
Assistant U.S. Attorneys
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
(907) 271-1500 (fax)
Email: Frank.Russo@usdoj.gov
        Thomas.Bradley@usdoj.gov

Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 3:06-cr-00041-01-RRB |
| | ) |
| Plaintiff, | ) |
| | ) UNITED STATES' SENTENCING |
| vs. | ) MEMORANDUM |
| | ) |
| THOMAS P. RANES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| _____ | ) |

<u>**SUMMARY OF SENTENCING RECOMMENDATIONS**</u>

**TERM OF IMPRISONMENT**...................... **360 MONTHS**

**SUPERVISED RELEASE**. ........................... **5 YEARS**

**SPECIAL ASSESSMENT**. ........................... **$300.00**

The United States Probation Office ("USPO") has prepared a presentence investigation report ("PSR") in this case. The United States agrees with the factual and legal findings of the USPO.

**I.    BACKGROUND**

The defendant was part of an international drug and money laundering conspiracy that is set forth in detail in the PSR. Initially, the defendant became involved with the conspiracy by welding hidden compartment fuel tanks for Thomas Cody. These fuel tanks were used to transport approximately 100 - 150 pound loads of marijuana across the border from Canada into Alaska. The defendant then began to borrow money from Cody to build a new automotive and welding shop, Ranes & Shine, LLC. In return for the cash loan, the defendant began to take a more active role in the conspiracy by boxing up marijuana that arrived as well as manufacturing compartments with higher capacities for marijuana, such as false beds in pickups and trailers. The defendant had difficulty

repaying Cody, which led to his involvement in money laundering and

international money laundering on behalf of Cody.  The defendant got his father,

James Ranes, involved in transporting marijuana for Cody, and later began driving

himself; his father also facilitated international money laundering on behalf of

Cody.  Cody was put on the payroll of Ranes & Shine as a way to both pay back

the loan and to launder the proceeds of marijuana trafficking that the loan

represented.

The defendant spent whatever money he earned on expensive toys – in

particular, race cars.  This annoyed Cody, as the defendant still owed him a

substantial sum.  Things came to a head in the spring of 2005, when Ranes's

then-wife began to call Cody to threaten to expose his marijuana trafficking

business.  In response, Cody sent someone to threaten Ranes.  Cody also

confiscated one of Ranes's race cars because he was late on a payment of the loan.

Ranes knew of Cody's capacity for violence, as he was told about an incident

where Cody had a former co-conspirator shot when the co-conspirator went into

business for himself.

By this time, the defendant had become instrumental in the management of

the marijuana trafficking business, as Cody removed himself from the dirty work

of coordinating and breaking down the shipments of marijuana. Ranes managed

these functions, with Cody and his partner Joe Bryant providing financing and

distribution contacts, and also receiving the lions' share of the profits. In May

2005, Cody was involved in the purchase of commercial real estate in Odessa,

Ukraine. He needed to send $1 million dollars cash to the Ukraine and arranged

for the money to be sent to Canada for pickup by a courier from Ukraine. Ranes,

being responsible for transportation, arranged to send the $1 million dollars, along

with approximately $600,000 for payment for marijuana, by concealing it in one of

the trucks that was scheduled to pickup marijuana from Whitehorse. As was the

custom, the Canadian drivers would meet the American driver and transfer the

money for the marijuana. However, the Canadian drivers, Kurtis Croy and Kyle

McDonald-Wolochatiuk, were stopped by the RCMP and arrested near

Whitehorse; 225 pounds of marijuana and one ounce of ecstasy was seized.

Cody was irate. Ranes instructed his driver, Curtis McDonald, to continue driving

to Vancouver.

At that point, Ranes came up with a plan. He could erase his debt to Cody

and make himself one million dollars profit by getting rid of Cody. As side

benefits, he would be free from Cody's threats and would assume a greater role in

the marijuana conspiracy, with an increased share of the profits.  Over the course of a few days, Ranes convinced Dennis Shine to kill Cody by telling Shine that he would get one-half million dollars for doing it.  In the meantime, Ranes lied to Cody and told him he was arranging for the money to be brought back to Alaska, rather than have the money exchange occur in Canada.  Cody made arrangements for the courier from Ukraine to come to Alaska to pick up the money.  Ranes spoke to Shine using two prepaid cellular telephones to discuss the details of the murder and disposal; Shine used his normal cellular phone.

However, Ranes never had any intention of bringing the money back to Alaska – at least not immediately.  Instead, he told Curtis McDonald to give it to Daniel Kneitel, one of the sources of supply for marijuana in Canada.  While this was happening, Shine was attempting to get up the nerve to kill Cody; he had manufactured a silencer for his 9 mm Beretta pistol at the Ranes & Shine shop. Shine backed out of three prior attempts before finally hiding in Cody's house and shooting Cody when he returned home at approximately 2:30 pm on June 1, 2005. Shine called Ranes for help after Cody was shot, but Ranes claimed he was "too busy at work" to help Shine with Cody's body.

Initially, Shine drove south to Portage, where he planned to bury Cody. The plan was for Ranes to meet Shine there to help. However, Ranes called Shine from Girdwood and told him that he had stopped to get gas in Girdwood and the surveillance cameras spotted him. Therefore, Ranes returned to Anchorage and suggested to Shine that they go to Jim Creek to bury Cody. Ranes told Shine he would meet him in Jim Creek to help. Shine went to Jim Creek but Ranes delayed going out to help. By the time Ranes got out there, Shine had just finished burying Cody and Ranes helped cover up the grave and burn the car Cody had been driving (which was actually Ranes's wife's car). Shine then drove up to Fairbanks while Ranes got a ride to Anchorage from one of Ranes' employees. Ranes confessed what he and Shine had done to the employee. Cellular telephone tower information corroborate the movements of both Ranes and Shine.

Tom Cody remained missing, and police had few leads into his disappearance. The arrival of the courier from the Ukraine contemporaneously with Cody's disappearance did nothing to alleviate the mystery; if anything, his questions to Cody's neighbor regarding whether "the package" was safe did more to deflect suspicion from Ranes. Ranes himself then began a campaign to deflect attention from himself, pretending to be scared, then later claiming that Cody must

have fled to Ukraine or Colombia.  In fact, Cody had tickets to go to Colombia later that month.  Cody's business partner, Joe Bryant, was mystified by Cody's disappearance.  Bryant answered the police's questions after retaining a lawyer; Ranes initially answered questions, but then refused once he had retained his own lawyer.

Meanwhile, Ranes schemed to get the million dollars back from Canada. He sent Curtis McDonald to Vancouver to put the money into storage until things calmed down in Alaska.  In late July 2005, McDonald returned with the money and gave it to Ranes.  Ranes, in turn, claims he used it to "pay the Russians" and Joe Bryant.  No corroboration can be found of this claim.  Moreover, Joe Bryant committed suicide in early May 2006, after learning that he was about to be indicted for his role in the conspiracy.

In or around September 2005, Ranes resumed the marijuana importation business, using Bryant as necessary to finance loads of marijuana, and sometimes sneaking marijuana in behind Bryant's back, thus cutting him out of the profits. He recruited his friends from the construction industry to participate with him: Kevin Browning, Dylan Bales, and Justin Killian.  He used some of Josh Murphy's old distribution contacts.  He spent the marijuana proceeds as quickly as

he made them, purchasing high priced assets, including customized vehicles such as a boat, a Hummer, and even a golf car for use in his auto racing hobby; he also used the money to keep his business afloat, and bought a new house with state of the art appliances. However, he still needed more people to sell marijuana to. It was his greed that was his ultimate undoing, as he befriended a business associate who claimed to have an interest in buying large amounts of marijuana. What Ranes did not know was that this business associate was an informant for the DEA.

Ranes showed the business associate his operation, how he got marijuana into the country, and told him when the next shipment was scheduled to arrive. A pole camera set up by investigators captured the arrival of the truck hauling a fifth wheel trailer into a warehouse on 84th Street in Anchorage. After the trailer arrived, over a dozen cardboard boxes came out of the warehouse. Shortly thereafter, the business associate first bought 10 pounds from Ranes. As partial payment, the business associate offered to launder some of Ranes's money through an undercover shelf account. This money was transferred to Ranes account, where it was used by Ranes to make payroll for his shop and to pay overdue employee payroll taxes to the IRS. Despite freeing himself from his debt to Cody, Ranes

was still in large amounts of debt.  This was confirmed by Title III wiretaps, which captured Ranes attempting to borrow from everyone he knew to pay for the next load of marijuana.

He managed to get some money from co-conspirators and sent Kevin Browning for the next marijuana load.  By this time, investigators had linked Ranes to two additional prepaid cellular telephones that he was using to conduct drug related conversations.  Investigators obtained additional wiretap orders for these phones, and were soon listening to Ranes speak freely about the details of the next shipment, including talking to his two sources of supply.  Investigators had help from the RCMP in identifying these sources, and the RCMP kept tabs on Browning throughout Canada.  In fact, Browning got a flat tire on this way back to Alaska, and was helped by an RCMP unit.  After Customs and Border Protection were instructed to waive Browning through to Alaska, Ranes called Bryant to joke about how the cops were unwittingly helping them smuggle marijuana.  Ranes did not know that every word he spoke on the phone was being intercepted at the DEA building in Anchorage, and that no less than 100 state and federal officers were surveilling Browning and waiting to execute fifteen search warrants.

Finally, the conspiracy came to an end on April 22, 2006, just after lunchtime. Investigators broke into the Quonset hut behind Ranes and Shine shop, where Ranes, Browning, and Robert McDonald were in the middle of boxing up 307 pounds of marijuana. Search warrants were executed on homes and storage units; money, assets, drugs and firearms (including one automatic weapon) were seized. Later, investigators discovered exactly what happened to Thomas Cody, and uncovered him in a shallow grave about 75 yards from the river, and about 300 yards from the burned out vehicle that was found in the Jim Creek area in June 2005.

## II.    THE PLEA AGREEMENT

The defendant pled guilty to counts 1 (conspiracy to import marijuana), 119 (money laundering), and 137 of the Second Superseding Indictment. The defendant also admitted legal culpability for the murder of Thomas Cody: "The murder fell within the scope of the unlawful agreement and I could have reasonably foreseen that it would be a necessary and natural consequence of the unlawful agreement, that is, it was foreseeable to me that a firearm would be used in the course of the conspiracy and that a death would result from such use ." Plea Agreement, p. 8. Thus, a jury could have assigned blame to Ranes for the murder

either under the government's theory that he aided, counseled, commanded, induced or procured the offense under 18 U.S.C. § 2[1]; or under the theory that Ranes agreed to admit to, which was culpability under Pinkerton v. United States, 328 U.S. 640 (1946), which held that a defendant could be held liable for a substantive offense committed by a co-conspirator as long as the offense occurred within the course of the conspiracy, was within the scope of the agreement, and could reasonably have been foreseen as a necessary or natural consequence of the unlawful agreement. See United States v. Alvarez-Valenzuela, 231 F.3d 1198, 1202 (9th Cir. 2000). There would have been no way to tell which theory a jury adopted in assignment of guilt.

Thus, the parties agreed on a 30 year sentence along with forfeiture of every penny and every asset seized during the course of the investigation. This sentence is within the parties' (as well as the USPO's) estimate of the defendant's advisory guideline range.

---

[1]     See United States v. Vaanderling, 50 F.3d 696, 702 (9th Cir. 1995)(an aiding and abetting instruction is proper even where the indictment does not specifically charge that offense, since all indictments are read to embody that offense in each count); Ninth Circuit Model Criminal Jury Instruction 5.1.).

### III.    The PSR and the Defendant's Objections

The defendant lodged several objections to the PSR.  If the Court accepts the parties plea agreement, the objections are inconsequential.  Nonetheless, the defendant objects to receiving leadership enhancements for both drug trafficking and money laundering.  The defendant does not dispute the leadership enhancement for drug trafficking.  However, he first legally disputes application of the money laundering enhancement, which argument appears foreclosed by the case of United States v. Syrax, 235 F.3d 422 (9th Cir. 2000), cited by the defendant.  However, the defendant makes a more practical point and perhaps more persuasive that he was a leader/organizer of a different money laundering scheme.  This simply involved giving cash to Browning and Bales to obtain cashier's checks made out to Ranes & Shine.  The defendant was not the leader or organizer of the more sophisticated money laundering scheme of Cody, which involved the structured deposits of money in Alabama for wire transfer to Odessa, Ukraine.  At most, because the defendant was the organizer of certain money laundering activities, and the organization was "otherwise extensive", he may qualify for a four level enhancement.  See U.S.S.G. § 3B1.2, application

notes 2 & 3.  At least, he would qualify as a manager / supervisor of money

laundering activities, requiring a three-level enhancement.  U.S.S.G. § 3B1.2(b).

The defendant's other objections are semantic in nature and not necessary to

resolution of any guideline issues.  Thus, the defendant's total offense level is 41

under the PSR's estimate; it is level 40 otherwise.  Either way, the defendant's

advisory guideline sentence falls within the range of 292 to 405 months.

## III.     APPLICATION OF 18 U.S.C. § 3553(a)

Application of the factors set forth in 18 U.S.C. § 3553(a) supports the

imposition of 360 month sentence.  The activity in which the defendant chose to

involve himself is among the most serious encountered in the District of Alaska.

The defendant was once a hard worker with valuable skills as a welder.  Despite

the fact that he had no criminal record, he chose to involve himself with some

nefarious characters who initially used him for those very skills.  The next thing he

knew, he was knee-deep in a violent international drug conspiracy.  Instead of

getting out while he could, he waded out to water well above his head, eventually

replacing his ambition to become a successful businessman with becoming a

successful drug trafficker.  Along the way, he placed his family and friends at risk

by associating with Tom Cody.  Instead of doing the right thing, the law abiding

thing, and the rational thing, he chose to take matters into his own hands by plotting the murder of his aggressor and the person to whom he owed hundreds of thousands of dollars.

Make no mistake, however:  the defendant's motives had more to do with greed than a pre-emptive strike on a person who was threatening his family and his own personal safety.  The defendant wanted to live the life of a drug kingpin, with all the accouterments befitting such a person:  race cars, large houses, expensive vehicles, and boats.  He saw an opportunity to be free from a large debt and take over a lucrative drug trafficking business, which he believed would in turn allow him to keep alive his legitimate business.  Once Cody was dead, he attempted to live the life of a kingpin and ended up attracting attention from law enforcement. This led to his demise.

Unfortunately for him, the defendant had little talent for legitimate business and even less talent for illegal business.  His talents lied in his ability to manipulate people, which he did quite successfully, even perpetrating the ultimate manipulation:  convincing someone with no criminal record to commit a murder. The defendant now must face the consequences for this manipulation, and for his participation in a multi-year, multi-defendant drug and money laundering

conspiracy.  Given the circumstances surrounding the defendant's involvement,

both mitigating and aggravating, the United States submits that a 30 year sentence

is appropriate, followed by five years of supervised release.  $300 in special

assessments are mandatory.

RESPECTFULLY SUBMITTED this  28th  day of May, 2008 in

Anchorage, Alaska.

NELSON P. COHEN
United States Attorney

s/ Frank V. Russo
Assistant U.S. Attorney
Federal Building & U.S. Courthouse
222 West Seventh Avenue, #9, Room 253
Anchorage, Alaska  99513-7567
(907) 271-5071
(907) 271-1500 (fax)
Frank.Russo@usdoj.gov


I declare under penalty of perjury that a true and correct copy of the foregoing
was sent to the following counsel of record on May 28, 2008, via:

(X) Electronic case filing notice

Allen Bentley, Esq.

Executed at Anchorage, Alaska, May 28, 2008

s/ Frank V. Russo
Office of the U.S. Attorney


U.S. v. Thomas P. Ranes
3:06-cr-00041-01-RRB                    15